**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| KIM SCHELLING, Individually and on behalf of all others similarly situated,<br><br>     Plaintiff,<br><br>     v.<br><br>MICROVAST HOLDINGS, INC., YANG WU, CRAIG WEBSTER,<br><br>     Defendants. | **Case No: 4:23-cv-4565**<br><br>**AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>**JURY TRIAL DEMANDED** |

## <u>TABLE OF CONTENTS</u>

I.   INTRODUCTION ........................................................................................................1

II.  JURISDICTION AND VENUE ...............................................................................5

III. PARTIES AND FORMER MICROVAST EMPLOYEES .................................6

IV.  DEFENDANTS COME TO U.S. SHORES THROUGH A SPAC ....................8

V.   DEFENDANTS MADE FALSE STATEMENTS ABOUT RECEIVING A GRANT FROM THE DEPARTMENT OF ENERGY ........................................................10

    A.   Department of Energy Grant Award Process ........................................ 10

    B.   Congress Enacts the Bipartisan Infrastructure Law to Bootstrap American Green Energy Infrastructure ...............................................................................11

    C.   Microvast Misleadingly Minimizes Its Chinese Operations to the Department of Energy ................................................................................................... 14

    D.   Microvast's Misstatements Create A Risk that Its Application Will Be Denied at the Negotiation Stage ................................................................................ 20

VI.  MICROVAST OVERSTATED THE CLARKSVILLE FACILITY'S PROGRESS ....22

    A.   For Almost A Year, Microvast Tells Investors Construction of the Clarksville Facility Is Nearing Completion .............................................................. 22

    B.   Microvast Publicly Overstated the Progress of the Clarksville Facility's Construction ............................................................................................ 26

    C.   Microvast Conceals that the Clarksville Facility's Critical Vendor Was Blowing Through Deadlines .................................................................................. 29

VII. DEFENDANTS' ACTIONABLE STATEMENTS .............................................32

    A.   Defendants Falsely Stated that Microvast *Had Received* a Department of Energy Grant ................................................................................................... 32

    B.   Defendants Falsely and Misleadingly Overstated the Clarksville Facility's Progress .................................................................................................... 39

**VIII. DEFENDANTS' MISSTATEMENTS CAUSE PLAINTIFFS' LOSSES**......................49

    **A. The Department of Energy Terminates Grant Negotiations** ................................. 49

    **B. Microvast Suspends Construction of the Clarksville Facility and Reveals It Is $150 Million and 6-8 Months Behind** ................................................................ 51

**IX. ADDITIONAL FACTS FURTHER PROBATIVE OF SCIENTER** .............................53

    **A. Defendants Made Their Statements About the Department of Energy Invitation to Negotiate With Scienter** ................................................................ 53

        *1. The nature of the statements and Defendants' knowledge that investors were closely monitoring the invitation to negotiate supports scienter* ........................... 53

        *2. The same executives who led Microvast's efforts to obtain the grant also approved and/or furnished information to be used in false statements about the grant* .............................................................................................. 54

        *3. Microvast's misstatements to the Department of Energy were deliberate* ........ 54

        *4. The Barrasso and Lucas letters drew Microvast's attention to the misstatements in the Application* ................................................................... 55

    **B. Defendants Knew or Were Reckless In Not Knowing that their Statements About the Clarksville Facility** ................................................................ 55

        *1. Wu's March 2023 statement that he had just seen all the equipment for the Clarksville Facility contradicted his own recent experience* ................................... 55

        *2. Wu and Smith personally witnessed development of the Clarksville Facility on a regular basis* ....................................................................................... 56

        *3. A direct subordinate of Smith knew as of Microvast's Investor Day that Lyric could not possibly meet the deadlines Lyric touted on that day* .............................. 57

        *4. Webster's false exculpatory statements support scienter* ................................... 57

        *5. Defendants' statements concerning the Clarksville Facility were specific* ...... 58

        *6. Wu's December 2023 false statements made from within the Clarksville Facility that it was nearly complete supports an inference that they made the earlier statements about the Clarksville Facility with scienter* ........................................... 59

        *7. The difference between the facts Microvast claimed during the Class Period— that it was putting the finishing touches on Clarksville—and the true facts—that the delays and costs of the Clarksville Facility were causing substantial doubt about Microvast's ability to continue as a going concern—supports an inference of scienter* ............................................................................................... 59

**X.    PLAINTIFFS' CLASS ACTION ALLEGATIONS** ..........................................................60

**XI.    PRESUMPTION OF RELIANCE** ..........................................................................62

**XII.  THE STATUTORY SAFE HARBOR AND BESPEAKS CAUTION DOCTRINE ARE INAPPLICABLE** ..............................................................................................................63

**XIII. COUNT I** .................................................................................................................64

**XIV. COUNT II** ...............................................................................................................67

**PRAYER FOR RELIEF** ....................................................................................................68

## <u>LIST OF DEFINED TERMS</u>

Act — Infrastructure Investment and Jobs Act, also known as the Bipartisan Infrastructure Law.

Application —Microvast's application for a $200 million grant from the U.S. Department of Energy.

ASRS — Automated Storage and Retrieval System.

Clarksville Facility — Microvast's facility in Clarksville, Tennessee.

Class — all persons or entities who purchased the publicly traded common stock of Microvast Holdings, Inc., from October 19, 2022, through April 1, 2024, both dates inclusive.

Class Period — all persons or entities who held shares through May 22, 2023, and/or April 1, 2024.

Exchange Act — Sections 10(b) and 20(a) of the Securities Exchange Act of 1934.

Hopkinsville Facility — Microvast's facility in Hopkinsville, Kentucky.

June 21, 2023 hearing — House Oversight and Investigations Subcommittee hearing titled *Microvast and More: Oversight of President Biden's Energy Spending Spree*

Lyric — Lyric Robot Automation Co., Ltd., the key equipment supplier for the Clarksville Facility

**<u>VENUES IN WHICH DEFENDANTS MADE FALSE STATEMENTS</u>**

October 19, 2022 — Tweet

November 2, 2022 — Press Release

November 10, 2022 — call to discuss Microvast's Q3 2022 earnings, referred to as Q3 2022 earnings call

February 15, 2023 — Baird Vehicle Technology & Mobility Conference

March 16, 2023 — Call to discuss Q4 2022 earnings, referred to as Q4 2022 earnings call.

May 9, 2023 — Call to discuss Q1 2023 earnings, referred to as Q1 2023 earnings call.

May 25, 2023 — Investor Day, referred to as Investor Day.

August 7, 2023 — Call to discuss Q2 2023 earnings, referred to as Q2 2023 earnings call.

August 8, 2023 — Oppenheimer Technology, Internet & Communications Conference, referred to as August 8 call

November 9, 2023 — Call to discuss Q3 2023 earnings, referred to as Q3 2023 earnings call.

December 13, 2023 — Fireside Chat with Cantor Fitzgerald, referred to as Cantor interview.

April 1, 2024 — Call to discuss Q4 2023 earnings, referred to as Q4 2023 earnings call.

AMENDED CLASS ACTION COMPLAINT - v

Lead Plaintiffs Steve Rodgers and Gregory L. Dunham, and Named Plaintiff Randy Fonk, individually and on behalf of all other persons similarly situated, by their undersigned attorneys, for their complaint against Defendants (defined below), allege the following based upon personal knowledge as to themselves and their own acts, and information and belief as to all other matters. Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I.    INTRODUCTION

1.    This is a securities class action brought on behalf of all persons or entities who purchased the publicly traded common stock of Microvast Holdings, Inc., from October 19, 2022, through April 1, 2024, both dates inclusive ("Class Period") and who held shares through May 22, 2023, and/or April 1, 2024 ("Class"). Plaintiffs bring claims under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act").

2.    Microvast was founded in 2006 as a Delaware corporation and trades on a U.S. exchange. Notwithstanding these nominal U.S. connections, Microvast has conducted substantially all its business through its Chinese subsidiary. Microvast develops its intellectual property in China, manufactures its product (batteries for commercial electric vehicles) in China, and makes most of its sales to companies located in China. As of March 2021, almost 95% of Microvast's employees were based in China. Microvast receives lavish subsidies from Chinese governments and hosts a Chinese Communist Party cell. Because its operations occur almost entirely in China, Microvast is subject to the plenary authority of the Chinese Communist Party.

3.    In 2021 and 2022, the U.S. Congress passed two laws creating subsidy programs to support a nascent U.S. green energy industry. These were the Bipartisan Infrastructure Law and the Inflation Reduction Act. In administering these laws, the administration stated time and time again that they were focused on standing up an industry to compete with China.

AMENDED CLASS ACTION COMPLAINT - 1

4.      In May 2022, the Department of Energy announced that it would award $3 billion total in grants to help U.S. battery companies develop their U.S. operations. The source of the funds was money allocated by the Bipartisan Infrastructure Law.

5.      By letter of intent in May 2022, and formally in July 2022, Microvast applied for a $200 million grant from the U.S. Department of Energy ("Application"). The Application was not publicly released.

6.      In its Application, Microvast inverted its geographic structure.  Microvast claimed it was a U.S. company operating out of the U.S. with some operations in other countries, including China. Microvast claimed to have manufacturing operations, and to have developed intellectual property, in the U.S. and Europe, relegating China to a tertiary position. In the Application, Microvast described its operations in China—or "Asia", as Microvast usually called it—as just another of its international offices, rather than the site of substantially all its operations.

7.      Microvast's Application initially encountered success. On October 19, 2022, Microvast announced that it had been "***selected as a recipient*** of a $200 million grant." But the Department of Energy had done no such thing. Instead, it had invited Microvast to negotiate for a grant. The Department of Energy conducts more comprehensive due diligence, including verifying the application's veracity, ***after*** beginning negotiations.

8.      And there was a hitch, known to Microvast, but not investors. Reasonable investors would think that Microvast had been forthright in its Application, including in disclosing the Chinese government's potential influence. Reasonable investors would assume that the Department of Energy had then actually considered the influence and decided to proceed with a grant anyway. Yet because Microvast had concealed potential Chinese influence in the Application, the Department of Energy had reached no such conclusion.

AMENDED CLASS ACTION COMPLAINT - 2

9.      Microvast may have counted on bureaucratic inertia to push the negotiations through to final approval, notwithstanding whatever the Department of Energy learned in its due diligence. But beginning in December 2022, Congressman Frank Lucas, and Senator John Barrasso publicly released a series of letters calling the Department of Energy's attention to Chinese influence over Microvast. These letters would not have alarmed reasonable investors, who had every reason to believe that Microvast had been forthright in its Application, including about its connections to China. But with this publicity, Department of Energy could not simply ignore Microvast's statements and potential Chinese influence.

10.     So, it was a surprise to investors that on May 22, 2023, after trading hours, Bloomberg reported that the Department of Energy terminated grant negotiations. Microvast's stock price fell 45.2% the next day.

11.     Meanwhile, Microvast's other plans to exploit U.S. subsidies were souring, too. Microvast was building a facility in Clarksville, Tennessee, that would make its state-of-the-art battery ("Clarksville Facility"). The Clarksville Facility looked like a slam dunk. As of mid-2023, before it was even completed, the Facility already had several hundred million dollars of backlog. Moreover, Microvast would receive subsidies from the Inflation Reduction Act for every battery the Clarksville Facility sold amounting to about 25% of the sale price, so that once built, the Clarksville Facility would immediately be profitable.

12.     Yet Microvast was falling further and further behind its scheduled completion date of Q4 2023. On the procurement front, the Clarksville Facility's main equipment manufacturer, Lyric Robot Automation Co., Ltd., responsible for 65-75% of the equipment, blew through an April completion deadline, then a May deadline, then two other deadlines. By August 2023, Lyric had still not even shipped any equipment to the Clarksville Facility, guaranteeing that Clarksville

AMENDED CLASS ACTION COMPLAINT - 3

would not get any Lyric equipment before mid-October 2023 at the latest. Construction was also falling further behind, with key portions of the building still missing. To make matters worse, towards August 2023, key contractors began to walk off the job as Microvast stopped paying their bills, effectively killing any chance of completing the Clarksville Facility.

13.    To conceal the delays and cost overruns, Microvast made false and misleading statements about the existing state of the equipment procurement and of construction. In March 2023, Microvast CEO Defendant Yang Wu told investors he had seen all the equipment that would go into the Clarksville Facility laid out on the factory floor ready for factory acceptance testing. That could not have happened: a Microvast employee reports that in May 2023, the employee visited Lyric's offices—and found that almost none of the equipment had even been assembled, and only one machine was ready for testing. At a high-profile May 2023 event, Microvast's Chief Operating Officer Defendant Shane Smith told investors that the Clarksville Facility had been built, utilities were installed, and equipment was scheduled to ship from June through September. Not so. Not only did the facility not have utilities, because it took 8 weeks from shipment to arrival, Smith already knew that through July, Microvast would only receive one tiny shipment. The rest of the equipment had not yet received factory acceptance.

14.    By December 2023—the completion date Microvast had cited to investors just four months before—the Clarksville Facility was just a "shell". It lacked key physical infrastructure and had installed very little equipment. And there was little prospect of continuing construction; the contractors had reduced headcount by upwards of 50-75% because of Microvast's non-payment, and work had slowed to a crawl. And Defendants' false statements became ridiculous. On December 13, literally sitting in a half-built Clarksville Facility that had been deserted by Microvast's unpaid contractors, Defendant Wu called into a public interview in which he reassured

AMENDED CLASS ACTION COMPLAINT - 4

investors that the Facility neared completion and that it was effectively done with capital expenditures.

15.     On April 1, 2024, after trading hours, Microvast announced that it was suspending work on the Clarksville Facility and that its contractors had filed some $31.9 million of mechanics' liens. Shockingly, Microvast admitted that it had completed only 50% of the total $300 million capital expenditures, which is precisely where Microvast had said it stood in May 2023, almost a year before.

16.     On April 2, 2024, Microvast's stock price fell 34.1%, damaging investors.

17.     Microvast tried to fake it till it made it. In its application to the Department of Energy for a grant that it would use to develop U.S. operations, and in its statements about progress towards completion of the Clarksville Facility, Microvast presented as already existing construction that it hoped it could pull off in the future. Yet Microvast never did make it. Today, its shares trades at less than $0.50—down 77% from its closing price at the beginning of the Class Period.

## II.    JURISDICTION AND VENUE

18.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

19.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, and Section 27 of the Exchange Act (15 U.S.C. §78aa).

20.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)) as the alleged misstatements entered and the subsequent damages took place in this judicial district.

AMENDED CLASS ACTION COMPLAINT - 5

21. In connection with the acts, conduct and other wrongs alleged in this complaint, Defendants (defined below), directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications and the facilities of the national securities exchange.

## III.    PARTIES AND FORMER MICROVAST EMPLOYEES

22. Plaintiffs Steve Rodgers and Gregory L. Dunham, as set forth in their certifications which were previously filed and are incorporated by reference, purchased Microvast securities during the Class Period and were damaged thereby.

23. Plaintiff Randy Fonk, as set forth in his certification which is attached as an Exhibit to this Complaint and incorporated by reference, purchased Microvast securities during the Class Period and was damaged thereby.

24. Defendant Microvast "design[s], develop[s] and manufacture[s] battery components and systems primarily for electric commercial vehicles" and, since 2022, for "utility-scale energy storage systems." Nominally headquartered in Texas, Microvast conducts a substantial majority of its activities in Huzhou, Zhejiang province, China.

25. Defendant Yang Wu founded Microvast in 2006 and has been its CEO and Chairman ever since. Wu controls Microvast both through his positions and his ownership of more than 25% of its shares.

26. Defendant Craig Webster served as Microvast's Chief Financial Officer from April 2022 through April 2024. He also served on its Board from July 23, 2021 to July 1, 2022. Webster became a director of a Microvast subsidiary in 2011.

27. Defendant Sasha Kelterborn served as Microvast's Chief Revenue Officer from June 2021 to April 2024. He also served in senior roles responsible for Microvast's non-China operations, often at the same time. For instance, he served as the Managing Director of both

AMENDED CLASS ACTION COMPLAINT - 6

Microvast EMEA and Microvast UK from June 2017 through April 2024. He simultaneously served as Senior Vice President for the Western Globe region from 2018 through 2021, and as Microvast President from April 2022 to January 2023.

28.    Defendant Shane Smith served as Microvast's Chief Operating Officer from July 2021 through August 7, 2023, at which point he was demoted to Chief Procurement Officer. Smith resigned two weeks later. According to FE 3, Smith had an office in Microvast's Clarksville facility for FE 3's entire employment at Microvast, February 2023 through August 2023.

29.    Defendant Zach Ward was appointed as Microvast's President on August 1, 2022 and Senior Vice President on January 2022. Ward abruptly resigned from Microvast on February 5, 2024.

30.    Defendants Wu, Webster, Kelterborn, Smith, and Ward are the "Individual Defendants."

31.    FE 1[1] was a Microvast Maintenance Supervisor employed at its Clarksville, Tennessee facility between March 2023 through December 2023. FE 1 was hired ostensibly to lead one of four teams of six technicians who would be responsible for preventive maintenance and fixing equipment when it broke. But because the equipment never came in, Microvast had FE 1 and FE 1's team conduct basic construction tasks like hanging up drywall and repairing bathrooms. Until August 2023, FE 1 reported to FE 3. From mid-August through December 2023, FE 1 reported to Christopher Barbee, who reported to William Muir, Microvast's Vice President – North American Manufacturing and Director of the Clarksville Facility. Muir reported to Smith.

32.    FE 2 worked for Microvast as a Buyer for the Clarksville Facility from May 2023 through August 2023, where FE 2 reported to Joe Muraca, who reported to David Lankewicz,

---

[1] References to numbered "FE" are to former Microvast employees.

AMENDED CLASS ACTION COMPLAINT - 7

Microvast's VP of Global Supply Chain. FE 2 was responsible for purchasing services for the Clarksville Facility. After August 2023, FE 2's responsibilities switched to supporting Microvast's Colorado Facility, serving as both a Buyer and a Systems, Application, and Products Analyst. As a Buyer for the Clarksville Facility, FE 2 was responsible for purchasing services and tools. FE 2 would also field calls and emails from vendors asking to have their overdue bills paid.

33.     FE 3 was the Clarksville Facility's Maintenance Manager. FE 3 was responsible for building out the Clarksville maintenance department that would install, commission, test, and put into operation the equipment at the Clarksville Facility. FE 3 reported to Muir, who reported to Smith. FE 3 worked out of the Clarksville Facility. In early May 2023, FE 3 visited Microvast's Huzhou Facility. While in China, FE 3 also visited the offices and factories of Lyric.

## IV.   DEFENDANTS COME TO U.S. SHORES THROUGH A SPAC

34.     A SPAC (also known as a blank check company) is a publicly traded company established with the purpose of raising capital to find an appropriate acquisition target, and ultimately use the funds it raises through its IPO to "acquire" another company in a reverse merger. After the reverse merger, former shareholders of the legacy private company own most of the public company's shares. It enables private companies to enjoy the advantages of an IPO, such as publicly traded shares and substantial funding, without having to comply with the regulations and disclosures required by traditional IPOs.

35.     SPACs present a potent conflict of interest. If the SPAC's sponsors identify a suitable partner, their so-called sponsor shares, for which they paid nominal consideration, become shares of the public company. If the SPAC cannot find an appropriate target within a specified period of time, usually two years, it returns the money it raised to its public investors and dissolves. The sponsors do not receive compensation for their efforts. Thus, the sponsors stand to make a

fortune no matter how the post-merger company works out and lose everything if they do not close a merger.

36.    Here, the SPAC was Tuscan Holdings Corp. ("Tuscan"), which was sponsored and controlled by Tuscan Holdings Acquisition LLC ("Sponsor"). On July 23, 2021, Tuscan and Microvast, Inc. ("Legacy Microvast") consummated their merger, with Microvast Holdings, Inc. remaining as the surviving entity.

37.    Both Tuscan and Legacy Microvast were desperate to consummate a deal. Tuscan stated in its registration statement that it would target companies in the "cannabis industry" including "businesses that legally cultivate, process, and/or aid in the retail distribution of cannabis." As the registration statement pointed out, Tuscan's sponsors had experience in the cannabis industry. But in late 2020, time was running out. If Tuscan did not close a deal soon, then the Sponsor's founder share would expire worthless.[2] So Tuscan entered into the merger agreement with Legacy Microvast, notwithstanding the Sponsor's employees' complete lack of experience relevant to Chinese high-tech battery manufacturers.

38.    Legacy Microvast needed a cash infusion. Microvast owed substantial debts to CITIC, a Chinese investment bank majority-owned by China's Ministry of Finance. The debt was due in November 2020. Wu needed to leverage the forthcoming cash from Tuscan to convince CITIC to extend payment to March 2021, at which point Microvast could secure a short-term loan to tide it through the consummation of the reverse merger.

39.    As Microvast's then-CFO explained to the Microvast senior management team, including Wu, "[i]f we do not sign the extension agreement, we are immediately in default. Signing

---

[2] Founder Shares refer to the 5,575,000 shares, or approximately 20%, of Tuscan common Stock, purchased by Tuscan Holdings Acquisition LLC in November 2018 for $25,000, costing less than one cent per share.

the extension at least gives us a fighting chance." The CFO emphasized that Microvast was at a "critical moment," and the plan to reach a deal with Tuscan was "the last chance for Microvast fighting [for] its survival."

40.    Microvast received approximately $708 million in the de-SPAC. Microvast told investors it would use most of the cash to fund two major projects, at a total cost of $446 million: an expansion of Microvast's existing Huzhou Facility and the new Clarksville Facility. Each Facility would produce 2 Gigawatt Hour (GWh) of the same batteries using similar factory design. Constructing these twin Facilities would still leave Microvast with about $200 million.

## V.    DEFENDANTS MADE FALSE STATEMENTS ABOUT RECEIVING A GRANT FROM THE DEPARTMENT OF ENERGY

### A.    Department of Energy Grant Award Process

41.    The U.S. Department of Energy's Office of Energy Efficiency and Renewable Energy, which was responsible for issuing the grants Microvast sought, has established a process to evaluate and award grants.

42.    After it receives an application, the Department of Energy conducts a technical/market review. Then, it notifies successful applicants that they have been invited to negotiate for a grant. Major due diligence occurs after the invitation to negotiate.

43.    At a June 21, 2023 House Oversight and Investigations Subcommittee hearing titled *Microvast and More: Oversight of President Biden's Energy Spending Spree*, Principal Deputy Director of the Department of Energy's Office of Manufacturing and Energy Supply Chains David Howell testified that before the selections, the Department of Energy's vetting is limited to "the technical capacity and capabilities of the companies." The real "in-depth vetting beg[ins] the day after [the] announcements" that the company is invited to negotiate a grant. At the time of Microvast's application, the "typical DOE process" involved "look[ing] at the SEC filings of the

company" after the announcement that the company is invited to negotiate a grant. The Department of Energy tells companies in the funding opportunity announcement that it "reserves the right to back out of negotiations without explanation."

44.    At a February 2, 2023, hearing of the Senate Committee on Energy & Natural Resources, the Department of Energy, Department of Energy Deputy Secretary David M. Turk testified that the Department verifies the accuracy of the representations made in the application during the due diligence process that follows an invitation to negotiate.

**B.    Congress Enacts the Bipartisan Infrastructure Law to Bootstrap American Green Energy Infrastructure**

45.    On November 15, 2021, the Infrastructure Investment and Jobs Act, also known as the Bipartisan Infrastructure Law ("Act"), was signed into law.

46.    The Act allocated tens of billions of dollars for investments in green energy infrastructure. The administration made clear that it understood that one of these investments' main purposes was to develop a U.S. green energy industry to compete with China:

a.    The chair of the White House Council of Economic Advisers stated that the Act is "designed to be the most strategic, effective investments so that we can continue to compete against China and other countries that are making bigger investments in their infrastructure."

b.    In remarks made shortly after the Act's enactment, President Biden stated that "because of this law, next year will be the first year in 20 years that American infrastructure investment will grow faster than China's."

c.    In March 30, 2022 testimony before the House Ways and Means Committee, U.S. Trade Representative Katherine Tsai described the Act as a tool to respond to unfair Chinese trade practices and revitalize U.S. manufacturing and infrastructure.

AMENDED CLASS ACTION COMPLAINT - 11

d.  In April 7, 2022 testimony before the Senate Energy and Natural Resources Committee, the Acting Director of Manufacturing and Energy Supply Chains, Vehicle Technologies Office stated that the Act was a solution to concerns that "China has also moved beyond conventional policy support with practices involving questionable environmental policies … and large subsidies throughout the battery supply chain."

47.    On May 2, 2022, Department of Energy Secretary Jennifer M. Granholm announced a new funding opportunity pursuant to the Act, totaling $3.1 billion, for electric vehicle batteries. The Department of Energy's official press release summarizing the announcement quoted Granholm as saying "[r]ight now, the processing of the materials that go into that battery largely happen in China. We don't have any processing in the United States, and [the grants] mean[] more jobs[.]" In the press release announcing the funding opportunity, the Department of Energy stated that "President Biden's historic investment in battery production and recycling will give our domestic supply chain the jolt it needs to become more secure and less reliant on other nations." The press release also quoted Senator Gary Peters as saying that "I was proud to help secure this funding through the Bipartisan Infrastructure Law to lessen our dependence on foreign producers like the Chinese government for these critical technologies."

48.    The Department of Energy then issued a formal Funding Opportunity Announcement titled *Bipartisan Infrastructure Law (BIL) Battery Materials Processing and Battery Manufacturing Funding Opportunity Announcement*.

49.    Letters of intent were due May 27, 2022. Full applications were due July 1, 2022.

50.    The application instructions made clear that the funds were intended to be distributed to U.S. companies. They required that the applicant be a "domestic entity":

AMENDED CLASS ACTION COMPLAINT - 12

To qualify as a domestic entity, the applicant must be incorporated (or otherwise formed) under the laws of a particular State or territory of the United States with majority domestic ownership or control and have a physical place of business in the United States.

51.    The application materials showed that the Department of Energy was specifically concerned about Chinese state influence over applicants. The materials mandated disclosure of any involvement of foreign participants:

All applicants selected for an award under this FOA [Funding Opportunity Announcement] and project participants (including subrecipients and contractors) who anticipate involving foreign nationals in the performance of an award, ***will be required to provide DOE with specific information about each foreign national to satisfy requirements for foreign national participation.*** A "foreign national" is defined as any person who is not a United States citizen by birth or naturalization. The volume and type of information collected may depend on various factors associated with the award. DOE concurrence may be required before a foreign national can participate in the performance of any work under an award.

52.    The application instructions also provided:

The use of battery material supplied by or originating from a foreign entity of concern will not preclude an application from consideration; however, applicants are encouraged to speak to how the project team will minimize the use of battery material supplied by or originating from a foreign entity of concern.

53.    "Foreign entities of concern" include businesses significantly "controlled by, or subject to the jurisdiction or direction of a government of a foreign country that is a covered nation." 42 U.S.C. § 18741(a)(5)(C) (effective since November 2021). China is a "covered nation." 10 U.S.C. § 4872(d)(2)(B).

54.    The statute permitting the grant provided "the Secretary shall (i) give priority to an eligible entity that (I) is located and operates in the United States [] and (V) will not use battery material supplied by or originating from a foreign entity of concern." 42 U.S.C. § 18741(b)(3)(C)). The application materials included a plain English summary of this statutory provision.

55.    In an October 19, 2022 speech announcing that companies had been invited to negotiate $2.8 billion in awards (including Microvast's $200 million), President Biden proclaimed

AMENDED CLASS ACTION COMPLAINT - 13

that the Act was "critically important" because "75% of [] battery manufacturing is done in China." Biden added that "our national labs, our research universities, our automakers led the development of this technology here in America. But by undercutting US manufacturers with their unfair subsidies and trade practices, China seized a significant portion of the market."

56.    In the June 21, 2023 House Oversight and Investigations Subcommittee hearing to discuss the Department of Energy's treatment of Microvast's application, Howell, testified that "help[ing] us compete with China" is "point blank [] exactly what our mission is."

57.    Thus, the application materials showed the Department of Energy's acute concern about Chinese state control over applicants. Because of this stated concern, Microvast's false statements in its application concealing the Chinese government's control over its operations were plainly material.

### C.    Microvast Misleadingly Minimizes Its Chinese Operations to the Department of Energy

58.    Microvast was founded in 2006 and began production in 2011. From 2011 through the present, Microvast has manufactured substantially all its batteries in China.[3]

59.    In the early 2010's, China was Microvast's sole market. More recently, Microvast has expanded into non-Chinese markets, though Microvast still earns most of its revenues from the Chinese market. In 2020, 2021, 2022, and 2023, respectively, Microvast earned 71%, 61%, 65%, and 51% of its revenues from sales in China.

---

[3] Microvast's 2023 10-K, filed April 1, 2024, provides: "As of December 31, 2023, we had an annual manufacturing capacity of approximately 5 GWh cell, module and pack capacity, 600 tons per year of cathode capacity, 3,000 tons of electrolyte capacity and 5 million square meters of separator material capacity on a pilot line. All of this capacity currently originates from our Huzhou, China facility." Microvast also has a small office in Berlin, Germany that, in addition to serving as the headquarters for Microvast's European operations, assembles batteries into packs and modules. The Berlin office, at 185,000 square feet, is barely a tenth the size of Microvast's facilities in Huzhou (1,461,000 square feet).

AMENDED CLASS ACTION COMPLAINT - 14

60.     Microvast applied for a grant to develop a U.S. facility that would mass produce a battery component, the separator.[4] Microvast decided to build the separator facility in Hopkinsville, Kentucky ("Hopkinsville Facility"), a short drive from a battery manufacturing plant Microvast was building in Clarksville, Tennessee ("Clarksville Facility"). Microvast estimated the Hopkinsville Facility would cost $504 million and sought a $200 million grant.

61.     On October 19, 2022, Microvast announced that it had received the $200 million grant. It kept on saying so until, on May 22, 2023, the Department of Energy announced that it had terminated grant negotiations.

62.     Microvast's 240-page application mentioned that it had operations in China only once. In a May 30, 2022 Letter of Support, Microvast claimed that it "was founded in December 2006 (headquartered in Stafford, Texas) and has since grown into a company with more than 1,800 employees worldwide with production sites built or under construction in the United States [], Europe, and China."

63.     In the narrative portion of the application, Microvast explained again that it is "a US majority owned battery solutions provider listed on the NASDAQ [] in 2021 and is headquartered in Stafford, Texas", once again touting its "manufacturing sites in USA, Europe, and Asia." Microvast also stated that it "has grown from its foundation in 2006 in Houston, Texas to become a well-established battery solutions provider with GWh [sic] production capacity (2GWh cell/module/pack installing in TN, 1 GWh module/pack in Berlin, 3 GWh installed [brief redaction] installing in Asia.)" Throughout the Application, Microvast stated, over and over again, that it was a "U.S." or "Texas" company.

---

[4] A battery supplies power through a chemical reaction involving electrons moving from its cathode to its anode. The separator keeps the cathode and anode apart while allowing the flow of electrons.

AMENDED CLASS ACTION COMPLAINT - 15

64.    Yet as of July 2022, when it applied for a grant, Microvast conducted its manufacturing entirely in Huzhou, Zhejiang Province, China. While Microvast also had a small facility in Germany, that facility was limited to assembling batteries into packs and modules. Microvast had barely begun to build the Clarksville Facility, let alone procuring equipment, and even further from installing the equipment and starting production. Microvast has since suspended construction on the Clarksville Facility.

65.    Microvast's Application also stated that "[t]o build its expertise in all levels of the battery manufacturing supply chain, research centers in Orlando, FL, Germany, and Asia have generated >582 patent applications (400 granted)." The statement gave the statement gave the misleading impression that Microvast had conducted a substantial portion of its research in research centers in Orlando or Germany.

66.    In a November 4, 2021 Chinese-language interview with the Chinese press in China, Microvast's CEO had stated that:

> It is a great honor that this is a technology we developed in China, and this technology is all made by the people of China, without any foreigners participating, it is a group of Chinese people who made this technology. [5]

67.    Microvast purportedly located its headquarters in Stafford, Texas, and purportedly built a research center in Orlando, Florida, in 2016. Yet an overwhelming majority of its employees were based in China. As of March 31, 2021 (the last date for which it disclosed the geographic location of its employees), Microvast had 1,255 full-time employees. Of these, 1,185 (94.4%) worked at Microvast's Chinese facilities and offices. ***Twenty*** (1.6%) worked in the U.S.

---

[5] In the first and second clauses, Wu used the terms 我国 and 我国人. These terms translate literally to "our country" and "the people of our country". But they are commonly used in China to refer to "China" and "the people of China", respectively, much like "the Republic", when used here, refers to the United States. Thus, Wu is referring specifically to citizens of China, not people with Chinese ethnic heritage.

68.    As of December 31, 2021, Microvast leased 4,400 square feet in Stafford for its purported headquarters and 1,200 square feet for the Orlando research office. Microvast had 1,461,000 square feet in its Huzhou Facility.

69.    Third, in the Application, Microvast did not disclose its extensive collaboration with Chinese governments, nor the extensive subsidies it received from China.[6] Both the Huzhou municipal government and the Zhejiang provincial government identified Microvast as a key strategic company:

a.    In a 2015 report, Zhejiang province (population 64.6 million) identified Microvast as one of its key electric vehicle industry research institutes. A Microvast executive was also appointed to the Zhejiang government's Expert Committee on New Energy Vehicles.

b.    In 2016, the Huzhou government published a policy document titled *Implementation plan of the Promotion and Application of New Energy Vehicles in Huzhou City*. The report identified four "key enterprises". Microvast was one of them. As a result, the report noted, Microvast would receive focused support from the local government to incubate and demonstrate its electric vehicle batteries.

c.    In Q1 2017, the Huzhou government published a report identifying key projects completed in that quarter. The report identified Microvast's Huzhou factory as a key project. Multiple government officials, including Huzhou's deputy mayor, attended the facility's inauguration.

---

[6] In China, sub-national government entities do not have independent powers. All governments derive their powers from, and are answerable to, the National People's Congress, China's unicameral legislature controlled by the Chinese Communist Party.

AMENDED CLASS ACTION COMPLAINT - 17

d.  In its June 2021 14th Five Year Plan, the Zhejiang provincial government identified Microvast as one of only three key enterprises in the battery field. The report stated that the government would provide substantial resources to support Microvast's growth.

70.    Through these programs and other, Microvast received millions of dollars every year from various Chinese governments.

71.    In addition, Microvast received strategic investments from Chinese state-owned enterprises. For example, in April 2017, a group of institutional investors led by two Chinese state-owned banks bought nearly $400 million of Microvast preferred stock. And on September 27, 2022, Microvast received a $100 million loan from a syndicate of Chinese state-owned banks at a favorable interest rate.

72.    Also, in 2018, Microvast established a company Chinese Communist Party cell.

73.    Pictures from the inauguration show the CCP inauguration meeting was well attended:





*Members swearing an oath to the Communist Party while saluting the Communist Party flag*[7]

---

[7] The Chinese flag has five stars rather the hammer and sickle.

AMENDED CLASS ACTION COMPLAINT - 19

74.    Microvast's then COO and its director of Human Resources attended the meeting.

75.    According to a January 2021 brief from the Center for Strategic and International Studies, in the late 2010's and going into 2020, China began to extend its concept of an "enterprise system with Chinese characteristics" to the private sector. As President Xi Jinping had previously stated in 2016, "[t]he 'characteristic' feature [] of the system of modern State-owned enterprise with Chinese characteristics [] is that it integrates the leadership of the Party into all aspects of corporate governance, embeds the enterprise's Party organization [] in the corporate governance structure, and clarifies and implements the legal status of the Party organization in the corporate governance structure."[8] The presence of a Communist Party cell within Microvast called into question its independence from Beijing.[9]

### D.    Microvast's Misstatements Create A Risk that Its Application Will Be Denied at the Negotiation Stage

76.    The information Microvast concealed could undermine its application. Microvast cannot feasibly wall off the 95% of its employees who work in China. Microvast would have to transmit intellectual property and know-how acquired in constructing and operating the Hopkinsville Facility back to China where the predominance of its operations were. This is plainly a Department of Energy concern—application materials require applicants to disclose each foreign national who would be involved. And even Microvast acknowledges that it cannot prevent the Chinese government or other Chinese entities from seizing its technology. As it stated in its 2021 10-K:

---

[8] Scott Livingston, *The New Challenge of Communist Corporate Governance*, January 15, 2021, Center for Strategic and International Studies available at https://www.csis.org/analysis/new-challenge-communist-corporate-governance
[9] Also undisclosed in the Application is that CDH Griffin Holdings Co. Ltd., an investment firm based in Beijing and focused primarily on investments in China, held more than 13% of Microvast's shares and had a seat on Microvast's Board of Directors.

AMENDED CLASS ACTION COMPLAINT - 20

The validity, enforceability and scope of protection available under the relevant intellectual property laws in the PRC is uncertain and still evolving. Implementation and enforcement of PRC intellectual property-related laws has historically been deficient and ineffective. Accordingly, the protection of intellectual property rights in the PRC may not be as effective as in the U.S. or other developed countries. There can be no assurance that our intellectual property rights will not be challenged by third parties or found by a governmental authority to be invalid or unenforceable. Furthermore, policing unauthorized use of proprietary technology is difficult and expensive, and we may need to resort to litigation to enforce or defend patents issued to us or our other intellectual property rights or to determine the enforceability, scope and validity of our proprietary rights or those of others. Such litigation and an adverse determination in any such litigation, if any, could result in substantial costs, loss of our proprietary rights, and diversion of resources and management's attention.

77.    Indeed, Microvast's Application cited its "patents and a decade of process know-how" as a "strength of the technology because it … would protect Microvast and the proposed US separator plant from copycat facilities being developed in locations with much weaker intellectual property protections [than] the United States." Yet Microvast could not protect any technology and know-how developed after transmission to China, either from the Chinese government or from other competitors there.

78.    Further, the Chinese government may control how Microvast deploys its resources to the Hopkinsville Facility in any number of ways. These include: restrictions on Microvast's ability to transfer revenues earned by its China subsidiary to develop the Hopkinsville Facility; restrictions on Microvast's ability to transfer intellectual property or know-how developed in China to the Hopkinsville Facility; restrictions on Microvast's ability to hire an auditor that is not based in China; and the fact that, as Microvast states in its SEC filings, "legal and judicial systems in China are still rudimentary, and enforcement of existing laws is uncertain[.]"

79.    Finally, that Microvast's operations in China are so much more important than its operations in all other countries creates the risk that Microvast would abandon the rest of the world if changes in Chinese law or the way it is enforced forced it to choose between the two, particularly

AMENDED CLASS ACTION COMPLAINT - 21

given the support Microvast receives from Chinese governments. Any Department of Energy grant might go to waste if Microvast divested itself of its U.S. operations.

80.    For all these reasons, the information Microvast misstated and concealed from the Department of Energy was material to the decision to award a grant.

81.    Thus, when Microvast announced that it had received a $200 million grant on October 19, 2022—actually an invitation to negotiate for a grant—there was a substantial, undisclosed risk that the Department of Energy might terminate grant negotiations when it learned the true facts. That risk materialized on May 22, 2023, when the Department of Energy terminated grant negotiations.

## VI.    MICROVAST OVERSTATED THE CLARKSVILLE FACILITY'S PROGRESS

### A.    For Almost A Year, Microvast Tells Investors Construction of the Clarksville Facility Is Nearing Completion

82.    Microvast boasted to investors that it would build the Hopkinsville and Clarksville Facilities, each of which would dwarf Microvast's existing U.S. operations. Though the former was abandoned after the Department of Energy terminated grant negotiations, Microvast claimed that construction of the latter continued apace.

83.    Microvast's 577,000 square foot Clarksville Facility would have a maximum capacity of 4 GWh. Microvast planned an initial build-out of 2 GWh, which it called Phase 1A. Phase 1A was the only project in progress during the Class Period; all Microvast's references to constructing and equipping the Clarksville Facility were to Phase 1A. After construction, Microvast planned to quickly add an extra 2 GWh of production (called Phase 1B), using tax incentives and borrowing collateralized by the completed Phase 1A project, in the same building as Phase 1A, at a cost of $125-150 million. Microvast would then build a second facility on the

acreage it had acquired and add another 4 GWh. The Clarksville Facility would only produce Microvast's newest, most high-tech battery, not any of its legacy products.

84.    Microvast had already pre-sold much of the Clarksville Facility's production. As Defendant Smith stated at Microvast's May 25, 2023 Investor Day, "[b]uilding these cells, again, back to my opening, more cells, more cells, every cell we build, we have a customer for it. I can't build enough of them to fulfill a backlog that's almost 700 million. I hope you get that message. This isn't about 'can Microvast win business', [it's about] 'can they get qualification? Can they execute? Can the operations team deliver all the demand that has been expressed to us through purchase orders?'"

85.    The Clarksville facility was also attractive because products produced there would be eligible for Inflation Reduction Act subsidies at $45 per KWh produced. 26 U.S.C. §45X.[10] Microvast told investors if it reached 2 GWh capacity, the Clarksville Facility could earn up to $80 million per year from these subsidies. Section 45X subsidies are also transferrable; the transactions are tax-free. To further encourage development, the Inflation Reduction Act provides that these subsidies may be sold before they are earned. Companies could sell the subsidies to generate the cash needed to expand plants. Thus, as Microvast told investors in a slide presented at its May 25, 2023 Investor Day presentation, "Clarksville (up to 8GWh) is self-funding due to IRA credits."

86.    Thus, just completing the Clarksville Facility would be a jolt to Microvast's fortunes.

---

[10] Though technically called "tax credits", the subsidies do not have anything to do with taxes and are paid even to taxpayers with no taxable income.

87.    In November 2022, Microvast stated that "[w]e currently expect Clarksville to begin serial production in Q4 2023." At the time, according to FE 3, Microvast expected Lyric to complete equipment delivery in March/April 2023.

88.    In a March 15, 2023 call to discuss Microvast's Q4 2022 earnings, Defendant Wu told investors that "I went [to China] last week. I saw all the equipment laying on the floor for FAT [Factory Acceptance Testing]." The implication of Wu's statement was that because the equipment was purportedly ready for factory acceptance testing—it had been built and assembled, and the manufacturer had enough confidence in the equipment to permit Microvast to test it—the equipment itself was almost ready to ship to Clarksville.

89.    Then, at Microvast's Investor Day, Smith claimed that "the building with utilities" had been constructed, with the equipment "now being put on boats", set to arrive "through June, July, August, September, all the equipment's coming into Clarksville." According to Smith, once that equipment arrived, it would immediately be installed. As he stated, "as soon as [the Clarksville Facility] equipment lands, we're ready to do that [set it up]."

90.    Moreover, according to Defendants, setting up the Clarksville Facility was "de-risked." In late 2022-early 2023, Microvast completed an expansion of its Huzhou Facility, adding an extra 2 GWh. According to Defendants, because the Clarksville Facility was a "100% mirror" of the Huzhou expansion, Microvast had already solved all the installation problems it would face in Clarksville. As a result, Smith stated in the Investor Day presentation, "we have our China team able to come over to the U.S. saying, hey, I just did this. This equipment looks the same way. We just need to make these changes, this optimization and we've already seen how this is going to work."

AMENDED CLASS ACTION COMPLAINT - 24

91.    In an August call to discuss Q2 2023 earnings, Microvast told investors that the Clarksville Facility was still "on track" to begin production in Q4 2023.

92.    On a November 2023 call to discuss Q3 2023 earnings, Microvast stated that "[o]n the construction side, we are nearly at completion with a majority of the building now under joint occupancy and only minor work remains to be done in the fourth quarter." Likewise, Microvast claimed to have 30% of the equipment on site, while the "majority of the remaining equipment have already been shipped."

93.    According to FE 1, FE 2 and FE 3, Defendants' statements were not true. In early 2023, Microvast began to experience substantial delays in procuring the Clarksville Facility's equipment. Microvast had anticipated that its largest equipment vendor, Lyric, responsible for 65-75% of the equipment, would complete delivery in March or April 2023. This would give Microvast about 9 months to install the equipment, which is about how long it took to install the equipment in the Huzhou Expansion. By February, the deadline had been pushed back to April/May. By May, none of Lyric's equipment had even passed factory acceptance testing in China. By August, none of Lyric's equipment had even been shipped.

94.    Nor was construction on schedule. By May, the Clarksville Facility was just an empty shell with no electricity or any of the infrastructure required to install and run equipment. That had hardly changed by August. But by July/August, contractors had started walking off the job because Microvast was not paying their invoices. Because of the reduced workforce, little was done between August and November/December when Microvast's contractors departed *en masse* because Microvast wasn't paying their bills.

95.    Defendants' descriptions of the progress of the Clarksville Facility were false statements of present fact.

**B.** **Microvast Publicly Overstated the Progress of the Clarksville Facility's Construction**

96. Defendants' statements falsely described the current state of construction of the Clarksville Facility.

97. Microvast was not ready to install equipment when FE 1 started in March 2023 nor when FE 1 left in December 2023.

98. Microvast did not have a building with utilities as of May 2023, as Smith claimed. According to FE 1, even as of June/July 2023 the Clarksville Facility lacked electricity and the floors were not done, among other problems. FE 3 similarly states that as of May 2023, Microvast still had to install electricity. FE 2 and FE 3 report that even as of August 2023, Microvast still had not installed power, except as to certain select functions like HVAC.

99. Moreover, Microvast still had not completed basic parts of the Clarksville facility. For example, Microvast manufactures lithium-ion batteries in areas free of airborne particulates. These areas are called "cleanrooms." According to FE 3, the Clarksville Facility cleanrooms generally had to reach class ISO 7, equivalent to Class 10,000 under Federal Standard 209E. This is the same level used in rooms that test and package semiconductors. Microvast had multiple large cleanrooms to set up throughout the Clarksville Facility. Yet Microvast did not even begin construction until May/June 2023. And when FE 3 left in mid-August 2023, Microvast had only completed cleanroom walls, but not ceilings, doors, or air locks. Moreover, Microvast had only begun work on some, but not all, the cleanrooms. According to FE 3, in August, about 50-60% of the task of building cleanrooms remained.

100. Microvast was also missing major pieces of infrastructure as of May 2023. These included a thermal oil plant, a fire suppression system, 72 receptacles in which cells would receive

their initial charges (each with a fire and smoke detector), a waste-processing system, the Facility's

floors, and a high-temperature room, among many other things.

101.    Microvast also had multiple problems that made completion of construction in

2023, let alone installation of equipment, borderline impossible. For example, according to FE 3,

in June 2023, Microvast discovered that an electric substation breaker that it had installed did not

have sufficient amperage. Microvast needed to install a breaker with capacity of 1,200 amps; until

then, installation of Microvast's equipment would be delayed. According to FE 3, Microvast

sought a 1,200 amp breaker from Schneider Electric, but at the time, 6-month lead times for big

breakers were not unusual. The lead time would delay installation until late 2023. Apparently, if

Schneider Electric did complete work, it did not do so until mid-December. It filed a Mechanic's

Lien against the Clarksville Facility representing that its last day of work was December 19, 2023.

Schneider Electric may also have simply walked off the job on December 19 without completing

it, around the same time as Microvast's other contractors walked off the job.

102.    And, by August 2023, it was clear that Microvast would never be able to complete

the Clarksville Facility. According to FE 1, FE 2, and FE 3, by then, Microvast had stopped paying

certain invoices and Microvast's contractors and vendors were instituting credit holds which were

bringing construction to a halt.

103.    According to FE 1, during FE 1's tenure, Microvast's two main contractors—DPR

Construction, the General Contractor, and Hodess Cleanroom, a subcontractor responsible for the

cleanrooms—both reduced headcount at the Clarksville Facility by 50-75%. FE 1 states that the

reductions began around July 2023. FE 3 confirms that DPR Construction, Hodess Cleanroom,

and the electrical subcontractor Faith Electric had started pulling personnel by the end of FE 3's

tenure in mid-August 2023. FE 3 estimates that by then, fully 20% of contractors had left the

AMENDED CLASS ACTION COMPLAINT - 27

building site because Microvast was "quite behind paying contractors." FE 3 adds that FE 3 learned through conversations with Barbee that Microvast continued not paying contractors after FE 3's departure. FE 1 was also told by Barbee that Microvast was not paying invoices. In fact, FE 1 left Microvast in December because FE 1 was told by managers that Microvast was "running out of money." According to FE 3, the contractors and subcontractors completely demobilized in December 2023/January 2024.

104.    FE 2 confirms FE 1 and FE 3's account. FE 2 was a Buyer for the Clarksville Facility until August 2023. In addition, though FE 2 was not vendors' primary point of contact, they still contacted FE 2 to complain about overdue bills. Thus, FE 2 had personal knowledge of Microvast's overdue bills. According to FE 2, vendors would regularly issue credit holds to Microvast (i.e., prohibiting Microvast from buying the vendor's goods or services on credit). According to FE 2, Microvast's late payments and the resulting credit holds were a problem when he worked for the Clarksville Facility (until August 2023) and continued when FE 2 worked for a facility in Colorado (thereafter).

105.    The drastic personnel cuts slowed work to a crawl. According to FE 1, after DPR cut its personnel, it was only "doing minimal work" and did not respond to Microvast's emails or phone calls. FE 1 and FE 1's colleagues "had to hunt down" DPR employees whenever they needed anything from DPR.

106.    As a result, little got done. Even in December 2023, when FE 1 left, the Clarksville Facility was nowhere near ready. According to FE 1, even as of December 2023, the time of FE 1's departure, the Clarksville facility was still "just a shell." According to FE 1, it was not ready to install equipment, because it still lacked a cleanroom, had no filters, had no tanks for storing chemicals, and had no venting for a "high-temperature room" because the vents had been placed

AMENDED CLASS ACTION COMPLAINT - 28

"in the wrong position," among other things. FE 1 believes that as of FE 1's departure, Microvast would still need four to six months of construction until the Clarksville Facility was ready to install equipment.

107.     Microvast's disclosures at the end of the Class Period confirm the Former Employees' accounts that it was not paying its bills. In its 2023 10-K filed April 1, 2024, Microvast revealed that it had $57.0 million of accounts payable that were currently due in connection with the Clarksville Facility, and that suppliers had placed $31.9 million of mechanics' liens on the Facility. Further, it stated that it needed an additional $150-170 million just to complete the Clarksville Facility Phase 1A.

### C.    Microvast Conceals that the Clarksville Facility's Critical Vendor Was Blowing Through Deadlines

108.     According to FE 3, Lyric Robot Automation Co., Ltd., a Chinese company, was responsible for about 65-75% of the equipment for the Clarksville Facility.

109.     When FE 3 interviewed for a job at Clarksville in November 2022, FE 3 was told that the Clarksville Facility would receive equipment in March/April 2023. FE 3 was only offered a job in late January or early February 2023. When FE 3 started, FE 3 was told that the delays were caused by Lyric. At that time, FE 3 was told that the Clarksville Facility would receive equipment in April/May 2023. From then on, every couple of months, Lyric would delay the equipment delivery date by a couple of months.

110.     According to FE 3, Microvast planned to conduct two acceptance procedures for the equipment. Factory acceptance would take place in China. Then, the equipment would be shipped from Shanghai or Hong Kong to a U.S. port, usually Savannah, Georgia. The equipment would then have to clear customs and, thereafter, it would be shipped to Clarksville in Tennessee. The journey, in total, took *at least* 8 weeks.

AMENDED CLASS ACTION COMPLAINT - 29

111.    FE 3 spent two weeks at Microvast's Huzhou office in May 2023. During this time, FE 3 flew to Lyric's facility to inspect the equipment that would be installed in Clarksville. FE 3 was told to conduct factory acceptance testing on any equipment that was ready for it. But according to FE 3, only one of Lyric's machines was ready for factory acceptance testing (it failed FE 3's tests). According to FE 3, though Lyric had mostly constructed or otherwise secured the parts that make up the equipment, Lyric had not assembled the parts into equipment.

112.    Assembling parts was no easy task. Microvast publicly boasted that the Clarksville Facility would be fully automated. As a result, according to FE 3, the Microvast equipment was complex with "tons of automation and wiring and control boards", sensors, and other parts that had to be precisely calibrated. Assembling equipment was a time-consuming task involving trial and error. Moreover, according to FE 3, Lyric was responsible for all the most complicated, precise, and delicate equipment that would be used in the Clarksville Facility. For example, Lyric was supposed to prepare 24 cut-and-stack machines. They were "pretty complex", developed errors in the production phase, and had lots of programming issues and other errors. By the time of FE 3's departure, some—but not all—of the cut-and-stack machines were "starting to pass" factory acceptance.

113.    On or about Monday May 22, 2023 (before Microvast's May 25 Investor Day presentation), FE 3 told FE 3's boss William Muir that Lyric was nowhere near ready for factory testing. Muir's response made clear that he already knew of the problems with Lyric and agreed that Lyric could not meet its current shipping deadlines.

114.    When FE 3 left Microvast in mid-August 2023, only about 10% of the equipment had been delivered, "being generous." None of it had been installed. More importantly, none of

Lyric's equipment had been delivered and none had even been shipped. So Lyric's equipment could not arrive at Clarksville for at least 8 weeks (mid-October) even if it was shipped the day FE 3 left.

115.    On occasion, when possible, Microvast took Lyric out of the equation. For instance, according to FE 3, Lyric had hired a subcontractor to create an Automated Storage and Retrieval System ("ASRS"). Lyric had originally been responsible for putting together the ASRS, but Microvast decided instead to have the subcontractor ship the ASRS directly to the Clarksville Facility, bypassing Lyric.

116.    Moreover, even after all the equipment arrived at Clarksville, it would still have to be installed and pass site acceptance. According to FE 3, it had taken 9-10 months to complete site acceptance and installation in the Huzhou facility. While Microvast hoped that it might be possible to shave a month or so, it would have had to cut the site acceptance and installation time to only 4 months to meet the Q4 2023 deadline Defendants reiterated in August.

117.    FE 1 confirms that Microvast was far behind its plans. FE 1 had been hired in March 2023 as a Maintenance Supervisor to maintain and fix equipment when it broke. Microvast clearly anticipated that it would need FE 1 and FE 1's colleagues to conduct the work they were trained for. Yet Microvast, instead, had FE 1 and the other Maintenance Technician do tasks that were contractors' responsibility like hanging drywall and breaking down walls and toilets in bathrooms, and then repairing them. Not only was this work that the Maintenance Technicians were not skilled at or qualified for, it was also a waste of the Maintenance Technicians' own technical skills.

118.    Microvast's own statements at the close of the Class Period confirm that it "started *some* installation *during Q4* [2023]," so it had not begun installing equipment even by September 2023

AMENDED CLASS ACTION COMPLAINT - 31

119.    Thus, both Microvast's statements describing the timeline to production and its statements describing the Clarksville Facility's current condition gave the impression that the Clarksville Facility production was just around the corner when, in truth, it was more than a year away even if Microvast managed to address its financial condition.

## VII.    DEFENDANTS' ACTIONABLE STATEMENTS

### A.    Defendants Falsely Stated that Microvast *Had Received* a Department of Energy Grant

120.    On October 19, 2022, Microvast tweeted on its official account:

At 3pm today, the White House will announce that our thermally stable polyaramid separator manufacturing plant proposal ***was selected as a recipient of a $200 million grant*** from the DOE's Battery Materials Processing and Battery Manufacturing initiative.

121.    That same day, Microvast also filed an 8-K with the SEC repeating the text of the tweet.

122.    Defendants' emphasized statements misleadingly concealed a substantial risk that Microvast would not receive the $200 million grant. In its Application, Microvast had falsely claimed to the Department of Energy that it was a U.S. firm with operations in other countries, of which China was only one; that it had manufacturing facilities in the U.S. and Europe; and that a substantial proportion of its intellectual property was developed outside China. In fact, Microvast's Chinese facilities accounted for all its battery manufacturing, all its intellectual property, and almost 95% of its employees. The facts Microvast concealed were material to the Department of Energy's approval decision. Microvast's Application was not released publicly, so the statements were not directly communicated to investors. But reasonable investors would assume that Microvast had forthrightly disclosed that its operations were overwhelmingly based in China when it applied for a Department of Energy grant. Thus, to reasonable investors, the Department of

Energy's invitation to negotiate despite the potential for Chinese government influence showed that the potential influence did not imperil the grant. That impression was misleading; because of Microvast's false statements in its Application, the Department of Energy had never had occasion to consider the extent of potential Chinese government influence over Microvast. Moreover, Microvast's false and misleading statements in the Application were themselves grounds to terminate negotiations. By claiming that Microvast had already received a grant, without disclosing that Microvast's Application had contained misleading statements, Defendants' false statements concealed these serious risks that the Department of Energy would ultimately terminate grant negotiations. Microvast's false statements to investors were misleading because it concealed risks Microvast had created for itself by making false statements to the Department of Energy.

123.    On November 2, 2022, Microvast issued a press release announcing that it had received a grant from the Department of Energy:

> HOUSTON, Texas, USA, November 2, 2022 — A wholly-owned subsidiary of Microvast Holdings, Inc. (NASDAQ: MVST) **was selected** by the U.S. Department of Energy (DOE) in collaboration with General Motors **to receive a $200 million grant** as part of the first set of projects funded by President Biden's Bipartisan Infrastructure Law. Over 200 companies applied for $2.8 billion in DOE grant funding and 20 companies were awarded grants.
> …
> As part of the selection process for the DOE grant, Microvast has been invited to negotiate the specific terms of the grant funding. **Once the terms have been finalized**, the grant funding will remain subject to the conditions precedent and other terms and conditions to be agreed during these negotiations.

124.    Defendants' emphasized statements misleadingly concealed a substantial risk that Microvast would not receive the $200 million grant. In its Application, Microvast had falsely claimed to the Department of Energy that it was a U.S. firm with operations in other countries, of which China was only one; that it had manufacturing facilities in the U.S. and Europe; and that a

substantial proportion of its intellectual property was developed outside China. In fact, Microvast's Chinese facilities accounted for all its battery manufacturing, all its intellectual property, and almost 95% of its employees. The facts Microvast concealed were material to the Department of Energy's approval decision. Microvast's Application was not released publicly, so the statements were not directly communicated to investors. But reasonable investors would assume that Microvast had forthrightly disclosed that its operations were overwhelmingly based in China when it applied for a Department of Energy grant. Thus, to reasonable investors, the Department of Energy's invitation to negotiate despite the potential for Chinese government influence showed that the potential influence did not imperil the grant. That impression was misleading; because of Microvast's false statements in its Application, the Department of Energy had never had occasion to consider the extent of potential Chinese government influence over Microvast. Moreover, Microvast's false and misleading statements in the Application were themselves grounds to terminate negotiations. By claiming that Microvast had already received a grant, without disclosing that Microvast's Application had contained misleading statements, Defendants' false statements concealed these serious risks that the Department of Energy would ultimately terminate grant negotiations. Microvast's false statements to investors were misleading because it concealed risks Microvast had created for itself by making false statements to the Department of Energy.

125.    While Defendants acknowledged in the November 2, 2022 press release that Microvast needed to negotiate the terms of the final award, they stated that these were technicalities to be "finalized" and that the negotiations were not a real impediment (e.g., claiming that the grant would be funded "*once* the terms *have been* finalized"), and subject to conditions precedent, rather than disclosing the serious risk that the Department of Energy may terminate negotiations entirely based on the Chinese government's influence over Microvast or Microvast's own misstatements

in the Application. Thus, Microvast's statements about negotiations were misleading for the same reasons as its statements that it had received a grant.

126.    On November 10, 2022, Defendants held a conference call to discuss Microvast's Q3 2022 earnings. The presentation included a PowerPoint slide deck. The first slide with substantive content listed a series of purported highlights. The first highlight was that Microvast had been:

> Selected by DOE, in collaboration with General Motors, **to receive $200 million grant** under Bipartisan Infrastructure Law in recognition of innovative polyaramid separator technology. (emphasis in original)

127.    Microvast included another slide in the PowerPoint presentation bragging that Microvast had been "selected [] to receive a $200 million grant".



## Selected by the U.S. Department of Energy for a $200 Million Grant

| Polyaramid Separator Funding of DOE |
|---|

- Microvast **selected by the U.S. Department of Energy** ("DOE") to receive a **$200 million grant.**
- Over 200 companies applied for $2.8 billion in grant funding; **only 20 companies selected.**
- The DOE grant, plus funding to be arranged by Microvast, will support construction of a **mass production facility in the U.S. for our thermally stable polyaramid separator** technology.
- **Target markets** for polyaramid separator **are large and growing** and include commercial, specialty and passenger EVs, as well as consumer electronics and ESS systems.
- Microvast **holds unique, patented wet-process technology to produce a thin polyaramid base** film for very high temperature resistance.
- The separator is a **critical element for battery safety** and our polyaramid technology has significant safety advantages over incumbent technology such as polyethylene and polypropylene.
- Microvast and **General Motors will collaborate** to create a specialized separator.

Page - 13

128.    Defendants' emphasized statements misleadingly concealed a substantial risk that Microvast would not receive the $200 million grant. In its Application, Microvast had falsely claimed to the Department of Energy that it was a U.S. firm with operations in other countries, of which China was only one; that it had manufacturing facilities in the U.S. and Europe; and that a

AMENDED CLASS ACTION COMPLAINT - 35

substantial proportion of its intellectual property was developed outside China. In fact, Microvast's Chinese facilities accounted for all its battery manufacturing, all its intellectual property, and almost 95% of its employees. The facts Microvast concealed were material to the Department of Energy's approval decision. Microvast's Application was not released publicly, so the statements were not directly communicated to investors. But reasonable investors would assume that Microvast had forthrightly disclosed that its operations were overwhelmingly based in China when it applied for a Department of Energy grant. Thus, to reasonable investors, the Department of Energy's invitation to negotiate despite the potential for Chinese government influence showed that the potential influence did not imperil the grant. That impression was misleading; because of Microvast's false statements in its Application, the Department of Energy had never had occasion to consider the extent of potential Chinese government influence over Microvast. Moreover, Microvast's false and misleading statements in the Application were themselves grounds to terminate negotiations. By claiming that Microvast had already received a grant, without disclosing that Microvast's Application had contained misleading statements, Defendants' false statements concealed these serious risks that the Department of Energy would ultimately terminate grant negotiations. Microvast's false statements to investors were misleading because it concealed risks Microvast had created for itself by making false statements to the Department of Energy.

129.    On February 15, 2023, Microvast delivered a presentation at the Baird Vehicle Technology & Mobility Conference.

130.    Microvast's presentation included the same slide it had presented on the November 10, 2022 earnings call, which is copied at ¶127, above.

131.    Presenting the slide, Defendant Kelterborn stated:

And now we're bringing [the separator] to the market, thanks to the DOE grant of 200 million, **which we just, just, just received**. As I mentioned, **selected by the US**

AMENDED CLASS ACTION COMPLAINT - 36

*Department of Energy for a 200 million grant for our separator technology*, only 20 companies were selected. ***We are very proud as an American company to receive that honor and being recognized as one of the very important partners for developing battery technology further into US***—and we are happy that General Motors will collaborate with us to create this special live separator.

132.    Defendants' emphasized statements misleadingly concealed a substantial risk that Microvast would not receive the $200 million grant. In its Application, Microvast had falsely claimed to the Department of Energy that it was a U.S. firm with operations in other countries, of which China was only one; that it had manufacturing facilities in the U.S. and Europe; and that a substantial proportion of its intellectual property was developed outside China. In fact, Microvast's Chinese facilities accounted for all its battery manufacturing, all its intellectual property, and almost 95% of its employees. The facts Microvast concealed were material to the Department of Energy's approval decision. Microvast's Application was not released publicly, so the statements were not directly communicated to investors. But reasonable investors would assume that Microvast had forthrightly disclosed that its operations were overwhelmingly based in China when it applied for a Department of Energy grant. Thus, to reasonable investors, the Department of Energy's invitation to negotiate despite the potential for Chinese government influence showed that the potential influence did not imperil the grant. That impression was misleading; because of Microvast's false statements in its Application, the Department of Energy had never had occasion to consider the extent of potential Chinese government influence over Microvast. Moreover, Microvast's false and misleading statements in the Application were themselves grounds to terminate negotiations. By claiming that Microvast had already received a grant, without disclosing that Microvast's Application had contained misleading statements, Defendants' false statements concealed these serious risks that the Department of Energy would ultimately terminate

AMENDED CLASS ACTION COMPLAINT - 37

grant negotiations. Microvast's false statements to investors were misleading because it concealed

risks Microvast had created for itself by making false statements to the Department of Energy.

133.    On March 16, 2023, Microvast held a call to discuss its Q4 2022 earnings. In

prepared remarks, Defendant Wu highlighted:

> *We were also selected for $200 million grant* by the U.S. Department of Energy to
> build our most advanced high-temperature separator plant in the United States to
> help enhance battery safety for the industry.

134.    On the call, an analyst asked Microvast about the Department of Education grant:

> Q: Okay, great. So another question that came in is about the current status of the
> DOE grant. If you could talk about that?
> **DEFENDANT WU**: Yeah, the DOE grant we are working on the—right now *it's
> very close to close the deal and it's in the contract negotiating stage*. We still need
> an engagement contract with the DOE. We are in the first batch of the negotiation
> and we'll see the results soon.[11]

135.    The slides accompanying the conference call listed under "2022 Overview" that

Microvast was "*Selected* by U.S. Dept. of Energy for $200M grant for our unique polyaramid

separator technology."

136.    Defendants' emphasized statements misleadingly concealed a substantial risk that

Microvast would not receive the $200 million grant. In its Application, Microvast had falsely

claimed to the Department of Energy that it was a U.S. firm with operations in other countries, of

which China was only one; that it had manufacturing facilities in the U.S. and Europe; and that a

substantial proportion of its intellectual property was developed outside China. In fact, Microvast's

Chinese facilities accounted for all its battery manufacturing, all its intellectual property, and

almost 95% of its employees. The facts Microvast concealed were material to the Department of

---

[11] After the first opportunities to negotiate were announced on October 19, 2022, the Department
of Energy issued another Funding Opportunity Announcement for more awards. Wu's reference to
the "first batch" means that Microvast had been invited to negotiate in the first round, not that
Microvast was in the first of a series of negotiations over its grant.

Energy's approval decision. Microvast's Application was not released publicly, so the statements were not directly communicated to investors. But reasonable investors would assume that Microvast had forthrightly disclosed that its operations were overwhelmingly based in China when it applied for a Department of Energy grant. Thus, to reasonable investors, the Department of Energy's invitation to negotiate despite the potential for Chinese government influence showed that the potential influence did not imperil the grant. That impression was misleading; because of Microvast's false statements in its Application, the Department of Energy had never had occasion to consider the extent of potential Chinese government influence over Microvast. Moreover, Microvast's false and misleading statements in the Application were themselves grounds to terminate negotiations. By claiming that Microvast had already received a grant, without disclosing that Microvast's Application had contained misleading statements, Defendants' false statements concealed these serious risks that the Department of Energy would ultimately terminate grant negotiations. Microvast's false statements to investors were misleading because it concealed risks Microvast had created for itself by making false statements to the Department of Energy.

### B. Defendants Falsely and Misleadingly Overstated the Clarksville Facility's Progress

137.    On the March 16, 2023 call to discuss Microvast's Q4 2022 earnings, Defendant Wu stated:

> Q: So first, is your Clarksville capacity spoken for already?

> **DEFENDANT WU**: The question is the Clarksville—Clarksville factory will be ready at the end of this year scheduled and we are on the fast speed and those sort of for the construction and then equipment is fabricating in China and—actually *I went there last week. I saw all the equipment laying on the floor for FAT [Factory Acceptance Testing] and—the factory testing.* After factory testing, it's qualified and we're going to ship I, ship to U.S. and install in U.S. The expectation is going to the end of this year to produce the battery.

138.    Wu's statement that he had seen "all the equipment laying on the floor for" factory acceptance testing was false because almost none of the Clarksville Facility equipment, and none of the equipment to be built by Lyric, had even been assembled for factory acceptance testing. Until they had been assembled, the equipment parts could not be submitted for factory acceptance testing. Wu thus claimed to have personally seen a scene that could not have happened. Wu's statement was materially false because it gave investors false reassurances that Microvast had largely eliminated the risk that equipment manufacturing would delay the Clarksville Facility, an important source of potential delay. In truth, not only was equipment manufacturing delay still a risk, it had already begun to materialize, as Lyric had already blown through at least one significant deadline and was still far away from completion.

139.    On the call, Defendant Wu also stated that "[a]fter factory testing, it's qualified and we're going to ship it. Ship to U.S. and install in U.S. ***The expectation is going to the end of this year to produce the battery.***" In PowerPoint slides accompanying the presentation, Microvast stated that its "***New 2GWh U.S. cell and module facility in Clarksville, TN will be online in Q4 [2023]***."

140.    The emphasized statements were misleading. At the Q3 2022 earnings call, Microvast had claimed that the Clarksville Facility would begin production in Q4 2023. Microvast's publicly disclosed schedule was based on Lyric's delivering equipment in March/April 2023. In March 2023, none of Lyric's equipment had even passed factory acceptance, let alone been shipped, and Lyric was supposed to deliver equipment in April/May. Defendants' statements confidently reiterating the Q4 2023 deadline was misleading for failing to disclose that production was already slipping materially.

AMENDED CLASS ACTION COMPLAINT - 40

141.    On the May 9, 2023 call to discuss Microvast's Q1 2023 earnings, Defendant Wu stated:

Q: Excellent. And then with the U.S. facility, can you talk a little bit about ***equipment procurement and any sort of headwinds*** or progress that you're making ***in terms of buying that equipment and getting it into the country***?

**DEFENDANT WU**: I can answer this question. ***The U.S. facility actually is 100% of mirror with China, the equipment that same supplier, same system, just the different certification that U.S. require a UL certification.*** And that's why we slightly, the behind a giant China equipment installation. ***And with the maturity of China site and operation experience and installation experience, we overcome all the problems in China.*** And we think the U.S. is going to be much smoother, and also we send the U.S. crew to China for the operation and installation training as well, that's why I expected U.S. is going to be much, much smoother. ***And we're still on the track on the plan to build this factory before the end of this year. That's our plan. It still remain[s].***

142.    Defendants' statements were misleading. First, when Wu spoke, Microvast had experienced "headwinds [] in terms of buying that equipment and getting it into the country": Lyric had already blown through the March/April deadline and the April/May deadline and showed no sign that it was anywhere near completing the equipment for factory acceptance testing, let alone shipping it to the Clarksville Facility in the U.S. Nor was Microvast "on track" to complete the Clarksville Facility by end of year: Microvast had created a delivery schedule upon which it based its estimate for the date of completion and Lyric was already three months behind the delivery schedule. Moreover, Wu's statement that Microvast had "overcome" the problems in China in part because it was using the same equipment from the same supplier gave the misleading impression that the supplier was succeeding in constructing equipment for the Clarksville Facility. In fact, Lyric's struggles showed that Microvast had not overcome the equipment-related challenges. Thus, asked whether Microvast faced any headwinds in constructing the Clarksville Facility, Wu's response gave the impression that there were no headwinds, even though Microvast was facing crippling delays in obtaining equipment.

AMENDED CLASS ACTION COMPLAINT - 41

143.    On May 25, 2023, Microvast held its Investor Day. In prepared remarks, Defendant Smith stated, about the Clarksville Facility:

Right now, it's just the ***building with utilities***, ***with the equipment on the way***. …

Now in Clarksville, we're making changes to the equipment. It's now put—that we had to do in Huzhou to get that running—***it's now being put on boats. Through June, July, August, September, all the equipment's coming into Clarksville***. …

But the confidence is very high because the U.S. team was with me while we [built out the Huzhou expansion]. Those that weren't there are now. We have a team there now, we got another team going in June. They get to see a production line already operating, already programmed, set up, and then they go back home and say, okay, ***as soon as [the equipment] lands, we're ready to do that***. …

144.    The emphasized statements were either false or misleading. First, the Clarksville Facility had not been constructed and did not have utilities. Rather, as of May 2023, the Clarksville Facility was at best partially electrified and most of the building, including the crucial cleanrooms, had not even been started. Second, at the time of Smith's statement, only one equipment delivery was scheduled to occur in the next two months, the mid-July delivery of parts of the ASRS system. No other deliveries were possible because it takes at least 8 weeks to ship equipment. Smith's statement that equipment was "on the way", was "now being put on boats" and would arrive "through June, July, August, September" gave investors the misleading impression that Microvast actually had a firm delivery schedule for all its equipment. In fact, the equipment was not "on the way" because a substantial majority of the equipment was not assembled, let alone factory tested. In any case, Microvast was not expecting any deliveries in June. Fourth, Clarksville employees could not immediately install equipment as it arrived because the Facility just a shell lacking a cleanroom, electricity, and other infrastructure. Moreover, Microvast had no concrete plan to install the equipment in substantially less time than the Huzhou installation's 9-10 months. And fifth, Microvast simply had no way to tell when the Clarksville Facility would be complete because

Lyric had already blown through several deadlines and was blowing through deadlines without getting any of the equipment ready for factory acceptance testing. In sum, Smith's statements gave the impression that the Clarksville Facility was nearly complete and only needed to be fitted out with equipment that was already on the way and scheduled to arrive in summer, though Microvast had not addressed any of the three major sources of delay—construction of the Clarksville Facility, manufacturing, testing, and assembly of the equipment, and installation of the equipment at the Clarksville Facility.

145.    On May 25, 2023, Microvast also issued a press release updating investors on its activities after announcing the termination of negotiations with the Department of Energy. Speaking about the Clarksville Facility, Defendants stated "[t]he facility is *about half-way through the company's more than $300 million investment in the plant*."

146.    The emphasized statements were false and misleading because, first, the Clarksville Facility itself was still mostly not built. Second, only a tiny fraction of the equipment—and none from the key vendor Lyric—necessary to develop the Facility had passed factory acceptance. Third, Lyric had repeatedly blown through deadlines, but Microvast had not adjusted its own public timeline. Fourth, there was no concrete schedule for completion of the facility. And fifth, as Microvast would later reveal, the Clarksville Facility was half-way through its $300 million capital expenditure budget for the Clarksville Facility *in April 2024*, so it could not have been halfway through the $300 million investment in May 2023. In sum, the Clarksville Facility was nowhere near halfway through completion.

147.    On June 30, 2023, Microvast issued a press release titled *Microvast Will Not Be Moving Forward With the Kentucky Plant Construction; Will Focus on Core Operations*, referring to the Hopkinsville Facility. The press release quoted Defendant Wu as saying that "[w]e are

concentrating on our core business efforts, including completing our first large-scale battery cell, module, and pack production plant in Clarksville, Tennessee. This project will ensure that our products are manufactured in America." The press release also stated that "[t]he decision to pause the building of the [Hopkinsville Facility] will provide the Company the flexibility to focus on its operations in Tennessee and to succeed in manufacturing its 53.5Ah battery cells, modules, and packs in the United States." The press release then stated that "Microvast began construction of its 4GWh cell and module facility in Clarksville in 2021. *The Company expects production to start in this year's fourth quarter, creating hundreds of new jobs in Tennessee*."

148.    The emphasized statements were misleading because by late June 2023, Microvast had fallen far behind the schedule it had previously formulated which was necessary to begin production in Q4 2023. Microvast's plan called for Lyric to deliver equipment in March/April 2023. By June 30, 2023, Lyric was already at least 4 months late (the original deadline was April and none of Lyric's equipment could be delivered until at least late August/early September even if it shipped on June 30), and most of Lyric's equipment had not passed factory acceptance testing. Moreover, construction of the Clarksville Facility was far behind schedule, with no cleanroom and electricity only for select functions, among other defects. Because Microvast had not met internal deadlines it had created to meet the Q4 2023 deadline, Microvast's statement that it continued to expect production in Q4 2023 was misleading.

149.    On August 7, 2023, Microvast held a conference call to discuss Microvast's Q2 2023 earnings. In prepared remarks, Defendant Webster stated that "we are pleased to report that our Clarksville facility *remains on track for a Q4 start of trial production*."

150.    On August 8, 2023, Microvast delivered a presentation at the Oppenheimer Technology, Internet & Communications Conference. On the call, Defendant Wu stated:

Q: Right. That's perfect. That's super helpful. And can you talk a little bit about where you're at with the US manufacturing? Obviously, you guys are building a substantial factory in Tennessee. ***Can you talk about where that is from a process perspective and how you're tracking to your targeted timeframe?***

**DEFENDANT WU**: *We are ready right now.* We are running super, super fast. *The entire team is just racing to get there*. And they put their 2 GWh in Clarksville, Tennessee. ***And we expect the test production at the end of this year*** and as in slowly ramping up to the capacity—design capacity.

151. The emphasized statements were false and misleading. By early August, Microvast had slipped even further behind its internal deadlines to meet production. First, 10% of the equipment had arrived, "being generous". Second, none of the equipment had been installed. It had taken the Huzhou Facility 9-10 months to complete installation and Microvast had no concrete plans to shave 5-6 months from this timeline. Second, the vast bulk of equipment had not passed Factory Acceptance testing by this point, making any definite plans to receive the equipment by year's end, let alone install it, fanciful. Third, Microvast's schedule called for Lyric to complete shipping equipment in March/April 2023. By August 2023, Lyric was already 6 months late (the original deadline was April, and none of Lyric's equipment could be delivered until at least late mid-October even if it shipped on August 8), a substantial majority of Lyric's equipment had not passed factory acceptance testing, and none of Lyric's equipment had arrived. Fourth, the physical plant was nowhere near ready for installation, with cleanrooms only 40-50% complete, a missing electrical breaker that might take up to six months to receive, and electricity available to only select functions. Accordingly, Microvast was not "tracking to [it]s targeted timeframe." Moreover, Wu's statement that "[t]he entire team is racing to get there" gave investors the misleading impression that Microvast was building momentum towards completion, when in reality, the contractors had begun to walk off the job because Microvast was not paying their bills. Thus, Microvast faced a

ticking clock: it had to complete construction before the contractors completely demobilized even as it had access to fewer and fewer contractor employees.

152.    On the August 8 call, Defendant Webster also stated:

Q: And so when we think about your cash needs and that sort of growth rate with all the different incentives and sources of cash, can you give us a sense of where you're at from a cash position and what your CapEx needs are through the balance of this year and next year to really ramp up to some of those higher revenue levels that you're targeting?
DEFENDANT WEBSTER: … But I think through that—so Huzhou 3.1 is done, very small CapEx needs in Huzhou 3.1 for the next year. Phase 1A in Clarksville, as [Defendant Wu] said, *the construction phase is nearly done*. The equipment we've been paying installments for, *the equipment's arriving now.*

153.    Defendant Webster's statements were false and misleading. As of August 8, 2023, the construction phase was nowhere near complete. Among other things, Microvast still had to build 50-60% of the cleanrooms and only a few functions had electricity. Moreover, the equipment was not "arriving now." Only about 10% of the equipment had arrived at the time. Because of long lead times, Microvast knew exactly how much equipment it would receive until at least mid-October 2023, and in November 2023, Microvast announced that only 30% of the equipment had arrived. Moreover, a majority of the equipment, including a substantial majority of the equipment Lyric was responsible for, had not passed factory acceptance. Thus, Defendant Webster's statements about the Clarksville Facility's then-existing status gave investors a materially misleading picture of the Clarksville Facility's progress.

154.    On November 9, 2023, Microvast held a call to discuss its Q3 2023 earnings. On the call, Defendant Ward stated:

*On the construction side, we are nearly at completion with a majority of the building now under joint occupancy and only minor work remains to be done in the fourth quarter.* We're also in good position with our production equipment, where we're using the same equipment that is now running with great success on our Huzhou 3.1 line. *We have approximately 30% of the equipment on site in*

AMENDED CLASS ACTION COMPLAINT - 46

*Clarksville with majority of the remaining equipment having already been shipped.*

155.    Defendants' statements were false and misleading. First, Microvast still had substantial construction work to complete, including the cleanrooms. Second, Ward's claim that construction was nearly complete was misleading because it concealed that Microvast could not complete the remaining portion. In mid-August 2023, 20% of the contractor employees had left because Microvast wasn't paying their bills. By November/December 2023, 50-75% had left, and the remainder were not responding to emails or calls. In December 2023/January 2024, the contractors completely demobilized. Because Microvast's contractors had walked off the job, it did not matter that construction was nearly complete; Microvast could not complete construction and install equipment without contractors. Thus, Microvast's statements gave the misleading impression that the Clarksville Facility was almost ready to begin operation, though because Microvast's circumstances had deteriorated, Microvast could not complete the job.

156.    On December 13, 2023, participated in a Fireside Chat with Cantor Fitzgerald. Wu dialed in from the Clarksville Facility. Defendants stated that Microvast had achieved its goals for 2023, including construction of the Clarksville Facility:

> **DEFENDANT WEBSTER**: *If you just wind back to the start of the year, we've really achieved [our goals] for this year*. … *And then we've really moved along great strides on Clarksville. Construction——pretty much done. We still do commissioning and installation from here on in, and when that's all done it's what we set out to do…*

157.    Webster also asserted that Microvast was still in a "race" to complete Clarksville to earn Inflation Reduction Act subsidies:

> **DEFENDANT WEBSTER**:…and it's why *we're in the race to get Clarksville into production.* You're talking nearly $20 million a quarter of cash flow from IRA [Inflation Reduction Act], but you know what we want to do is—you take that and you reinvest. That's what the government wants you to do, they want you to reinvest that in more capacity, to shorten your payback period and carry on doing it. So that's why really if we look out a little bit, there's a 24, that's really the core focus for our

AMENDED CLASS ACTION COMPLAINT - 47

business next year is maintain the revenue growth rate, narrow the losses and like make sure we bring on the U.S. capacity.

158.    The interviewer asserted without contradiction that Microvast's capital expenditures for Clarksville were essentially complete:

So it sounds to me like the capex is largely complete…

159.    Instead, Defendants claimed that Clarksville Phase 1A was already complete, and Microvast was moving on to Phase 1B:

Q: Yeah, and just on the IRA stuff, just to achieve some of the growth targets we had talked about. Sounds like the IRA can help fund further expansion in the United States. So what does that mean from a capital raise perspective for you guys, can that IRA fund another 2 GW in the United States? Can you talk about the IRA and how it might help on the capital front?

**DEFENDANT WEBSTER**: *If you look at both Huzhou and Clarksville, the sort of hard yards have been done.* … From ordering equipment through to finishing commissioning/install is like 9-12 months. And then that would be the same in Clarksville. *The building, the infrastructure is done.* Phase 1B just goes in at the side of Phase 1A and again, you're mainly ordering equipment, and when you're ordering equipment, you pay in milestones to suppliers so you don't need to fund it all up front it'll be funded over 9-12 months. So what you're able to do is match some of your cash flows from IRA against your main payments which are on the equipment side. So that's how you can use IRA credits to effectively fund the capacity expansion, basically paying for your equipment.

160.    Indeed, Wang vigorously resisted when the interviewer suggested that it was possible that production might be moved to Q4 2024:

Q: What are the next steps needed to get Clarksville in production and what milestones need to be achieved to get the right amount of capacity in place by Q4 of 2024?
**DEFENDANT WU**: Q4? We should put in production before Q4 2024. We plan in production in Q2. Why move to Q4?

161.    Asked "what needs to happen in terms of milestones to get" to 2 GWh production in Clarksville, Defendant Wu did not even mention completing Clarksville Phase 1A or securing additional capital:

AMENDED CLASS ACTION COMPLAINT - 48

Q: And so exiting the year, what are the goals in terms of utilization of that facility [Clarksville] and what needs to happen in terms of milestones to get there? So really just executing. Sort of copy pasting what you're doing in Huzhou in Clarksville?

**DEFENDANT WU**: Yeah, you know, for the production line you know this is the same production line and the employee in order to send to China, on the real production line, train 20 more people and came back already. And also we will have a team from China side to help to start up. To safeguard the initial production. And I don't see the big problem for putting in production. Right now we are heavily, heavily training our employees, the training programs initiated, and everybody in the training right now.

162.    Defendants' emphasized statements were false and misleading. First, Defendants misleadingly implied that CapEx for the Clarksville Phase 1A was essentially complete. In truth, Microvast was only halfway through the Clarksville Phase 1A CapEx and had run out of money. Second, asked whether there were any milestones to achieving full production on through Q4 2024, Defendant Wu only raised training employees, though in fact, Microvast had run out of money to complete the Clarksville Facility. Third, Webster's statements that "the hard yards have been run" and that Microvast had accomplished its goals in Clarksville were false because Microvast had only completed half the CapEx for the Clarksville Facility, had run out of cash, and had no way to complete the Clarksville Facility. Fourth, Webster's statement that Microvast was in a race to complete the Clarksville Facility was false because construction had actually stalled; the contractors had either walked off or were walking off by the time of the statement. Thus, Defendants' statements gave the impression that production was just around the corner, when in fact completion was no longer achievable.

## VIII.    DEFENDANTS' MISSTATEMENTS CAUSE PLAINTIFFS' LOSSES

### A.    The Department of Energy Terminates Grant Negotiations

163.    On December 7, 2022, Ranking Member of the Senate Committee on Energy and Natural Resources John Barrasso publicly released a letter he was sending to Department of Energy

Secretary Jennifer Granholm raising "grave concerns" about the $200 million grant to Microvast. Citing Microvast's SEC filings admitting that Microvast is "subject to extensive PRC government regulation," among other indicia, Barrasso asked Granholm to explain why the Department of Energy had issued the grant to a "company joined at the hip with China." House Science, Space, and Technology Committee member Frank Lucas also publicly released a letter to Granholm that day, raising much the same concerns as Barrasso.

164.    Barrasso's and Lucas's letters raised concerns about the Chinese government's influence over Microvast that it had not disclosed in its Application. But reasonable investors would have assumed that Microvast had already forthrightly told the Department of Energy in its Application about the Chinese government's influence. Because reasonable investors would have had no cause for concern, Microvast's stock price did not move in response to the letters and trading volume was normal.

165.    Barrasso and Lucas continued to publish letters to the Department of Energy concerning the Microvast grant. None of these letters referenced representations Microvast had made in its Application.

166.    Then, on May 22, 2023, after trading hours, Bloomberg reported that the Department of Energy was discontinuing negotiations over the $200 million grant.

167.    The Department of Energy's termination of contract negotiations was the materialization of a risk that Defendants' false statements had concealed. On May 23, 2023, the House Oversight and Investigations Subcommittee hearing titled *Growing the Domestic Energy Sector Supply Chian and Manufacturing Base: Are Federal Efforts Working?* There, the following colloquy occurred:

AMENDED CLASS ACTION COMPLAINT - 50

**Q**: Can you confirm that Microvast or any other entity with improper ties to the Chinese Communist Party will not receive any federal funding from the Department?

**A:** Yes, I can confirm that.

168.    Then, at the June 21, 2023 hearing before the House Oversight and Investigations Subcommittee, the Department of Energy's David Howell testified in response to a question about the termination of negotiations with Microvast:

> Q: So what kinds of concerns would keep DOE from actually providing a company an award? Maybe you've answered that, but if you…
> Howell: Sure. So ownership by a federal entity of concern, as defined in the regulations and in appropriation, ***the control that a Federal entity of concerned could actually exhibit over a U.S. company***, that control could be shares in the company. It could the parent company ownership as well. And it could also be, as I mentioned, voting members on the board. It could be key personnel being part of the talent's program. ***It could be an IP position.***

169.    On May 23, 2023, the price of Microvast's stock fell from its previous close of $2.20 to close at $1.40, down $0.70 (45.2%), damaging investors.

## B.    Microvast Suspends Construction of the Clarksville Facility and Reveals It Is $150 Million and 6-8 Months Behind

170.    On April 1, 2024, Microvast announced its earnings for Q4 2023 and held a call to discuss them.

171.    After two years of boasting about the Clarksville Facility's progress and prospects, Microvast admitted on the call that it had stopped construction of the Clarksville Facility until it could secure financing.

172.    On the call, Wu admitted that "we are not currently anticipating material production volumes or revenues from our Clarksville facility. ... Once we are able to secure financing, our current estimate is that an additional six months to eight months is needed to bring Clarksville Phase 1A to SOP, with the majority of this time allocated to equipment."

AMENDED CLASS ACTION COMPLAINT - 51

173.    On the call, Defendant Webster was asked how much CapEx was still needed for the Clarksville Facility, and responded that the Facility was *only half done*:

> Q Thanks so much, you guys. Can you talk a little bit about the overall quantum of capital that you're going to need to secure to get Clarksville back on track? …
>
> **DEFENDANT WEBSTER**: Hi, Colin, hope you well. ***So as we indicated last time, we've got about halfway through Clarksville on CapEx. So to get it done, it's about $150 million***. That includes some aging AP and the so the majority of what's best to spend, relates to equipment and installation. And to do that, we need to raise money. As we've always said, we've got this as far as we could on balance sheet. So we've been working for quite a period now and you're probably sick of hearing us talk about it on the financing and it wasn't done at the end of the year we're still making progress on that. No guarantees that it's done, but we've been spending a lot of time with one lender in particular.
> The estimated timing to get Clarksville to SOP would be six months to eight months from when we close that financing. And as I just mentioned, the majority of that time is to do installation. We'd already started some installation during Q4. …

174.    The news shocked investors because on May 25, 2023, Microvast had stated that "[t]he [Clarksville] facility is about half-way through the company's more than $300 million investment in the plant." Now, 10 months later, Defendants were saying that Microvast was still at the halfway point of completing Clarksville and still needed $150 million to complete it.

175.    Other Microvast statements revealed that construction of the Clarksville Facility was nowhere as advanced as Microvast had claimed. For instance, in the November 2023 call to discuss Q3 2024 earnings, Microvast had told investors that the Clarksville Facility would begin production in Q1 2024. In announcing Q4 2023 earnings, Microvast indicated that the "impact of [lack of funds] on project progress started to be felt towards the end of Q4." Yet Microvast estimated that it would only complete the Microvast Facility 6-8 months after obtaining financing. This delay is significantly more than its earlier statements would indicate is necessary just to complete the tasks Microvast had stated were outstanding.

AMENDED CLASS ACTION COMPLAINT - 52

176.    On April 2, 2024, the price of Microvast's stock fell from its previous close of $0.90 to close at $0.59, down $0.41 (34.1%), damaging investors.

IX.    **ADDITIONAL FACTS FURTHER PROBATIVE OF SCIENTER**

A.    **Defendants Made Their Statements About the Department of Energy Invitation to Negotiate With Scienter**

1.    *The nature of the statements and Defendants' knowledge that investors were closely monitoring the invitation to negotiate supports scienter*

177.    Defendants' statements were deliberate and unqualified.

178.    Defendants made false statements about the Department of Energy invitation to negotiate a grant, which Microvast invariably misdescribed as an actual grant, in a tweet and a press release whose sole purpose was to describe the invitation.

179.    Defendants included an entire slide in Microvast's Q3 2023 earnings call presentation discussing the Department of Energy invitation to negotiate.

180.    Defendants unequivocally told investors Microvast had already "received" a $200 million grant.

181.    Defendants knew investors were focused on the Department of Energy's invitation to negotiate. Microvast's stock price rose 33.8% on the day it announced that it had received the Grant. In its Q3 2022 presentation, Microvast claimed the DOE Grant as the first of its "Highlights" for the quarter. Moreover, as alleged above, Defendants repeatedly made false statements about Microvast's invitation to negotiate.

182.    Accordingly, Defendants understood that investors were closely monitoring their statements about the Department of Energy's invitation to negotiate.

AMENDED CLASS ACTION COMPLAINT - 53

      2.    *The same executives who led Microvast's efforts to obtain the grant also approved and/or furnished information to be used in false statements about the grant*

183.    On the Q3 2022 earnings call, Defendant Webster explained that "[m]y colleagues Dr. [Wenjuan] Mattis and Shane [Smith] did an awesome job with DOE" in securing the Department of Energy invitation to negotiate. Thus, both Mattis and Smith understood the details of the Application.

184.    Both Mattis and Smith were quoted at length in the November 2, 2022 press release making false statements about Microvast's invitation to negotiate a grant, as alleged above. Thus, both Mattis and Smith furnished information used in and/or approved the November 2, 2022 press release.

185.    Thus, Mattis and Smith were knowledgeable about the specifics of the Application and their scienter can be imputed to Microvast because they were involved in drafting the November 2, 2022 statements.

      3.    *Microvast's misstatements to the Department of Energy were deliberate*

186.    Microvast's statements in the Application were calibrated to conceal the fact that substantially all its operations were in China. Microvast claimed U.S. and European operations that did not exist, contradicted its CEO's recent statements that all of Microvast's technology was developed exclusively in China, and omitted to disclose copious investments by and subsidies from Chinese governments.

187.    Defendants' statements in the Application are evidence that when Microvast filed its Application, Defendants knew that the purpose of the Act was to encourage manufacturing from U.S. companies.

AMENDED CLASS ACTION COMPLAINT - 54

188.    The Clarksville Facility was one the two projects Microvast identified as critical in its presentations to investors and SEC filings. Microvast's description of the Clarksville Facility as a manufacturing site, when Microvast had barely started constructing it, was plainly misleading.

189.    Likewise, Microvast's statement that its U.S. and Germany offices were involved in securing intellectual property expressly contradicted Wu's statement just months before that Microvast developed all its intellectual property from its Chinese office.

4.    *The Barrasso and Lucas letters drew Microvast's attention to the misstatements in the Application*

190.    The Barrasso and Lucas letters drew Defendants' attention to the fact that the Chinese government's influence over Microvast was troubling lawmakers.

191.    Microvast was thus on notice that any statements it had made to the Department of Energy regarding its Chinese connections would be closely scrutinized.

192.    Yet even after the letters were publicly released, Defendants said at least three times that Microvast had actually received a grant.

**B.    Defendants Knew or Were Reckless In Not Knowing that their Statements About the Clarksville Facility**

1.    *Wu's March 2023 statement that he had just seen all the equipment for the Clarksville Facility contradicted his own recent experience*

193.    On March 16, 2023, Wu stated that "actually I went there [China] last week. I saw all the equipment laying on the floor for FAT [Factory Acceptance Testing]."

194.    Wu made a definite statement about something he had purportedly witnessed in the recent past. Wu's statement could not be true because the vast majority of the equipment Microvast would use in the Clarksville Facility was not assembled even two months later in May 2023. Thus, the equipment was not ready for factory acceptance testing. Wu's factory visit, as he described it, could not have occurred.

AMENDED CLASS ACTION COMPLAINT - 55

195.     Thus, Wu made the statements with scienter.

     2.    *Wu and Smith personally witnessed development of the Clarksville Facility on a regular basis*

196.     At Microvast's May 2023 Investor Day, Smith told investors that he lived in Nashville, Tennessee. Nashville is about a one-hour drive from Clarksville.

197.     According to FE 3, Smith had an office in the Clarksville Facility. Smith was present at his office, on average, about once per week.

198.     According to FE 1, Smith visited the Clarksville Facility.

199.     According to FE 1, Defendant Wu visited the Clarksville Facility on several occasions. FE 1 recalls that during his visits, Wu would "walk around" and meet with facility managers, presumably including Muir, who was the Clarksville Facility's overall manager. Indeed, Defendant Wu stated on the Cantor interview call that he was calling in from the Clarksville Facility.

200.     There would be no reason for Smith not to visit Lyric in person. At Microvast's Investor Day presentation, Smith told investors he had spent three months working in China at Microvast's Huzhou Facility. Lyric's facility was in Guangzhou, a two-hour flight from Huzhou, a one-hour train ride from Hong Kong, and a metropolis in its own right.

201.     According to FE 3, Microvast executives, including C-suite officers, held weekly calls with Lyric. Smith was on at least some of the calls.

202.     The Clarksville Facility was Smith's responsibility. As Wu stated at Microvast's Investor Day, Smith is responsible for "putting together an amazing factory here in Clarksville."

AMENDED CLASS ACTION COMPLAINT - 56

> **3.** *A direct subordinate of Smith knew as of Microvast's Investor Day that Lyric could not possibly meet the deadlines Lyric touted on that day*

203.    During FE 3's trip to China, FE 3 had visited Lyric factory. One of FE 3's jobs there was to test any equipment that was ready for factory acceptance testing. FE 3 found that only one of Lyric's machines was ready for testing (it failed FE 3's tests).

204.    FE 3 returned from FE3's trip to China on or about May 18, 2023. On or about Monday May 22, 2023, FE 3 told FE 3's boss Muir about what FE 3 had discovered in FE 3's visit to Lyric's factory. At that time, FE 3 told Muir that there was no way Lyric would be ready for factory acceptance testing for a great deal of time. FE 3 told Muir that Lyric would not meet Microvast's current deadline. According to FE 3, Muir had already reached the same conclusion. Thus, Smith's statements in the May 25, 2023 Investor Day presentation that claimed Microvast had a definite schedule to receive Lyric's equipment at Clarksville contradicted information known by his direct report, Muir, which Muir had no reason to keep from Smith.

205.    At Microvast's Investor Day, Smith stated that all of Clarksville's equipment was scheduled to arrive by September 2023.

> **4.** *Webster's false exculpatory statements support scienter*

206.    When announcing suspension of construction of the Clarksville Facility, Webster made a series of statements that sought to give the false impression that Microvast had previously disclosed the information it was then revealing.

207.    Contrary to Webster's statement, Microvast had not told investors "last time" (i.e., on the Q3 2023 earnings call) that it was halfway through CapEx with $150 million to go. Microvast had stated on May 25, *2023*, that it was halfway through the CapEx for the Clarksville Facility with $150 million to go. Between July 1, 2023, and December 31, 2023, Microvast had

spent at least $54.9 million on CapEx for the Clarksville Facility.[12] And during the December 13, 2023, Cantor interview, Webster stated that Microvast was in a "race" to complete Clarksville without ever mentioning the need for additional capital. Webster had also responded to the interviewer's assertion that Microvast had essentially completed CapEx without correction.

208.    Webster's statement that "you're probably sick of hearing us talk about" the need for financing to complete the Clarksville Facility was false because Microvast had not previously disclosed that it needed financing to complete the Clarksville Facility. Instead, Microvast had claimed that it would use the completed Clarksville Facility as collateral to obtain loans for the Phase 1B expansion of the Clarksville Facility.

209.    Webster's false exculpatory statements claiming that halting the Clarksville Facility was consistent with prior disclosures supports an inference of scienter.

5.    *Defendants' statements concerning the Clarksville Facility were specific*

210.    Smith made specific and detailed statements about the Clarksville Facility. For instance, Smith stated the Facility had "utilities", though it did not. Smith also stated that as of November 2023, there was only "minor work" remaining on the physical facility, though cleanrooms had not been built and the plant was not ready to install the equipment it received.

211.    By making these specific statements to investors, Smith gave reasonable investors the impression that he had detailed knowledge of the state of construction at the Clarksville Facility.

---

[12] Microvast spent $38.3 million in Q3 2023 on the Clarksville expansion. Microvast spent another $33.2 million in Q4 2023, "primarily driven by capacity expansion at our Clarksville, Tennessee Facility."

> 6. *Wu's December 2023 false statements made from within the Clarksville Facility that it was nearly complete supports an inference that they made the earlier statements about the Clarksville Facility with scienter*

212.    As Microvast would soon admit, at the time of the December 13, 2023 Cantor interview, Microvast was only halfway through capital expenditures for the Clarksville Facility.

213.    Yet on the Cantor interview, Defendants maintained that CapEx for the Clarksville Facility was essentially complete. ¶¶156-161.

214.    Defendant Wu could hardly miss that the Clarksville Facility was nowhere near complete because, as he said during the interview, he was calling in from the Clarksville Facility and had been there for three days.

215.    Defendants' brazen misstatements about the Clarksville Facility in December 2023 supports the inference that their earlier statements during 2023 were also made with scienter.

> 7. *The difference between the facts Microvast claimed during the Class Period—that it was putting the finishing touches on Clarksville—and the true facts—that the delays and costs of the Clarksville Facility were causing substantial doubt about Microvast's ability to continue as a going concern—supports an inference of scienter*

216.    Microvast's 10-K, filed April 1, 2024, included a warning that "there is substantial doubt regarding our ability to continue as a going concern." These so-called going concern warnings indicate that the company does not have enough cash or sufficiently firm financing for the company to subsist through the following 12 months. In the 10-K, Defendants stated that Microvast was attempting to secure a $150 million loan to complete the Clarksville Facility.

217.    On May 9, 2024, Microvast filed its Q1 2024 10-Q. That 10-Q disclosed that Microvast was negotiating not only a $150 million but an additional $30 million working capital loan of lesser seniority.

AMENDED CLASS ACTION COMPLAINT - 59

218.    In the Q1 2024 10-Q, Microvast also disclosed that it had recruited an investment bank to, among other things, assess strategic alternatives—code for seeking to sell the company or file for bankruptcy.

## X.    PLAINTIFFS' CLASS ACTION ALLEGATIONS

219.    Plaintiffs brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all persons other than Defendants who acquired Microvast common stock publicly traded on the NASDAQ during the Class Period, and who held such shares through May 22, 2023, and/or April 1, 2024. Excluded from the Class are the Individual Defendants, the officers and directors of Microvast, members of the Individual Defendants' immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

220.    The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Microvast common stock was actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiffs at this time and can be ascertained only through appropriate discovery, Plaintiffs believe that there are hundreds, if not thousands, of members in the proposed Class.

221.    Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

222.    Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation. Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

AMENDED CLASS ACTION COMPLAINT - 60

223.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the Exchange Act was violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, the financial condition, business, operations, and management of Microvast;

- whether Defendants' public statements to the investing public during the Class Period omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

- whether the Defendants caused Microvast to issue false and misleading filings during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false filings;

- whether the prices of Microvast common stock during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

224.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## XI.    PRESUMPTION OF RELIANCE

225.    At all relevant times, the market for Microvast's common stock was an efficient market for the following reasons, among others:

- Microvast common stock met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

- As a regulated issuer, Microvast filed periodic public reports with the SEC and the NASDAQ;

- Microvast regularly and publicly communicated with investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

- Microvast securities met the requirements for listing, and were listed and actively traded on the NASDAQ, an efficient market;

- At least 20 market makers made a market in Microvast stock;

- On average, 5.6% of the total Microvast shares outstanding, or 9.8% of its float, traded weekly, permitting a very strong presumption of reliance;

- Microvast was followed by at least four securities analysts employed by major brokerage firms who wrote reports that were widely distributed and publicly available;

- Microvast was eligible to file a Registration Statement on Form S-3 throughout the Class Period; and

AMENDED CLASS ACTION COMPLAINT - 62

- Unexpected corporate announcements were followed by immediate stock price movements.

226.    As a result of the foregoing, the market for Microvast's common stock promptly digested current information regarding Microvast from all publicly available sources and reflected such information in the price of Microvast's common stock. Under these circumstances, all purchasers and acquirers of Microvast's common stock during the Class Period suffered similar injury through their purchase or acquisition of Microvast's common stock at artificially inflated prices and the presumption of reliance applies.

227.    Further, at all relevant times, Plaintiffs and all other Class members reasonably relied upon the Defendants to disclose material information as required by law and in the Company's SEC filings. Plaintiffs and the other Class members would not have purchased or otherwise acquired Microvast common stock at artificially inflated prices if the Defendants had disclosed all material information as required. Thus, to the extent that the Defendants concealed or improperly failed to disclose material facts with regard to the Company and its business, Plaintiffs and other Class members are entitled to a presumption of reliance in accordance with *Affiliated Ute Citizens of the State of Utah v. United States,* 406 U.S. 128 (1972).

## XII.    THE STATUTORY SAFE HARBOR AND BESPEAKS CAUTION DOCTRINE ARE INAPPLICABLE

228.    The Private Securities Litigation Reform Act's statutory safe harbor and the bespeaks caution doctrine applicable to forward-looking statements under certain circumstances does not apply to any of the false and materially misleading statements alleged herein.

229.    None of the statements complained of herein was a forward-looking statement. Rather, each was a historical statement or a statement of purportedly current facts and conditions relating to Microvast's business at the time such statement was made.

AMENDED CLASS ACTION COMPLAINT - 63

230.    To the extent that any of the false and materially misleading statements alleged herein can be construed as forward-looking, any such statement was not accompanied by meaningful cautionary language identifying important facts that could cause actual results to differ materially from those in the statement.

231.    To the extent that the statutory safe harbor does apply to any forward-looking statement alleged herein, the Defendants are liable for any such statement because at the time such statement was made, the particular speaker actually knew that the statement was false or misleading, and/or the statement was authorized and/or approved by an executive officer of Microvast who actually knew that such statement was false when made.

232.    Moreover, to the extent that any Defendant issued any disclosures purportedly designed to "warn" or "caution" investors of certain "risks," those disclosures were also materially false and/or misleading when made because they did not disclose that the risks that were the subject of such warnings had already materialized and/or because such Defendant had the requisite state of mind.

### XIII.   COUNT I
### Violation of Section 10(b) of The Exchange Act and Rule 10b-5
### <u>Against All Defendants</u>

233.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

234.    Plaintiffs assert this claim against all Defendants, basing the claim upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

235.    During the Class Period, in violation of Section 10(b) of the Exchange Act and Rule 10b-5(b), the Company and the Individual Defendants, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew or

AMENDED CLASS ACTION COMPLAINT - 64

deliberately disregarded were misleading in that they contained misrepresentations, omitted material facts, and failed to disclose material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading.

236.    The Company and the Individual Defendants violated §10(b) of the 1934 Act and Rule 10b-5(a) and (c) in that they employed devices, schemes and artifices to defraud and/or engaged in acts, practices and a course of business that operated as a fraud or deceit upon Plaintiffs and others similarly situated in connection with their purchases of Microvast securities and directly impacted the price of Microvast's common stock during the Class Period.

237.    The Company and the Individual Defendants acted with scienter in that they knew or recklessly disregarded that the public documents and statements issued or disseminated in Microvast's name were materially false and misleading and omitted material information; knew or recklessly disregarded that such statements or documents would be issued or disseminated to the investing public; and knowingly or recklessly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws.  These Individual Defendants, by virtue of their receipt of information reflecting the true facts of the Company, their control over, and/or receipt and/or modification of the Company's allegedly materially misleading statements or material omissions, and/or their associations with the Company which made them privy to confidential proprietary information concerning the Company, participated in the fraudulent scheme alleged herein. Information showing that Microvast, by and through the Individual Defendants, and other senior Microvast officers and employees, acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control.

238.    The Individual Defendants knew or recklessly disregarded the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Plaintiffs and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or other Microvast personnel to members of the investing public, including Plaintiffs and the Class.

239.    As a direct and proximate result of the scheme or artifice to defraud that led directly to Microvast's disclosing materially false and misleading information, the market price of Microvast's securities was artificially inflated during the Class Period. In ignorance of the falsity of the statements at issue, Plaintiffs and the other members of the Class relied on the statements described above and/or on the integrity of the market price of Microvast's securities during the Class Period in purchasing the Company's securities at prices that were artificially inflated as a result of Microvast's false and misleading statements and omissions.

240.    Had Plaintiffs and the other members of the Class been aware that the market price of Microvast's securities had been artificially and falsely inflated by the fraudulent scheme that caused Microvast to issue misleading financial statements, and by the material adverse information which the Company did not disclose, causing artificial inflation in Microvast's stock price, they would not have purchased Microvast's securities at the artificially inflated prices that they did, or at all.

241.    As a result of the wrongful conduct alleged herein, Plaintiffs and other members of the Class have suffered damages in an amount to be established at trial.

242.    By reason of the foregoing, Defendants Microvast and the Individual Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder and are

liable to the Plaintiffs and the other members of the Class for substantial damages which they suffered in connection with their purchases of Microvast's securities during the Class Period.

## XIV.    COUNT II
### Violation of Section 20(a) of the Exchange Act
### Against the Individual Defendants

243.    Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

244.    During the Class Period, Microvast, by and through its officers and directors, violated Section 10(b) of the Exchange Act and SEC Rule 10b-5 promulgated thereunder.

245.    The Individual Defendants participated in the operation and management of Microvast and its operating units, and conducted and participated, directly and indirectly, in the conduct of Microvast's business affairs. As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Microvast's financial condition and results of operations, and to correct promptly any public statements issued by Microvast which had become materially false or misleading.

246.    Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Microvast disseminated in the marketplace during the Class Period. Throughout the Class Period, the Individual Defendants exercised their power and authority over Microvast. The Individual Defendants, therefore, were "controlling persons" of Microvast within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Microvast's securities.

247.    Each of the Individual Defendants, therefore, acted as a controlling person of Microvast. By reason of their senior management positions and/or being directors of Microvast, each of the Individual Defendants had the power to direct the actions of, and exercised the same,

AMENDED CLASS ACTION COMPLAINT - 67

to cause Microvast to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of Microvast and possessed the power to control the specific activities which comprise the primary violations about which Plaintiffs and the other members of the Class complain.

248.    By reason of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act and are jointly and severally liable to the Plaintiffs and the other members of the Class for substantial damages that they suffered in connection with their purchases of Microvast securities during the Class Period.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs, on behalf of themselves and the Class, pray for judgment and relief as follows:

(a)    declaring this action to be a proper class action, designating plaintiffs as Lead Plaintiffs as class representative under Rule 23 of the Federal Rules of Civil Procedure and designating plaintiff's counsel as Lead Counsel;

(b)    awarding damages in favor of plaintiffs and the other Class members against all defendants, jointly and severally, together with interest thereon;

(c)    awarding plaintiffs and the Class reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)    awarding plaintiffs and other members of the Class such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

199.    Plaintiffs hereby demand a trial by jury.

AMENDED CLASS ACTION COMPLAINT - 68

Dated: May 13, 2024                    Respectfully submitted,

                                       **CONDON TOBIN SLADEK**
                                       **THORNTON NERENBERG PLLC**

                                        /s/   Stuart L. Cochran
                                       Stuart L. Cochran
                                       Texas Bar No. 24027936
                                       8080 Park Lane, Suite 700
                                       Dallas, Texas 75231
                                       Telephone: (214) 265-3804
                                       Email: scochran@condontobin.com

                                       *Co-Liaison Counsel for Co-Lead Plaintiffs*

                                       **THE ROSEN LAW FIRM, P.A.**

                                        /s/ Jonathan Horne
                                       Phillip Kim (admitted *pro hac vice*)
                                       Jonathan Horne (admitted *pro hac vice*)
                                       275 Madison Avenue, 40th Floor
                                       New York, New York 10016
                                       Telephone: (212) 686-1060
                                       Fax: (212) 202-3827
                                       Email: pkim@rosenlegal.com
                                       Email: jhorne@rosenlegal.com

                                       *Co-Lead Counsel for Co-Lead Plaintiffs*

                                       **THE SCHALL LAW FIRM**

                                       Brian Schall, Esq.
                                       1880 Century Park East, Suite 404
                                       Los Angeles, CA 90067
                                       Telephone: (424) 303-1964
                                       Email: brian@schallfirm.com

                                       *Additional Counsel for Movant Rodgers*

AMENDED CLASS ACTION COMPLAINT - 69

**STECKLER WAYNE & LOVE, PLLC**

*/s/ Bruce W. Steckler*
Bruce W. Steckler (TX Bar No. 00785039)
Austin P. Smith (TX Bar No. 24102506)
Paul D. Stickney, Of Counsel (TX Bar No.0789924)
12720 Hillcrest Suite 1045
Dallas, TX 75230
Tel: (972) 387-4040
Fax: (972) 387-4041
bruce@swclaw.com
austin@swclaw.com
judgestick@gmail.com

*Co-Liaison Counsel for Co-Lead Plaintiffs*

**BERGER MONTAGUE PC**

*/s/ Michael Dell'Angelo*
Michael Dell'Angelo (admitted *pro hac vice*)
1818 Market Street, Suite 3600
Philadelphia, PA 19103
Tel: (215) 875-3000
Email: mdellangelo@bm.net

*Co-Lead Counsel for Co-Lead Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on May 13, 2024, a true and correct copy of the foregoing document was served by CM/ECF to the parties registered to the Court's CM/ECF system.

*/s/ Stuart L. Cochran*
Stuart L. Cochran

AMENDED CLASS ACTION COMPLAINT - 70