**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | |
|---|---|
| KIM SCHELLING, individually and on behalf of all others similarly situated,<br><br>        Plaintiffs,<br><br>   v.<br><br>MICROVAST HOLDINGS, INC., YANG WU, CRAIG WEBSTER, SASCHA KELTERBORN, SHANE SMITH, and ZACH WARD,<br><br>        Defendants. | Case No. 4:23-cv-04565-ASH<br><br>**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE AMENDED CLASS ACTION COMPLAINT**<br><br>District Judge Andrew S. Hanen |

## TABLE OF CONTENTS

Page

STATEMENT OF NATURE AND STAGE OF THE PROCEEDING ........................................ 1

STATEMENT OF ISSUES TO BE RULED UPON BY THE COURT ...................................... 1

SUMMARY OF ARGUMENT .................................................................................... 2

FACTUAL BACKGROUND ...................................................................................... 3

LEGAL STANDARDS ............................................................................................. 6

ARGUMENT ......................................................................................................... 6

I.  Plaintiffs Adequately Allege Materially Misleading Statements and Omissions ............... 6

    A.  Defendants Misleadingly Stated That Microvast Had Received
        the $200 Million DOE Grant ........................................................................ 6

        1.  Defendants Concealed From Investors that Microvast Had
            Not Received a Grant and that It Had Misled the DOE ............................ 6

        2.  Defendants' References to Ongoing Negotiations Do Not
            Cure Their False Statements ...................................................... 9

    B.  Defendants Made False and Misleading Statements About the
        Progress of the Clarksville Facility ............................................................. 11

        1.  Defendant Wu's March 2023 Statement That All Equipment
            Was Laying on the Floor for Factory Acceptance Testing ...................... 11

        2.  Defendant Smith's May 2023 Statements that the
            Clarksville Facility Had Utilities, that Equipment
            Was Being Put on Boats, and that Once the Equipment
            Arrived Microvast Was Ready to Install It ........................................ 12

        3.  Defendants' Statements that Microvast Was On Track To
            Complete Construction By the Scheduled Deadlines .............................. 14

        4.  Defendants' Statements About the Race to Complete the Facility .......... 18

        5.  Defendants' Construction Updates and Completion Estimates
            are Not Protected Forward-Looking Statements ................................... 18

II.  Plaintiffs Adequately Allege Scienter ........................................................... 19

    A.  The DOE Grant Statements ......................................................................... 20

B.    The Clarksville Facility Statements ........................................................... 23

    1.    The Complaint Sufficiently Alleges that the Former
Employees Would Know the Facts They Provided ................................... 23

    2.    Defendant Wu's March 2023 Statement that He Saw All
the Equipment Ready for Factory Acceptance Testing ........................... 26

    3.    Defendant Smith's May 2023 Statements .................................................. 26

    4.    Defendants' Statements About Progress Toward Completion ................. 28

III.    Plaintiffs Allege a Section 20(a) Claim for Control Person Liability ............................... 30

CONCLUSION ..................................................................................................................... 30

## <u>TABLE OF AUTHORITIES</u>

<u>Page(s)</u>

<u>Cases</u>

*Amgen v. Conn. Ret. Plans & Tr. Funds*,
568 U.S. 455 (2013)........................................................................................ 10

*Brody v. Zix Corp.*,
2006 WL 2739352 (N.D. Tex. Sept. 26, 2006)............................................ 27, 28, 1

*Camelot Event Driven Fund v. Alta Mesa Res., Inc.*,
2021 WL 1416025 (S.D. Tex. Apr. 14, 2021) ................................................ 24

*Carlton v. Cannon*,
184 F. Supp. 3d 428 (S.D. Tex. 2016), *Amended on other grounds on denial of
reconsideration*, 2016 WL 3959164 (S.D. Tex. July 22, 2016) .................... 7, 21, 24

*City of Roseville Employees' Ret. Sys. v. Horizon Lines, Inc.*,
686 F. Supp. 2d 404 (D. Del. 2009)............................................................... 20

*Detroit Gen. Ret. Sys. v. Medtronic, Inc.*,
621 F.3d 800 (8th Cir. 2010) ......................................................................... 7

*Firefighters Pension & Relief Fund v. Bulmahn*,
53 F. Supp. 3d 882 (E.D. La. 2014)............................................................... 29

*Fitzpatrick v. Uni-Pixel, Inc.*,
35 F. Supp. 3d 813 (S.D. Tex. 2014) ............................................................. 25

*Ga. Firefighters' Pension Fund v. Anadarko Petroleum Corp.*,
514 F. Supp. 3d 942 (S.D. Tex. 2021) ........................................................... 16

*Hall v. Rent-A-Ctr., Inc.*,
2017 WL 6398742 (E.D. Tex. Oct. 19, 2017) ............................................... 30

*Holzwasser v. Staktek Holdings, Inc.*,
2006 WL 897746 (W.D. Tex. Mar. 30, 2006)................................................ 29

*In re Apache Corp.*,
2022 WL 4277350 (S.D. Tex. Sept. 15, 2022) ........................................... 16, 20

*In re Aphria, Inc. Sec. Litig.*,
2020 WL 5819548 (S.D.N.Y. Sept. 30, 2020)................................................ 26

*In re Cobalt Int'l Energy, Inc.*,
2016 WL 215476 (S.D. Tex. Jan. 19, 2016) ................................................ 1, 12

*In re NetSolve, Inc. Sec. Litig.*,
185 F. Supp. 2d 684 (W.D. Tex. 2001)........................................................... 22

*In re Pfizer, Inc. Sec. Litig.*,
538 F. Supp. 2d 621 (S.D.N.Y. 2008)............................................................. 21

*In re SemGroup Energy Partners, L.P.*,
729 F. Supp. 2d 1276 (N.D. Okla. 2010) ....................................................... 17

*In re Venator Materials PLC Sec. Litig.*,
547 F. Supp. 3d 624 (S.D. Tex. 2021) ........................................................ 19, 29

*Institutional Invs. Grp. v. Avaya, Inc.*,
564 F.3d 242 (3d Cir. 2009)............................................................................ 22

*KB Partners I, L.P. v. Barbier*,
  907 F. Supp. 2d 826 (W.D. Tex. 2012) ................................................................ 25
*Lee v. Active Power, Inc.*,
  29 F. Supp. 3d 876 (W.D. Tex. 2014) ................................................................ 23
*Lormand v. US Unwired, Inc.*,
  565 F.3d 228 (5th Cir. 2009) ................................................................ 13, 16
*Macquarie Infrastructure Corp. v. Moab Partners, L.P.*,
  601 U.S. 257 (2024) ................................................................ 9
*Marcus v. J.C. Penney Co., Inc.*,
  2015 WL 5766870 (E.D. Tex. Sept. 29, 2015) ................................................................ 17
*Matrixx Initiatives, Inc. v. Siracusano*,
  563 U.S. 27 (2011) ................................................................ 19
*Nathenson v. Zonagen Inc.*,
  267 F.3d 400 (5th Cir. 2001) ................................................................ 6, 19
*Oklahoma Firefighters Pension & Ret. Sys. v. Six Flags Ent. Corp.*,
  58 F.4th 195 (5th Cir. 2023) ................................................................ passim
*Oscar Priv. Equity Invs. v. Holland*,
  2004 WL 5244597 (N.D. Tex. June 10, 2004) ................................................................ 19, 2
*Owens v. Jastrow*,
  789 F.3d 529 (5th Cir. 2015) ................................................................ 20, 21
*Ramirez v. Exxon Mobil Corp.*,
  334 F. Supp. 3d 832 (N.D. Tex. 2018) ................................................................ 26
*Roberti v. OSI Sys., Inc.*,
  2015 WL 1985562 (C.D. Cal. Feb. 27, 2015) ................................................................ 23
*Rosenzweig v. Azurix Corp.*,
  332 F.3d 854 (5th Cir. 2003) ................................................................ 18
*Rougier v. Applied Optoelectronics, Inc.*,
  2019 WL 6111516 (S.D. Tex. Mar. 27, 2019) ................................................................ 15
*Shupe v. Rocket Cos.*,
  660 F. Supp. 3d 647 (E.D. Mich. 2023) ................................................................ 25
*Singh v. 21Vianet Grp., Inc*,
  2017 WL 4322483 (E.D. Tex. Sept. 13, 2017) ................................................................ 29
*Southland Sec. Corp. v. INSpire Ins. Sols., Inc.*,
  365 F.3d 353 (5th Cir. 2004) ................................................................ 23
*Spitzberg v. Houston Am. Energy Corp.*,
  758 F.3d 676 (5th Cir. 2014) ................................................................ 12, 13, 19, 20
*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
  551 U.S. 308 (2007) ................................................................ 20
*Town of Davie Police Pension Plan v. Pier 1 Imps., Inc.*,
  273 F. Supp. 3d 650 (N.D. Tex. 2017) ................................................................ 18
*W. Palm Beach Police Pension Fund v. DFC Glob. Corp.*,
  2015 WL 3755218 (E.D. Pa. June 16, 2015) ................................................................ 17
*Wieland v. Stone Energy Corp.*,
  2007 WL 2903178 (W.D. La. Aug. 17, 2007),
  *Report and recommendation adopted*, 2007 WL 4403548 (W.D. La. Oct. 1, 2007) ................................................................ 10

*Zak v. Chelsea Therapeutics Int'l, Ltd.*,
    780 F.3d 597 (4th Cir. 2015) ........................................................................... 10

<u>Statutes</u>

15 U.S.C. § 78u-4(b)(1) ........................................................................................ 6
15 U.S.C. § 78u-4(b)(2) ...................................................................................... 19

<u>Rules</u>

Fed. R. Civ. P. 9(b) .......................................................................................... 1, 6
Fed. R. Civ. P. 12(b)(6) ........................................................................................ 1

Lead Plaintiffs Steve Rodgers and Gregory Dunham, and Named Plaintiff Randy Fonk, (collectively "Plaintiffs"), respectfully submit this Opposition to the Motion to Dismiss (Dkt. 37) ("MTD") filed by defendants Microvast Holdings, Inc. ("Microvast"), Yang Wu, Craig Webster, Sascha Kelterborn, Shane Smith, and Zach Ward (collectively "Defendants").

## STATEMENT OF NATURE AND STAGE OF THE PROCEEDING

This is a securities class action brought on behalf of Microvast investors. Plaintiffs' Amended Class Action Complaint (Dkt. 30) ("Complaint") asserts claims under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934. The present briefing concerns Defendants' MTD. This is the first opportunity the Court has had to evaluate the substantive claims.

## STATEMENT OF ISSUES TO BE RULED UPON BY THE COURT

Whether Plaintiffs adequately pled the falsity and scienter elements of their claims as required by the Private Secs. Litig. Reform Act of 1995 ("PSLRA") and Fed. R. Civ. P. 9(b).

Defendants seek dismissal under Fed. R. Civ. P. 12(b)(6). "A motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure is viewed with disfavor and is rarely granted." *In re Cobalt Int'l Energy, Inc.*, 2016 WL 215476, at *2 (S.D. Tex. Jan. 19, 2016). The standard of review for Rule 12(b)(6) motions to dismiss in securities cases like this one is as follows:

> The complaint must be liberally construed in favor of the plaintiff, and all facts pleaded in the complaint must be taken as true.  The complaint must, however, contain sufficient factual allegations, as opposed to legal conclusions, to state a claim for relief that is "plausible on its face." When there are well–pleaded factual allegations, a court should presume they are true, even if doubtful, and then determine whether they plausibly give rise to an entitlement to relief.

*Id.*[1]

---

[1] Citations to quotes within quotes are omitted herein, unless otherwise noted.

1

## SUMMARY OF ARGUMENT

In the years after listing its stock on a U.S. stock exchange, Microvast, a battery manufacturer, claimed to investors that it was pivoting from its traditional Chinese market to America, where it would benefit from generous new subsidies. Though its workforce is overwhelmingly based in China, and it uses intellectual property and know-how developed in China to manufacture batteries in China, Microvast applied for a grant from a U.S. Department of Energy ("DOE") program designed to stand up a U.S. renewables industry that would compete with China. Despite the incongruity, in October 2022, Defendants announced that Microvast had actually received a grant, in the amount of $200 million. The news immediately caused Microvast's stock price to rocket 42%.

But as investors would learn in May 2023, Defendants' announcement was false. Microvast had not been selected to *receive* a grant, but instead to *negotiate* for one. As of October 2022, the DOE had not yet begun to substantively vet Microvast. Worse, there was a high likelihood the due diligence would go badly because Microvast had fabricated U.S. operations on its application. The risk concealed by Defendants' statements materialized in May 2023 when the DOE announced that it had dropped negotiations, causing Microvast's stock price to fall by 36% in one day.

In their MTD, Defendants mischaracterize Plaintiffs' theory. They argue that Microvast's statements to the DOE could not materially mislead investors because its SEC filings set out the scope of its Chinese operations. But the facts concealed from investors were not Microvast's operations, but that Microvast had not received a grant and had mischaracterized its operations in the application. That the DOE failed to uncover Microvast's misrepresentations in its applications until after inviting negotiations is not exculpatory.

Defendants also misled investors about Microvast's progress in its other attempt to exploit U.S. subsidies. Microvast boasted that it was building a new manufacturing facility in Clarksville,

2

Tennessee ("Clarksville Facility"), which would earn tax credits on every battery it made. Yet as 2023 progressed, production fell further and further behind. To conceal the delays, Defendants made a series of concrete false statements, detailing what Microvast had purportedly already accomplished. Indeed, Microvast's CEO described looking over a factory in China and seeing all the Clarksville Facility's equipment set up for factory acceptance testing, a scene that could never have occurred because even two months later the critical vendor responsible for 65-70% of the Facility's equipment had only assembled *one* machine for testing (it failed).

Implicitly acknowledging that the Complaint sufficiently alleges falsity and scienter, Defendants ignore the specific facts they told investors and claim all these statements conveyed was that construction was ongoing. Yet a materially misleading statement about construction progress is still actionable even if the defendant does not claim construction is complete. Microvast's CEO's statement that he saw the Clarksville Facility's equipment set up for factory acceptance testing gave reasonable investors false comfort that the project was more advanced, and the remaining work less costly and less risky, than was true.

The Complaint and Defendants' MTD are the proverbial ships passing in the night. The Court should deny Defendants' MTD.

## FACTUAL BACKGROUND

**Microvast**. Microvast produces batteries and battery components primarily for electric vehicles. ¶24.[2] During the Class Period[3], it conducted substantially all its manufacturing in China. ¶¶2, 24, 58-59. As of March 31, 2021, the last date for which Microvast provided a geographic breakdown, 94% of its employees worked in China. ¶67. According to its CEO, its technology was

---

[2] All "¶__" references are to the Complaint (Dkt. 30).
[3] The Class Period is from October 19, 2022, through April 1, 2024, both dates inclusive. ¶1.

entirely developed in China with no assistance from anyone located outside China. ¶66. Microvast has only nominal U.S. operations. ¶¶2, 24. Microvast is a darling of local and provincial Chinese governments who lavish it with subsidies and cheap loans. ¶¶69-71. It hosts an internal Chinese Communist Party cell, and its then-COO attended the cell's founding meeting. ¶¶72-74.

**The DOE Grant**. In 2021, the U.S. Congress enacted legislation which included a subsidy program designed to develop a U.S. clean energy industry specifically to compete with China's. ¶¶3-4, 46, 55-57. Microvast applied for, and in October 2022 announced that it had received, a $200 million DOE grant to develop a facility in Hopkinsville, Kentucky ("Hopkinsville Facility") that would build battery component parts. ¶¶5, 7, 60, 120. The day of the announcement, Microvast's stock price rose 42%. ¶181.[4]

Microvast's statements were false. *First*, Microvast misled the DOE in its grant application, characterizing itself as a U.S. corporation with branch manufacturing offices in China, rather than a company that conducted substantially all of its operations in China. ¶¶6, 62-65, 69. *Second*, Microvast had not actually received a grant, but was instead merely invited to negotiate for a grant. ¶¶7, 42-43. And, crucially, the DOE had not yet conducted due diligence on Microvast, so it was still relying on Microvast's false representations minimizing its Chinese operations. ¶¶7, 42-44. On May 22, 2023, the DOE announced that it was terminating negotiations with Microvast. ¶¶10, 61, 166. The DOE denied the grant after learning of Microvast's extensive ties to China in part from letters from two members of Congress who opposed Microvast's eligibility due to its China ties. ¶¶9-10, 61, 163-66. The day of the announcement, Microvast's stock price fell by 36%. ¶169.[5]

---

[4] The Complaint stated that the stock price increased by 33.8% that day (¶181), but that figure was understated. The correct increase was 42%. On October 19, 2022, Microvast opened trading at $1.57 and closed at $2.23.

[5] The correct percentage change on May 23, 2023 is 36% (rather than 45% in the Complaint), calculated from a previous close of $2.20 on May 22, 2023 to $1.40 (¶169).

**The Clarksville Facility**. Beginning in late 2022, Defendants boasted that Microvast was constructing its first U.S. facility, located in Clarksville, Tennessee. Defendants claimed that the Clarksville Facility was a carbon copy of Microvast's existing Huzhou, China facility and thus would face very little risk in being built and equipped. ¶¶90, 141. Yet Microvast instead encountered repeated delays in both constructing the facility and obtaining equipment. Lyric, a key vendor that was supposed to deliver equipment in March/April 2023 pushed deliveries back to April/May, then July, then August, then October. ¶¶12, 108-09. To conceal the delays, Defendants made a series of specific false claims about the progress. For instance, Defendant Smith told investors in May 2023 that the Clarksville Facility had utilities though it did not. ¶143. He then told investors that the facility's equipment was being put on boats with expected deliveries in Clarksville beginning in June, though because shipping from China to Clarksville takes eight weeks, deliveries by June were already chronologically impossible. ¶¶110, 143-44. And Defendant Wu boasted in March 2023 that he had actually seen "all the equipment laying on the floor for FAT [Factory Acceptance Testing]." ¶137. This was also impossible; the equipment had not been assembled by vendors by that date so it could not be ready for factory acceptance testing. ¶¶111-12, 114, 138.

Beginning in July 2023, construction slowed to a crawl as unpaid contractors (including the prime contractor) shifted employees from the site. ¶¶94, 103-05. Though Microvast was already half a year behind its schedule, Defendants continued to tell investors it was "on track" for completion by Q4 2023. ¶¶91, 141, 149. Construction stopped entirely by December 2023. ¶94. Yet, calling in to a December 2023 investor "Fireside Chat" from the deserted construction site, Defendant Wu continued to maintain that construction was "pretty much done" and production was not far away. ¶¶156, 160. On April 1, 2024, Microvast abruptly revealed that: (i) it was

5

suspending work on the Clarksville Facility because the Company ran out of funding; (ii) the facility was not close to completion; (iii) an additional $150 million to $170 million in funding was required before the facility could be production-ready; and (iv) an additional six to eight months of work would be needed if the funding were even secured. ¶¶15, 107, 170-74.

## LEGAL STANDARDS

**Standards for Pleading Falsity**. Under the PSLRA, plaintiffs must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and . . . state with particularity [the] facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1). The PSLRA incorporates the pleading standard of Fed. R. Civ. P. 9(b), and to meet that standard plaintiffs must "specify the statements contended to be fraudulent, identify the speaker, state when and where the statements were made, and explain why the statements were fraudulent." *Nathenson v. Zonagen Inc.*, 267 F.3d 400, 412 (5th Cir. 2001).

## ARGUMENT

I.    **Plaintiffs Adequately Allege Materially Misleading Statements and Omissions**

    A.    **Defendants Misleadingly Stated That Microvast Had Received the $200 Million DOE Grant**

        1.    **Defendants Concealed From Investors that Microvast Had Not Received a Grant and that It Had Misled the DOE**

Microvast's pivot to America depended on extensive subsidies. To appease investors, Defendants repeated for more than seven months that Microvast had been "selected" by the DOE to "receive" a "$200 million grant." ¶¶120-21, 123, 126-27, 129-31, 133, 135.[6] These statements were false: Microvast had not been selected to receive a grant but instead to negotiate one. ¶7. In fact, other than looking into the project's technical feasibility, the DOE had done nothing to assure

---

[6] For the Court's convenience, a list of key excerpts from Defendants' false and misleading statements regarding the DOE grant and Clarksville Facility is set forth at Exhibit A hereto.

itself that Microvast was a proper recipient. ¶¶42-44. Thus, Defendants' statements gave investors the misleading impression that the DOE had "approved" Microvast's application and "selected [it] to receive" a grant, when it had done no such thing. *See Carlton v. Cannon*, 184 F. Supp. 3d 428, 468 (S.D. Tex. 2016)[7] (falsity established where defendants created "an impression of a state of affairs" materially different than the "one that actually existed").

Reasonable investors interpreted Defendants' statements as meaning Microvast had actually received the grant. Microvast's stock price rose 42% the day it falsely announced it had received the grant and fell 36% when the DOE announced that it was dropping negotiations. ¶¶10, 169; *supra* n. 4, 5. These price movements show that Defendants' false statements misled investors. *See*, *e.g.*, *Detroit Gen. Ret. Sys. v. Medtronic, Inc.*, 621 F.3d 800, 807 (8th Cir. 2010) ("A significant change in stock price upon disclosure of withheld information is strong evidence that the information was material.").

Microvast's statements to investors also misleadingly concealed a serious, company-specific risk that threatened approval of the grant: it had made false statements in its DOE application. ¶¶81, 122. In its non-public application for the grant, Microvast told the DOE—falsely—that it was a company based in the U.S. with only minimal operations in China and that its "research centers in Orlando, FL, Germany, and Asia have generated" its intellectual property. ¶¶62-63, 65, 122. Indeed, Microvast specifically stated in the application that it had manufacturing sites in "USA, Europe, and Asia." MTD at 10; ¶¶63-65. But Microvast's *only* manufacturing site was in China, 95% of Microvast's employees were based in China (1.6% worked in the U.S.) as of just a year before its application, and in November 2021 its CEO had told a Chinese audience

---

[7] *Amended on other grounds on denial of reconsideration*, 2016 WL 3959164 (S.D. Tex. July 22, 2016).

that **all** its technology had been developed in China by citizens of China **alone**. ¶¶66-67. Indeed, Microvast hosted a Chinese Communist Party cell whose founding meeting was attended by Microvast's then-COO, where attendees were required to swear an oath to the Chinese Communist Party. ¶¶72-74. Put simply, Microvast is a Chinese company whose only substantial connection to the U.S. was that it was incorporated here and hoped to one day open facilities here. Thus, Microvast faced the high likelihood that when the DOE did conduct due diligence, it would discover Microvast's false statements and would drop the negotiations. ¶¶81, 122.

Defendants' arguments to the contrary lack merit. Defendants argue that Microvast's statements to the DOE could not have misled investors because they were not public. MTD at 2, 9-10. That the DOE application was not public is a significant aspect of why investors were misled. Investors would assume that Microvast had forthrightly told the DOE that its operations were overwhelmingly Chinese, and the DOE nonetheless decided to proceed with grant negotiations. ¶¶8, 122. And for the same reason, it does not matter that Microvast publicly disclosed its connections to China, because what Microvast's statements concealed to investors was that it misled the DOE, creating a significant risk of grant denial.

Microvast tries to shift blame to the DOE for failing to uncover misstatements in the application, charging the DOE with constructive knowledge of Microvast's SEC filings. MTD at 12. There is no doubt that the DOE initially did not conduct appropriate due diligence before announcing the selection of Microvast to *negotiate* for a potential award. ¶¶42, 44. But even though Microvast had successfully bamboozled the DOE, its false statements in its application made it significantly more likely that the DOE would eventually cut off negotiations.

Rejecting the Complaint's allegations, Defendants declare that their own misstatements were inconsequential because the real story is that the DOE bowed to "anti-Chinese sentiment"

and "political posturing." MTD at 1, 12. Microvast will have an opportunity to level these accusations at summary judgment or trial, though it bears noting that the alarm at the DOE's award to Microvast was bipartisan. ¶47.[8] At the motion to dismiss stage, the Complaint's allegations govern, and the Complaint alleges that the DOE has itself admitted it only conducted technical due diligence before inviting Microvast to negotiate and that Microvast's application contained false statements creating a risk of grant denial. ¶¶42, 62-65, 122.

Defendants also point to other federal U.S. grants Microvast received but the awards were made by a different office under a different legal regime. These small awards in which Microvast was a subcontractor were made in 2020 at the latest,[9] before the Infrastructure Investment and Jobs Act was enacted to stand up a U.S. green energy industry and before the DOE office was created which granted and administered the awards (¶¶41, 45-48). They do not show the DOE considered, or even knew anything about, Microvast's Chinese operations.

Finally, contrary to Defendants' arguments (MTD at 9-11), the Complaint does not allege "pure omissions." "A pure omission occurs when a speaker says nothing, in circumstances that do not give any particular meaning to that silence." *Macquarie Infrastructure Corp. v. Moab Partners, L.P.*, 601 U.S. 257, 263 (2024). Defendants told investors Microvast had received a grant.

### 2. Defendants' References to Ongoing Negotiations Do Not Cure Their False Statements

Defendants concede, as they must, that their past-tense statements that Microvast had been selected to receive the DOE grant are *not* forward-looking. Defendants nonetheless claim that other

---

[8] Exhibit B at 4, statement by Senator Manchin during October 19, 2023 Senate hearing ("[O]ur committee expressed bipartisan concern at a hearing earlier this year when DOE was considering providing a grant to Microvast, a battery company with alleged links to the Chinese government. . . . DOE ultimately made the correct decision not to award this grant . . ..").

[9] MTD Ex. 3 at 9.

disclosures make their false statements not misleading, a truth-on-the-market defense. MTD at 11-13. Such a truth-on-the-market defense is "intensely fact-specific" because the defendant must show that the "'corrective information was conveyed to the public with a degree of intensity and credibility sufficient to counterbalance effectively any misleading information created by' the allegedly false and misleading statements." *Wieland v. Stone Energy Corp.*, 2007 WL 2903178, at *11 (W.D. La. Aug. 17, 2007)[10]; *see also Amgen v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 481-82 (2013) (whether "news of the [truth] credibly entered the market and dissipated the effects of [prior] misstatements…is a matter for trial").

The disclosures Defendants cite come nowhere close to establishing a truth-on-the-market defense. Defendants warned only that the "'specific terms and conditions of the [DOE] grant funding remain under negotiation.'" MTD at 5. A company's warning that it may not reach its ultimate destination does not clear up the misleading impression given by false reports overstating its progress. *See Zak v. Chelsea Therapeutics Int'l, Ltd.*, 780 F.3d 597, 601, 610-11 (4th Cir. 2015) (alleged mischaracterization of FDA comments actionable even though defendant never promised FDA would approve drug and cautioned that it had raised "lines of inquiry" calling approval into question). Similarly, Microvast's disclosures of political risks do not immunize its false statements. MTD at 11. *First*, Microvast did not face generic political risks just because it is a Chinese company. It faced the risk of not getting the grant because it made misstatements in its application. *Second*, Defendants did not state that they believed Microvast would receive a grant, they made the past-tense statement that Microvast already received the grant. Thus, Microvast has not met its burden of showing that its generic risk disclosures eliminated any risk of misleading investors.

---

[10] *Report and recommendation adopted*, 2007 WL 4403548 (W.D. La. Oct. 1, 2007).

Similarly, Defendants point to *the DOE's* disclosure that "DOE may cancel negotiations and rescind the selection for any reason during that time." MTD at 5, 13. In addition to being another truth-on-the-market defense, the DOE's disclosure fails for several reasons. *First*, the DOE explains what happens when applicants are selected for award negotiations, but investors had no reason to believe Microvast was merely selected for negotiations, given that Microvast claimed to have been selected to receive a grant. *Second*, the DOE's disclosure does not mitigate Defendants' own false statements. *Third*, the DOE disclosing that it may cancel negotiations does not adequately disclose to investors that the DOE would have good reasons to cancel once it discovered that Microvast's application concealed its Chinese operations.

## B. Defendants Made False and Misleading Statements About the Progress of the Clarksville Facility

### 1. Defendant Wu's March 2023 Statement That All Equipment Was Laying on the Floor for Factory Acceptance Testing

On March 16, 2023, Defendant Wu stated on Microvast's Q4 2022 earnings call: "I went there [China] last week. ***I saw all the equipment laying on the floor for FAT [Factory Acceptance Testing]***." ¶137.[11] In fact, it was chronologically impossible for vendors to have provided "all" or even most of the Clarksville Facility's equipment for factory acceptance testing at the time of Wu's statement. Microvast told investors the Clarksville Facility would be fully automated, involving complex equipment that needed to be precisely calibrated. ¶112. Lyric, a third-party vendor, was responsible for 65-70% of the Clarksville Facility's equipment, including its most complicated. *Id.* By February 2023, Lyric told Microvast of the first in a series of delays that would ultimately doom the Clarksville Facility. ¶109. The equipment must be assembled before it can be subjected to factory acceptance testing, but even by May 2023, two months after Wu's statement, Lyric had

---

[11] All emphasis in quotes herein is added, unless otherwise noted.

only assembled *one machine* for factory acceptance testing. ¶¶111-12, 138.  Thus, Wu could not have seen "all" the equipment on the floor for testing.

Defendants' argument that Wu's statement was true disregards the statement itself. MTD at 25. *First*, Defendants say Wu might have been referencing equipment supplied by a vendor other than Lyric. At the pleading stage, reasonable inferences in interpreting Wu's statement are resolved in favor of Plaintiffs, not Defendants. *See, e.g.*, *In re Cobalt*, 2016 WL 215476 at *2; *see also Spitzberg v. Houston Am. Energy Corp.*, 758 F.3d 676, 689 (5th Cir. 2014) (reasonable investors' interpretation of statement is fact question to be resolved by factfinder). Wu categorically stated that he saw "all" the equipment. Reasonable investors had no reason to read a substantial qualification into Wu's statement (*i.e.*, that he was referring to just a subset of the aggregate equipment needed for Clarksville) that Wu himself never suggested. *Second*, Defendants maintain that Wu nowhere said the equipment was "ready" for factory acceptance testing. They say he may have been speaking of equipment in a pre-assembled state not yet ready for testing but that would subsequently be assembled and subjected to factory acceptance testing. But if the equipment is not ready, then it is on the floor "for" assembly, not factory acceptance testing.

Finally, Wu did not make a "high-level general statement" (MTD at 15) that construction was progressing: he described a scene he purportedly saw.

### 2.    Defendant Smith's May 2023 Statements that the Clarksville Facility Had Utilities, that Equipment Was Being Put on Boats, and that Once the Equipment Arrived Microvast Was Ready to Install It

At Microvast's May 25, 2023 high-profile Investor Day, Smith told investors that: (i) Microvast had completed the "***building with utilities***," and (ii) "***[the equipment is] now being put on boats. Through June, July, August, September, all the equipment's coming into Clarksville***." ¶143. Neither statement was true.

*First*, even a month later, the Clarksville Facility did not have electricity. ¶98. Indeed, by August 2023, Microvast had only installed power to certain select functions. *Id.* Microvast had not even built out the Clarksville Facility's internal structure as of June. ¶¶98-100.

*Second*, "the equipment" was not "now being put on boats." Smith's categorical statement conveyed that Microvast had scheduled delivery of all equipment to the Clarksville Facility. Instead, Microvast had scheduled a single small shipment, which would arrive in July, and nothing would arrive in June. ¶¶13, 110.  By August 2023, *none* of Lyric's equipment had been shipped to the U.S., and only 10% of the aggregate equipment required by the Clarksville Facility had been shipped by Microvast's vendors. ¶114.

Smith's statements gave investors a materially misleading impression of progress on the Clarksville Facility and the risks Microvast still faced. If, as Smith maintained, the building was already complete, then all that remained was installing the equipment. If the equipment was already being put on boats, then reasonable investors would conclude the Clarksville Facility was almost finished and completion was a mere matter of installing functioning equipment.

Defendants nonetheless argue that Smith's statements were true. MTD at 14, 28. They maintain that the Clarksville Facility had utilities, presumably because it had an external connection to power. But literally true but misleading statements are actionable under the securities law because disclosure "is measured … by the ability of the statements to accurately inform rather than mislead." *Lormand v. US Unwired, Inc.*, 565 F.3d 228, 248 (5th Cir. 2009). And it is *at least* plausible that a reasonable investor (or home buyer) expects that a building "with utilities" is fully wired, not just that it is connected to the grid. *See Houston American*, 758 F.3d at 689 (given competing interpretations, ultimate interpretation of statement is not suitable at motion to dismiss stage). Moreover, if there were any doubt, Smith's statement that "as soon as [the equipment]

lands, we're ready to [install it]" (¶¶89, 143) makes clear that Smith was saying the building is fully wired. It makes no sense to install equipment if there is no outlet to plug it into, or before the floor on which it will rest is complete. And as with Wu's statement about factory acceptance testing, Smith's claims that the Clarksville Facility had utilities and that equipment was presently being put on boats is neither "high-level" nor "vague." He described the present status of construction and equipment shipments.

### 3. Defendants' Statements that Microvast Was On Track To Complete Construction By the Scheduled Deadlines

Defendants' statements about progress towards completion, such as construction being "on track" (May 2023, Aug. 2023), "nearly done" (Aug. 2023), "nearly at completion" (Nov. 2023), and "pretty much done" (Dec. 2023), were statements of present fact that were false and misleading when made. ¶¶139, 141, 147, 149, 150, 152, 154, 156; Exhibit A. Thereafter, on April 1, 2024, Microvast revealed that the Clarksville Facility was not close to completion, an additional $150 million to $170 million in funding was required before completion, and an additional six to eight months of work would be needed if funding were even to be secured. ¶¶15, 107, 170-74.

In reality, as Defendants made their statements, it was becoming increasingly clear that Microvast would never be able to complete the Clarksville Facility with its existing funding. Contractors began reducing headcounts in July 2023 and walking off the job in August 2023 because Microvast failed to pay them. ¶¶12, 103. Contractors even began taking the relationship-damaging step of filing mechanics' liens due to non-payment. ¶¶15, 101, 107. Because of the reduced workforce, little work was done between August and December when Microvast's contractors completely demobilized because Microvast failed to pay their bills. ¶¶94, 103.

Moreover, Defendants tied their statements about the expected Q4 2023 completion date to the present status of construction. For instance, on March 16, 2023, Wu told investors to expect

completion by Q4 2023 ***because*** "we are on the fast speed . . . for the construction" and "all the equipment" was ready for factory testing. ¶137. On August 8, 2023, Defendants said production was expected to begin by Q4 2023 ***because*** the "construction phase is nearly done" and "[w]e are running super, super fast." ¶¶150, 152. Mixed statements of present fact and future projections are actionable as statements of current fact where the statements convey a misleading picture of current progress. *See Oklahoma Firefighters Pension & Ret. Sys. v. Six Flags Ent. Corp.*, 58 F.4th 195, 211 (5th Cir. 2023) ("Although the deadline is a future projection, the crux of Plaintiff's fraud claim is that Defendants misled investors about the Company's present construction progress. This is a mixed present/future statement ineligible for safe harbor protection."); *Rougier v. Applied Optoelectronics, Inc.*, 2019 WL 6111516, at *10 (S.D. Tex. Mar. 27, 2019) (safe harbor protection denied for projections that omitted current adverse facts). Thus, Defendants are liable for their misleading Q4 2023 timeframe that was tied to false statements of current construction progress.

The equipment delivery process was similarly plagued with delays. Microvast had disclosed an aggressive timeline for completion of the Clarksville Facility, for which it needed complex, precision-calibrated equipment. ¶112. The process of obtaining, testing, and installing equipment was time-consuming and contingent on timely delivery from equipment vendors. If Microvast fell behind on factory acceptance testing, then the entire project would be delayed on the back end. Yet according to multiple FEs, by ***early 2023***, Microvast was already seeing major equipment procurement delays. ¶93. Microvast's construction plan contemplated that its main vendor Lyric would complete all its deliveries in China by March or April 2023, giving Microvast eight or nine months to test, ship, install, and calibrate the equipment by Q4 2023. ¶¶87, 93, 109, 140. But, according to FEs, by February 2023 Lyric pushed its deadline to May 2023. ¶93. From then on, every couple of months, Lyric delayed the expected delivery date for its equipment by

another couple of months. ¶109. According to FE 3, by August 2023 *none* of the Lyric equipment had been shipped to the U.S. and only 10% or less of Microvast's total equipment was delivered by vendors. ¶¶93, 114. Because Lyric did not complete delivery by then—or by May, June, August, or even November—Defendants were not "on track" to meet their aggressive construction schedule calling for production to begin in Q4 2023. Defendants' "on track" claims were false because they had fallen behind their own schedule and would not be able to make up the time.

It is also clear that Microvast was falling behind schedule because its skilled employees had no work to do. Microvast hired skilled technical employees like FE 1 to install and maintain the equipment in the Clarksville Facility. Because of equipment delays, Microvast had FE 1 and FE 1's team instead conduct construction tasks like hanging up drywall and repairing bathrooms. ¶¶31, 117. Microvast would not have employed its technical employees in construction if it was meeting its schedule.

Defendants argue that they cannot be liable for concealing the equipment delays because Microvast included a general risk disclosure in its Form 10-Ks stating "'delays by [our] equipment vendors'" could affect the Company's ability to meet projections. MTD at 6, 15. For the reasons discussed *supra* § I.A.2, this risk disclosure does not inoculate Defendants' statements of present facts.[12] Further, Defendants boilerplate risk disclosure is not tailored to the reality that equipment delays were *already occurring* and would delay operability of the Clarksville Facility. A boilerplate warning of a hypothetical risk is ineffective when the risk has already come to pass. *See In re Apache Corp.*, 2022 WL 4277350, at *5 (S.D. Tex. Sept. 15, 2022) ("far more specific warnings were required" when the company had "data indicating" that the risk would occur); *Ga.*

---

[12] Nor are Defendants protected by any "safe harbor" as the Complaint alleges. They knew the statements were misleading at the time. *Lormand*, 565 F.3d at 244.

*Firefighters' Pension Fund v. Anadarko Petroleum Corp.*, 514 F. Supp. 3d 942, 953 (S.D. Tex. 2021) ("[w]hen risks have already begun to materialize, it is no longer sufficient to generally warn of the possibility of these risks in the future."); *Marcus v. J.C. Penney Co., Inc.*, 2015 WL 5766870, at *3 (E.D. Tex. Sept. 29, 2015) (same).[13]

Finally, to distract from the Complaint's evident merit, Defendants seek to nitpick its allegations. MTD at 15-16. But the errors are Defendants'. Defendants stated in May 2023 that Microvast was about "halfway" through Microvast's "$300 million investment." ¶145. Defendants stated in April 2024 that Microvast was "halfway through [] on CapEx" with $150 million left. ¶173. This is an apples-to-apples comparison: in both cases, nearly a year apart, Defendants are describing $300 million in expenditures as half complete. ¶174. Defendants also maintain that Webster's December 2023 statement that "the [] hard yards have been done" relates to Clarksville Phase 1B, not Phase 1A. MTD at 16. Not so. The "hard yards" statement relates to Phase 1A, with Phase 1B (the easy yards, by contrast) then involving installing identical equipment with expenditures that are timed so that they can be paid from cash flows generated by government subsidies. ¶159.

---

[13] Defendants also challenge several statements as "puffery" by taking certain portions of statements out of context. MTD at 16-17. When read in context, these statements are "too specific to categorize as general corporate optimism." *See Six Flags*, 58 F.4th at 220. Importantly, the Fifth Circuit has held that statements similar to the statement that Microvast was making "great strides on Clarksville" are not puffery. *See id.* ("Statements describing construction as 'continuing' and 'progressing' in the context of confirming the park timelines [for completion] are not puffery."). These statements also involve matters of vital importance for the Company. *See, e.g.*, *W. Palm Beach Police Pension Fund v. DFC Glob. Corp.*, 2015 WL 3755218, at *13 (E.D. Pa. June 16, 2015) ("Far from being a vague statement of intention or optimism, fraudulent comments regarding [] a fundamental aspect of [defendant's] business are of vital importance to investors."). Further, these statements contradict current information at the Company. *See, e.g.*, *In re SemGroup Energy Partners, L.P.*, 729 F. Supp. 2d 1276, 1294 (N.D. Okla. 2010) (a statement is not puffery "where material, nondisclosed information undermines the truth of those statements").

### 4.    Defendants' Statements About the Race to Complete the Facility

Defendants' August 8, 2023 statement that Microvast was "racing" to achieve production by Q4 2023, and Defendants' December 13, 2023 statement that it was "in [a] race to get Clarksville into production," were both misleading when made. ¶¶150, 157. Microvast's contractors began deserting the work site in July 2023, 20% of the contractors left the site by August, and all contractors completely demobilized by December 2023/January 2024. ¶¶94, 103. Also, according to Defendant Ward, by November 2023 only 30% of the equipment had been delivered by vendors. ¶154. Little to no progress was being made at the time of Defendants' statements, and no race was being run.[14]

### 5.    Defendants' Construction Updates and Completion Estimates are Not Protected Forward-Looking Statements

Defendants argue that a subset of their Clarksville statements are protected as forward-looking. MTD at 17-18; MTD Appx. B pp. 1-2.[15] Their arguments fail.

The claims about completing the Clarksville Facility by Q4 2023 were intertwined with statements describing the progress of construction. "Mixed present/future statement[s]" about construction deadlines and progress are actionable as present-tense statements if they convey a

---

[14] Defendants' cases are inapposite. In *Rosenzweig v. Azurix Corp.*, 332 F.3d 854, 861, 870 (5th Cir. 2003), the defendants' vague statements that the company was "making steady progress" was puffery because the destination—"maximiz[ing] returns on our existing businesses"—was itself vague. Similarly, *Town of Davie Police Pension Plan v. Pier 1 Imps., Inc.*, 273 F. Supp. 3d 650, 677-78 (N.D. Tex. 2017) involved vague statements of being "sophisticated" and "well prepared" that were "too general to be material." Here, Defendants were not "racing" towards a set completion date, they were losing more and more contractors because Microvast stopped paying their bills. Defendants' statements are similar to *Six Flags* and false for the same reason. In *Six Flags*, the Fifth Circuit found actionable a statement that the company was "progressing nicely" because it "misled investors about the [c]ompany's *present* construction progress" to meet a concrete plan. 58 F.4th at 210-11 (emphasis in original).

[15] Notably, Defendants do ***not*** argue that their statements that construction was "about half-way through," "nearly done," "nearly at completion," and "pretty much done" were forward-looking. Those statements were clearly statements of then-existing fact.

misleading picture of current construction status. *Six Flags*, 58 F.4th at 210-11, 217 (holding that a statement that construction was "progressing nicely towards their anticipated opening dates" is a present-tense statement because of previously-disclosed schedule); *In re Venator Materials PLC Sec. Litig.*, 547 F. Supp. 3d 624, 656-58 (S.D. Tex. 2021) (statement that company "continue[s] to make progress on the construction phase" and "expect … capacity to be producing finished product during the second half of this year" are actionable as mixed statements of present fact). Defendants knew throughout 2023 that construction and equipment deliveries were significantly delayed such that it was nearly impossible for the Clarksville Facility to be operational by Q4 2023. Thus, Defendants' statements are not protected under the safe harbor.[16] Further because of Defendants' previously-disclosed construction plan (¶¶140, 148), their statements that construction was expected to be completed by Q4 2023, are actionable statements of present fact.

## II.    Plaintiffs Adequately Allege Scienter

Plaintiffs must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). In this circuit, scienter is an "intent to deceive, manipulate, or defraud or severe recklessness." *Six Flags*, 58 F.4th at 214. Severe recklessness consists of conduct that "'present[s] a danger of misleading [investors] which is either known to the defendant or is so obvious that the defendant must have been aware of it.'" *Nathenson*, 267 F.3d at 408.[17]

---

[16] Defendants also argue that some of the purportedly forward-looking statements are immaterial. MTD at 19. But "materiality is usually a mixed question of law and fact properly left to a jury." *Oscar Priv. Equity Invs. v. Holland*, 2004 WL 5244597, at *9 (N.D. Tex. June 10, 2004).

[17] Motive allegations are not necessary for a strong inference of scienter. *Houston Am.*, 758 F.3d at 685 ("a strong inference of severe recklessness does not depend on [motive allegations] in the present case."); *see also Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 48 (2011) ("The absence of a motive allegation, though relevant, is not dispositive.").

Facts supporting scienter must be viewed "holistically" rather than "scrutinized in isolation." *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 323, 326 (2007); *accord Owens v. Jastrow*, 789 F.3d 529, 536 (5th Cir. 2015). "The inference . . . [of] scienter need not be irrefutable, *i.e.*, of the 'smoking-gun' genre, or even the 'most plausible of competing inferences.'" *Tellabs*, 551 U.S. at 324. A strong inference of scienter is "at least as compelling as any opposing inference one could draw from the facts alleged." *Id.* "[W]here there are competing inferences that establish or negate the scienter requirement, 'a tie favors the plaintiff' on a motion to dismiss." *Houston Am.*, 758 F.3d at 686.

## A.    The DOE Grant Statements

For seven months, Defendants repeatedly made clear, unequivocal statements that Microvast had been "selected" to "receive" a $200 million grant from the DOE. In the MTD, Defendants do not dispute that they knew Microvast had only been invited to negotiate a grant. Because Defendants knew facts showing their statements were false, they made the statements with scienter. *See In re Apache Corp.*, 2022 WL 4277350, at *8 (collecting cases).[18]

Defendants nonetheless maintain that their knowledge of contrary facts does not establish scienter because facts about the DOE program were purportedly public. MTD at 13. This non-sequitur does not impact the scienter analysis. Here, Plaintiffs allege specific facts showing that Defendants knew their statements were false or were severely reckless. Even if investors were aware of public information regarding the terms of the grant, reasonable investors would assume that when Defendants said unequivocally that Microvast had been "selected" to "receive" a grant,

---

[18] Unlike here, in *City of Roseville Employees' Ret. Sys. v. Horizon Lines, Inc.*, 686 F. Supp. 2d 404, 425 (D. Del. 2009), the challenged statements' specificity did not suffice for scienter because the plaintiffs alleged lower-level employees secretly conspired to fix prices and plaintiffs did not allege facts showing the defendants knew or had any way to know when they made statements.

it was based on representations from the DOE.[19] Falsely claiming that Microvast had been selected to receive the grant without specific assurances from the DOE is severe recklessness. *Id.*

In addition, Plaintiffs allege scienter by showing that Defendants made misstatements about important facts connected to the company's core business. *Carlton*, 184 F. Supp. 3d at 479. Courts consider four factors: "(1) a small company where it is more likely corporate executives are familiar with day-to-day operations; (2) transactions 'critical to the company's continued vitality'; (3) omitted information readily apparent to the speaker; and (4) statements by the corporate officer that are internally inconsistent." *Id.* at 479, 484 ("four considerations that might tip the scales in favor of an inference of scienter…No one 'special circumstance' is dispositive.").

Here, the difference between what Wu said in China and what Microvast told the DOE supports scienter. Wu told his Chinese audience that Microvast's intellectual property and know-how were entirely produced by citizens of China working in China. ¶66. Microvast told the DOE the opposite, claiming that its U.S. sites had contributed to developing its potent intellectual property library. ¶65. Microvast told the DOE that it was a U.S. company with manufacturing in the U.S. and Germany, relegating China (site of substantially all its operations) to third place. ¶¶62-64. Thus, Wu knew Microvast had obtained an invitation to negotiate by making false statements to the DOE, imperiling the application. The internal inconsistency between Wu's statements supports scienter.

---

[19] Defendants' cases are inapposite. In *Owens*, 789 F.3d at 540-41, a great recession case, the company failed to take an accounting charge but voluntarily disclosed the red flags the investors maintained required the accounting charge. In *Pfizer*, the contradictory information was public studies calling a drug candidate's mechanism of action into question. *In re Pfizer, Inc. Sec. Litig.*, 538 F. Supp. 2d 621, 629 (S.D.N.Y. 2008). Here, neither the DOE application nor Microvast's communications with the DOE were public.

Moreover, while Microvast itself had slightly more than a thousand employees, its U.S. operations—by law, responsible for applying for and administering the grant—only consisted of 20 employees as of March 31, 2021. ¶67. The size of the U.S. operations makes it more likely that Microvast executives are familiar with the DOE grant issues.

Significantly, the DOE grant was critical to Microvast's continued vitality. With increasing tensions with China bringing new trade protections, Microvast was depending on a strong U.S. manufacturing base for its survival. *See In re NetSolve, Inc. Sec. Litig.*, 185 F. Supp. 2d 684, 697 (W.D. Tex. 2001) (scienter where misstatements concerned "lifeblood of the company"). The announcement of the DOE grant was plainly important to investors: it caused Microvast's stock price to increase by 42%. *Supra* n. 4. Defendants understood as much and listed the grant as the first "Highlight" for Q3 2022. ¶181. The importance of the DOE grant to the Microvast story supports scienter because Defendants would have an incentive to learn critical facts about the company's business and if they failed to learn these facts before they made their unhedged statements it "is not necessarily exculpatory." *Institutional Invs. Grp. v. Avaya, Inc.*, 564 F.3d 242, 270 (3d Cir. 2009). And even after the grant drew Congressional attention because of Microvast's connection with China, Defendants continued to misstate that it had already been awarded. ¶192.

Finally, the omitted information was readily apparent. Microvast had merely been invited to negotiate for a grant, in fact Defendants do not dispute that they knew Microvast had not yet received the grant when they made their statements. Nevertheless, Defendants repeatedly stated that they had actually been selected to receive the DOE grant. Moreover, Microvast's deception of the DOE did not relate to a tangential issue but instead directly to the purpose of the DOE grant. The Infrastructure Investment and Jobs Act was designed precisely to stand up a U.S. clean energy industry to compete against China, not to assist a company with deep ties to China. ¶¶62-63, 187.

Further, Defendants Smith, Webster, Kelterborn, and Wu spoke publicly about the DOE grant, creating an inference that they had knowledge of facts underlying the topics they spoke about. *See*, *e.g.*, *Roberti v. OSI Sys., Inc.*, 2015 WL 1985562, at *12 (C.D. Cal. Feb. 27, 2015) ("[A]n inference of scienter can be established by the fact that the Defendant[s' statements] touched on the specific issue[.]"). For example, Defendant Wu stated on the March 16, 2023 earnings call that Microvast had been "selected for a $200 million grant by the [DOE]." ¶133; MTD Ex. 15. Defendant Kelterborn stated at the February 15, 2023 investor conference that Microvast had been "selected by the [DOE] for a $200 million grant," and "we just, just, just received" the grant. ¶131; MTD Ex. 13. Defendant Webster stated on the November 10, 2022 earnings call: "that's why we received such a significant grant" and "it's a grant, we don't have to pay it back." MTD Ex. 9.

In any case, the scienter of both Smith and non-defendant Wenjuan Mattis is clear and imputed to Microvast. For corporate statements it is not just the speaker whose scienter is imputed to the company. *Lee v. Active Power, Inc.*, 29 F. Supp. 3d 876, 884-85 (W.D. Tex. 2014). Courts also impute the scienter of officials who "order or approve it or its making or issuance, or who furnish information or language for inclusion therein, or the like." *Southland Sec. Corp. v. INSpire Ins. Sols., Inc.*, 365 F.3d 353, 366 (5th Cir. 2004). ¶183. Smith and Mattis were the Microvast executives primarily responsible for negotiating the DOE grant and both were quoted in the November 2, 2022 press release announcing the grant award, and thus necessarily furnished information used in and/or approved the November 2, 2022 press release. ¶¶183-84.

## B.    The Clarksville Facility Statements

### 1.    The Complaint Sufficiently Alleges that the Former Employees Would Know the Facts They Provided

Courts credit allegations from former employees who are identified with enough detail to

"support the probability that a person in the position occupied by the source would possess the information alleged." *Six Flags*, 58 F.4th at 208. The Complaint relies in part on facts drawn from three FEs. The Court should credit allegations drawn from these witnesses because "'from the description of their jobs [they] were in a position to know at first hand the facts,' and there is 'convincing detail' to the information they provide." *Id.*

- FE 1 was a Maintenance Supervisor at the Clarksville Facility from March 2023 to December 2023. ¶31. FE 1 was hired to maintain production equipment, and FE 1 also assisted with construction of the facility. *Id.* FE 1 provided information about: (i) delays in equipment deliveries; (ii) construction delays; (iii) Microvast's inability to pay contractors; (iv) work stoppages by contractors due to non-payment; and (v) Defendant Wu's and Smith's site visits at the facility. ¶¶93, 97-98, 102-03, 105-06, 117, 198-99. FE 1 would be familiar with the goings-on at the Clarksville Facility because FE 1 worked there.

- FE 2 was a Buyer for the Clarksville Facility from May 2023 to August 2023. ¶32. FE 2 was responsible for purchasing services and tools, and FE 2 also fielded calls and emails from vendors asking to have their overdue bills paid. *Id.* FE 2 provided information about: (i) delays in equipment deliveries; (ii) construction delays; (iii) Microvast's inability to pay its contractors; and (iv) work stoppages by contractors due to non-payment. ¶¶93, 98, 102, 104. As a Buyer, FE 2 would be aware of vendor complaints, and FE 2's account establishes that FE 2 personally received them.

- FE 3 was a Facility Maintenance Manager at the Clarksville Facility from February 2023 to August 2023. ¶¶28, 33. FE 3 was responsible for building out the department that would install and maintain production equipment. ¶33. FE 3 provided information about: (i) delays in equipment deliveries; (ii) construction delays; (iii) Microvast's inability to pay its contractors; (iv) work stoppages by contractors due to non-payment; (v) Lyric's inability to provide test-ready equipment on time; (vi) weekly calls between Microvast executives and Lyric (which Defendant Smith attended); and (vii) Defendant Smith's weekly presence at the Clarksville Facility. ¶¶28, 33, 93, 98-99, 101-03, 108-116, 197, 201, 203-04. FE 3 has personal knowledge of the facts FE 3 recounts. Moreover, FE 3 would know about the status of the equipment because FE 3's principal work, maintaining the equipment, would only begin when the equipment arrived.

These descriptions suffice. *See Carlton*, 184 F. Supp. 3d at 474 (crediting factory floor employees' first-hand descriptions); *Camelot Event Driven Fund v. Alta Mesa Res., Inc.*, 2021 WL 1416025, at *12 (S.D. Tex. Apr. 14, 2021) (crediting statements made by the company's production engineers).

Moreover, the corroboration between the FEs' accounts and other facts provides further reason not to discount their statements. *See Six Flags*, 58 F.4th at 209 n.11 (crediting "corroborative nature of other facts alleged, including from other sources"). Here, the FEs' statements are consistent with each other, and are also consistent with Microvast's admissions that it ran out of money to pay contractors and the Clarksville Facility was not close to completion by year-end 2023. ¶¶15, 107, 170-74. *See KB Partners I, L.P. v. Barbier*, 907 F. Supp. 2d 826, 831 n.2 (W.D. Tex. 2012) ("corroborating allegations" of CWs "make the inference of scienter . . . more compelling"). All three FEs report that the Clarksville Facility did not have power in June-August 2023, and all three report that Microvast's contractors were becoming agitated because Microvast was not paying their bills. ¶¶98, 102. Both FE 1 and FE 3 report the logical consequence: contractors reduced their workforce at the Clarksville Facility. ¶¶102-03. Moreover, the FEs' accounts are detailed, reporting on individual contractors, installation of individual pieces of equipment, and individual equipment shipments. ¶¶101, 103, 105, 111-12, 115.

Defendants argue that the FEs should be disregarded because none of them had "senior management roles or reported directly to the Individual Defendants," nor were they "involved in any meetings with senior management." MTD at 24. Defendants misstate the role former employee allegations play. If former employees are in a position to know the facts they report, then courts accept those facts as true. Courts then consider those facts alongside the plaintiffs' other allegations in determining whether the complaint pleads a strong inference of scienter. *See*, *e.g.*, *Fitzpatrick v. Uni-Pixel, Inc*., 35 F. Supp. 3d 813, 829, 832 (S.D. Tex. 2014) (accepting confidential witness statements from "low-level former employee" who did not communicate with the individual defendants and "did not attend" any meetings with "senior personnel"); *Shupe v. Rocket Cos.*, 660 F. Supp. 3d 647, 680 (E.D. Mich. 2023) (accepting information from "entry-level . . . employees"

who did not communicate with defendants). Here, the FEs describe what the Individual Defendants would have witnessed with their own eyes or heard from internal reports.

### 2.    Defendant Wu's March 2023 Statement that He Saw All the Equipment Ready for Factory Acceptance Testing

While Defendants incorrectly maintain that Wu's March 16, 2023 statement was not false (it was false as discussed above), they do not dispute that the Complaint sufficiently alleges that if the statement was false, it was made with Wu's knowledge of its falsity. With good reason. Wu was making a false statement about something he claimed to have seen with his own eyes just weeks before. Wu's claim was impossible because: (i) Lyric, responsible for 65-70% of the Clarksville Facility's equipment, had no equipment ready for factory acceptance testing at the time of Wu's statement and would not have any ready for testing until at least two months later (¶¶111, 138); and (ii) even by August 2023, five months after Wu's statement, only 10% of the aggregate equipment required by the Clarksville Facility had been shipped (¶114). Simply put, it was impossible for "all" equipment to have been on the floor ready for testing at the time of Wu's statement, as the equipment was not even ready several months later. Wu claims to have personally witnessed a scene that could not have happened. ¶¶138, 194. Wu made his March 16, 2023 statement knowing it was false, which suffices to establish that he made the statement with scienter. *See Ramirez v. Exxon Mobil Corp.*, 334 F. Supp. 3d 832, 853 (N.D. Tex. 2018) (finding a strong inference of scienter where defendants had "actual awareness and knowledge").

### 3.    Defendant Smith's May 2023 Statements

One of the clearest ways to show scienter is to place a defendant at a location and show that what the defendant would have seen with their own eyes contradicts the defendant's public statements. *See In re Aphria, Inc. Sec. Litig.*, 2020 WL 5819548, at *9 (S.D.N.Y. Sept. 30, 2020) (defendant's "site visits" and "inspecting [of] operations" were sufficient to establish knowledge

of dilapidated state and scienter); *see also Brody v. Zix Corp.*, 2006 WL 2739352, at *7 (N.D. Tex. Sept. 26, 2006) (defendants had "actual knowledge to indicate their alleged misstatements and omissions could be materially misleading, thereby allowing the Court to infer scienter").

Smith's May 25, 2023 statement that the Clarksville Facility was a "building with utilities" and that Microvast would be ready to install the equipment "as soon as [it] lands" was made with scienter because, among other things, the Clarksville Facility did not have utilities, the floors were not complete, and the Facility was not remotely ready for equipment installations. ¶¶94, 98-100, 143-44, 196-202. According to FE 3, Smith had an office at the Clarksville Facility which he worked out of about once per week on average. ¶197. FE 1 recalled that he regularly saw Smith at the Clarksville Facility. ¶198. Moreover, Smith lived a mere hour's drive away. ¶196. A short walk through the facility from Smith's office would have confirmed that its floors were not completed, it did not have power, and it was not ready for equipment to be installed. ¶98. It is absurd to suggest that Smith never took that walk before making his statements at Microvast's high-profile May 25, 2023 Investor Day. Additionally, Smith was responsible for the Clarksville Facility—according to Wu, Smith "put[] together an amazing factory here in Clarksville"—and he was Microvast's Chief Operating Officer. ¶¶28, 202. The Complaint thus sufficiently alleges that Smith was at least severely reckless when he made these specific statements.

Smith's other Investor Day statement that equipment is "now being put on boats" and would arrive in Clarksville beginning in "June" was also made with scienter. ¶¶143-44, 201-04. At the time of his statement, no Lyric equipment was ready to ship. ¶114. Only one minor equipment delivery was scheduled to occur in the next two months, the mid-July delivery of a component from a non-Lyric vendor. ¶¶13, 144. And, because it takes eight weeks to ship equipment from China to Clarksville (¶110), Smith knew that even if equipment were to be put on

boats the day after his May 25, 2023 statement, it would not arrive in Clarksville until July at the earliest—not June, as he said. And that only 10% of the Clarksville Facility's equipment was delivered by August 2023 (¶114), three months after Smith's statement, shows that Microvast had not scheduled to have the equipment delivered from June through August.

Moreover, according to FE 3, Microvast executives held weekly calls with Lyric, and Smith was on many of the calls. ¶201. The Complaint alleges what Smith learned on the calls by alleging the status of the Lyric delivery with specificity, including that Lyric repeatedly missed its deadlines beginning in February 2023 and by May none of Lyric's equipment had even passed factory acceptance testing in China. ¶¶93, 113, 204. *See Brody*, 2006 WL 2739352, at *7 ("based on the testimony of confidential witnesses, [] [d]efendants regularly received [reports]…which would have alerted them to the fact that their statements….were materially misleading."). Smith's knowledge satisfies scienter here.

### 4.    Defendants' Statements About Progress Toward Completion

Defendants' statements about the Clarksville Facility being "on track" for completion by Q4 2023, "nearly done," "nearly at completion," "pretty much done," and the like were made with scienter. ¶¶141, 149, 152, 154, 156; Exhibit A. Several Individual Defendants were present at the Clarksville Facility and/or spoke knowledgeably about the progress of construction and equipment procurement. For example:

- Defendant Wu (CEO): According to FE 1, Wu visited the Clarksville Facility on several occasions during FE 1's tenure from March 2023 to December 2023. ¶199. When he was there, Wu toured the facility and met with facility managers. *Id*. Further, Wu stated during the December 13, 2023 investor event that he was calling in from the Clarksville Facility and had been there for three days. ¶¶156, 199, 214.

- Defendant Smith (COO): Smith oversaw the Clarksville Facility, and Wu said Smith "put[] together an amazing factory here in Clarksville." ¶202. According to FE 3, Smith had an office at the Clarksville Facility and was there about once per week. ¶197. FE 1 corroborated that Smith often visited the facility. ¶198. According to FE 3, Microvast executives held weekly calls with Lyric, and Smith was on many of the calls. ¶201.

- Defendant Webster (CFO): Webster frequently updated investors about the construction status, stating: (i) the "facility remains on track for a Q4 start of trial production" (Aug. 7, 2023, ¶149); (ii) the "construction phase is nearly done" and the "equipment's arriving now" (Aug. 8, 2023, ¶152); (iii) and "we've really moved along great strides on Clarksville. Construction [is] pretty much done" (Dec. 13, 2023, ¶¶156-57, 159, 207).

- Defendant Ward (President): Ward stated on Nov. 9, 2023: "On the construction side, we are nearly at completion . . . and only minor work remains to be done . . . . We're also in good position with our production equipment." ¶154.

Given their involvement with the construction process, these Defendants were aware of the construction and equipment delays. Also, Smith (due to his oversight role), Wu (because of both his status as CEO and his frequent visits), and Webster (due to his financial oversight role) would have been aware of Microvast's non-payment of contractors, liens being filed, and contractors walking off the job before most of their misleading progress statements. ¶¶12, 94, 103. Their knowledge of this information while making contrary statements to investors supports scienter. *See In re Venator*, 547 F. Supp. 3d at 663 (scienter adequately pled where defendants had "regular access to information regarding the…capacity and construction progress" contradicting their public statements); *Singh v. 21Vianet Grp., Inc*, 2017 WL 4322483, at *3 (E.D. Tex. Sept. 13, 2017) (scienter adequately pled where "defendants 'knew facts or had access to information suggesting that their public statements were not accurate'").[20]

Further, under the core operations doctrine, the Court should infer that the Individual Defendants were aware of the construction and equipment delays. *See Venator*, 547 F. Supp 3d at 665 ("It defies reason and common sense to believe that [defendants] would have been unaware of the capacity and status of arguably their most profitable facility"); *Holzwasser v. Staktek*

---

[20] Defendants' authorities are easily distinguished. In *Firefighters Pension & Relief Fund v. Bulmahn*, 53 F. Supp. 3d 882, 910-12 (E.D. La. 2014), plaintiffs failed to allege contemporaneous facts regarding what defendants knew when the challenged statements were made. Here, the scienter allegations are based on contemporaneous knowledge.

*Holdings, Inc.*, 2006 WL 897746, at *4 (W.D. Tex. Mar. 30, 2006) (misstatements that "pertained to [company's] core business" supported scienter). Defendants identified the Clarksville Facility as critical in Microvast's presentations to investors and in SEC filings. ¶188. Microvast specifically called the Clarksville Facility a core operation in a June 30, 2023 press release: "We are concentrating on our core business efforts, including completing our . . . plant in Clarksville." ¶147; MTD Ex. 20. Indeed, the cost of the Clarksville Facility threatened the Company's very existence. Microvast warned in its FY 2023 10-K that it might not be able to continue as a "going concern" due in large part to the "capital expenditures required to complete [the] Clarksville [Facility]." ¶216; Exhibit C at 63.[21]

### III.    Plaintiffs Allege a Section 20(a) Claim for Control Person Liability

Defendants challenge Plaintiffs' § 20(a) claim on the sole ground that a primary violation of § 10(b) was not adequately pled. MTD at 30. For the reasons noted above, Plaintiffs adequately pled a § 10(b) claim. Thus, Defendants' challenge to the § 20(a) claim fails.[22]

### CONCLUSION

Plaintiffs respectfully request that the MTD be denied in its entirety. If the Court grants the motion in whole or in part, Plaintiffs respectfully request leave to amend.


Dated: August 12, 2024                    Respectfully submitted,

                                         **CONDON TOBIN SLADEK**
                                         **THORNTON NERENBERG, PLLC**

---

[21] Defendants' argument about group pleading (MTD at 19, 21-22) fails because there is sufficient indicia of scienter for each Individual Defendant.

[22] *See Hall v. Rent-A-Ctr., Inc.*, 2017 WL 6398742, at *34 (E.D. Tex. Oct. 19, 2017) ("Defendants contest Plaintiffs' § 20(a) claims only on the basis that the underlying § 10(b) claim should be dismissed. Because those arguments fail, Defendants' assertions regarding Plaintiffs' claims under § 20(a) of the Exchange Act are also without merit.").

_/s/ Stuart L. Cochran_
Stuart L. Cochran (TX Bar No. 24027936)
8080 Park Lane, Suite 700
Dallas, TX 75231
Tel: (214) 265-3804
Email: scochran@condontobin.com

_Counsel for Plaintiffs_

**STECKLER WAYNE & LOVE, PLLC**

Bruce W. Steckler (TX Bar No. 00785039)
Austin P. Smith (TX Bar No. 24102506)
Paul D. Stickney, Of Counsel (TX Bar No. 0789924)
12720 Hillcrest, Suite 1045
Dallas, TX 75230
Tel: (972) 387-4040
Email: bruce@swclaw.com
Email: austin@swclaw.com
Email: judgestick@gmail.com

_Counsel for Plaintiffs_

**THE ROSEN LAW FIRM, P.A.**

Phillip Kim (admitted _pro hac vice_)
Jonathan Horne (admitted _pro hac vice_)
275 Madison Avenue, 40th Floor
New York, NY 10016
Tel: (212) 686-1060
Email: pkim@rosenlegal.com
Email: jhorne@rosenlegal.com

_Counsel for Plaintiffs_

**BERGER MONTAGUE PC**

Michael Dell'Angelo (admitted _pro hac vice_)
1818 Market Street, Suite 3600
Philadelphia, PA 19103
Tel: (215) 875-3000
Email: mdellangelo@bm.net

_Counsel for Plaintiffs_

**THE SCHALL LAW FIRM**

31

Brian Schall
1880 Century Park East, Suite 404
Los Angeles, CA 90067
Telephone: (424) 303-1964
Email: brian@schallfirm.com

*Counsel for Plaintiffs*

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on August 12, 2024, a true and correct copy of the foregoing Plaintiffs'

Opposition to Defendants' Motion to Dismiss the Amended Class Action Complaint was

electronically filed using the Court's CM/ECF system, which automatically provides email

notification to all counsel of record.

*/s/ Stuart L. Cochran*

Stuart L. Cochran
