United States District Court
Southern District of Texas
**ENTERED**
August 22, 2025
Nathan Ochsner, Clerk

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

KIM SCHELLING, *individually and on behalf* §
*of all others similarly situated,* §
§
§
*Plaintiff,* §
VS. § CIVIL ACTION NO. 4:23-cv-4565
§
MICROVAST HOLDINGS, INC. *et al.,* §
§
*Defendants.* §

## ORDER

Pending before this Court is a Motion to Dismiss the Amended Class Action Complaint,

(Doc. No. 37), filed by Yang Wu ("Wu"), Craig Webster ("Webster"), Sascha Kelterborn

("Kelterborn"), Shane Smith ("Smith"), Zach Ward ("Ward"; collectively, the "Individual

Defendants"), and Microvast Holdings, Inc. ("Microvast"; together, with Individual Defendants,

"Defendants"). Kim Schelling and the purported class ("Plaintiffs") filed a response in opposition.

(Doc. No. 39). Defendants filed a reply. (Doc. No. 42). Having considered the motion, relevant

pleadings, and applicable law, the Court **GRANTS IN PART** and **DENIES IN PART** the motion.

(Doc. No. 37).

**I.    Background**

This is a securities fraud case purportedly brought on behalf of a class of investors who

purchased Microvast's publicly-traded common stock between October 19, 2022 and April 1,

2024, (the alleged "Class Period") and who held shares through May 22, 2023 and/or April 1,

2024.[1] The two pleaded causes of action are based upon Section 10(b) (and Rule 10b-5

promulgated thereunder) and Section 20(a) of the Securities Exchange Act of 1934.

---

[1] Unless otherwise denoted, these "facts" are derived from Plaintiffs' Amended Class Action Complaint
("Complaint"), (Doc. No. 30), and are recited as if true as the Court must accept non-speculative and non-conclusory

Microvast is a publicly-traded Delaware corporation. While its principal place of business is in Stafford, Texas, Microvast does most of its business through its Chinese subsidiary. Its primary products are batteries made in China for electric vehicles, and 95% of its employees are located in China.

Wu was the founder and is, and has been, the Chief Executive Officer and Chairman of Microvast at all pertinent times. Webster was the Chief Financial Officer and served on the Board of Directors during the Class Period. Keiterborn was Microvast's Chief Revenue Officer and headed many of Microvast's non-Chinese operations during the Class Period. Smith was the Chief Operating Officer and later was the Chief Procurement Officer. Ward was, at different points in time, Microvast's Senior Vice President and President.

### A.  Pre-Class Period Factual Allegations

#### i.    Microvast's Background

Tuscan Holdings Corp. ("Tuscan") was a so-called Special Purpose Acquisition Company ("SPAC"). Like other SPACs, it was established to raise capital, find a "target," and acquire the target via a reverse merger—a strategy whereby the stockholders of the acquired company become the primary stockholders of the acquiring company. Tuscan identified Microvast (then called Legacy Microvast) as being just such a target. Interestingly, Tuscan's initial goal was to target companies in the cannabis business, but as its founder shares approached expiration, Tuscan shifted goals and acquired Microvast in late 2020.

At that point, Microvast, already in the battery business, owed substantial debts to a Chinese investment bank, with the payment due date imminent. Thus, Plaintiffs allege, Microvast

---

factual allegations as true at the motion-to-dismiss stage. In many places, these "facts" are quoted without attribution. Further, while the Court references a class action, no such status has yet been granted.

needed the cash infusion from the reverse merger with Tuscan to avoid default. Simultaneously, Tuscan needed to complete the merger before the founder shares expired.

Subsequently, the two consummated the deal. For its part, Microvast received approximately $708 million. It told its investors that $446 million would be used to expand its facility in China and build a new facility in Clarksville, Tennessee. Each facility would produce similarly designed batteries.

## ii.    The Infrastructure Investment and Jobs Act

Congress, in late 2021, passed the Infrastructure Investment and Jobs Act ("IIJA") that allocated billions of dollars to green energy projects. The next May, the Department of Energy ("DOE") announced a new funding opportunity under the IIJA for manufacturers of electric car batteries, totaling $3.1 billion. One of the purposes of this funding was to lessen this country's dependence on foreign sources of batteries—primarily China.

The application materials made that purpose apparent. Not only did the applicants need to be "domestic [United States] entities," but the application materials also mandated the disclosure of any involvement of foreign participants:

> All Applicants selected for an award under this FOA [Funding Opportunity Announcement] and project participants (including subrecipients and contractors) who anticipate involving foreign nationals in the performance of an award will be required to provide DOE with specific information about each foreign national to satisfy requirements for foreign national participants. A "foreign national" is defined as any person who is not a United States citizen by birth or naturalization. The volume and type of information collected may depend on various factors associated with the award. DOE concurrence may be required before a foreign national can participate in the performance of any work under an award.

The application's instructions also provided:

> The use of a battery material supplied by or originating from a foreign entity of concern will not preclude an applicant from consideration; however, applicants are

3

encouraged to speak to how the project team will minimize the use of battery material supplied by or originating from a foreign entity of concern.

"Foreign entities of concern" include businesses significantly "controlled by, or subject to the jurisdiction or direction of a government of a foreign country that is a covered nation." 42 U.S.C. § 1847(a)(5)(C). China is a "covered nation." 10 U.S.C. § 4872(d)(2)(B). The statute permitting the grant provided that "the Secretary shall (i) give priority to an eligible entity that (I) is located and operates in the United States . . . and (V) will not use battery material supplied by or originating from a foreign entity of concern." 42 U.S.C. § 1874(b)(3)(C).

### B. Factual Allegations Underlying the Complaint

#### i.    The DOE Grant

By the time of IIJA's enactment and the DOE's funding opportunity, Microvast had been manufacturing batteries for more than ten years, but almost solely in China. In fact, from its early years into the 2020s, the substantial majority of its sales were in China, albeit in an ever-decreasing percentage. At some point, though, it decided to build a separator[2] plant in Hopkinsville, Kentucky, close to its planned Clarksville, Tennessee battery plant. This separator plant was estimated to cost $504 million. To help offset this expense, it applied for a $200 million grant from the DOE.

In its grant application, Microvast represented that it was headquartered in Stafford, Texas and had built or was building production sites in the United States, Europe, and China. Plaintiffs claim Microvast repeatedly emphasized its connection to the United States but failed to reveal that almost all of its manufacturing capability and almost all of its 1,800 employees were in China.[3] Only 20 or so employees were actually in the United States. In fact, Microvast allegedly had

---

[2] The separator is the part of the battery that keeps the cathode and anode apart while permitting the flow of electrons.

[3] Microvast also had an assembly plant in Berlin, Germany.

extensive ties with the Chinese government, not only in terms of manufacturing and production, but also in terms of financial support, such as loans, grants, or investments.

Plaintiffs allege that Microvast understated and/or misrepresented its ties to China in its grant applications to the DOE—especially in light of the fact that the DOE had made it clear that the goal of the program was to make the United States less dependent on Chinese manufacturing. Plaintiffs further contend that Microvast exaggerated its ability to protect its technology from the Chinese government and downplayed its financial and political ties with the Chinese government.

On October 19, 2022, Microvast announced that it had *received* this grant. In truth, however, it had only been selected to *negotiate* for a grant. It was at this "negotiation" stage that the DOE would conduct a more thorough due diligence on the company. Nevertheless, Microvast continued to claim that it had received this grant until May 22, 2023, when the DOE announced that it had terminated grant negotiations.

### ii.    The Clarksville Facility

Once the DOE terminated the grant negotiations, Microvast opted to abandon the Hopkinsville project. It nonetheless continued with the construction of its nearly 600,000-square-foot battery-manufacturing plant project in Clarksville, Tennessee ("Clarksville Facility"). Its plan for that plant was divided into phases. Phase 1A was the initial build-out of 2 GWh production line, which was to be followed by Phase 1B, another 2 GWh production project. Phase 1A was the only phase actually in progress during the Class Period. Once completed, Microvast planned to use it as collateral to aid in financing Phase 1B. Microvast announced that the Clarksville Facility's products were already pre-sold and that a backlog of demand existed. It also told investors that the Clarksville Facility was self-funding due to the Inflation Reduction Act credits.

Plaintiffs allege a continuing series of misleading and/or false statements made by various Microvast employees regarding the Clarksville Facility. They allege, for example, that, in March

2023, Wu represented to Microvast's investors that the equipment for the facility—65% to 75% of which was being produced by a third-party company called Lyric—had been built, assembled, and were ready to be tested and shipped to Clarksville. In May 2023, Smith also represented to investors that the equipment was "now being put on boats." In November 2023, Ward claimed that 30% of the equipment was on site, with the majority of the remaining equipment already shipped. Plaintiffs allege, however, that these statements were false, according to accounts of former employees ("FEs") 1, 2, and 3. In February of 2023, Lyric had pushed the equipment delivery date to April or May. By May, none of Lyric's equipment—again, comprising 65% to 75% of Microvast's equipment—had passed factory acceptance testing. By August, none of Lyric's equipment had been shipped.

On top of these alleged misrepresentations regarding equipment, Defendants allegedly also misrepresented the progress on the actual construction of the facility. In August 2023, Microvast told its investors that the Clarksville Facility construction was "on track" to begin production in Q4 2023, and in November, it told its investors that construction was "nearly at completion with a majority of the building now under joint occupancy and only minor work remains to be done in the fourth quarter." Recounting FEs' statements, Plaintiffs allege that these representations were false. According to FEs, even as of June or July of 2023, the facility lacked electricity, and the floors were not yet complete. By August, the facility still had no power, and only about 40% to 50% of cleanrooms[4] were complete. Making matters worse, contractors began walking off the construction site. According to FEs, by August 2023, Microvast had stopped paying certain invoices, and its contractors and vendors were instituting credit holds, bringing construction to a

---

[4] Cleanrooms are areas free of airborne particulates used to manufacture lithium-ion batteries or test and package semiconductors.

halt. By December 2023 or January 2024, the contractors and subcontractors allegedly demobilized completely, and the facility was effectively "just a shell."

### C. Statements Plaintiffs Contend are Actionable

Plaintiffs contend that, in thirteen specific instances—five regarding the DOE grant and eight regarding the Clarksville Facility—Defendants made material misstatements or omissions. These statements, as outlined below, form the basis of Plaintiffs' causes of action.[5]

#### i. Statements Regarding the DOE Grant

#### 1. October 19, 2022, Tweet and Form 8-K

On October 19, 2022, Microvast tweeted on its official account:

> At 3pm today, the White House will announce that our thermally stable polyaramid separator manufacturing plant proposal *was selected as a recipient of a $200 million grant* from the DOE's Battery Materials Processing and Battery Manufacturing initiative.

On the same day, Microvast filed a Form 8-K with the Securities and Exchange Commission repeating the text of the tweet.

#### 2. November 2, 2022, Press Release

On November 2, 2022, Microvast issued a press release announcing that it had received a grant from the Department of Energy:

> HOUSTON, Texas, USA, November 2, 2022 — A wholly-owned subsidiary of Microvast Holdings, Inc. (NASDAQ: MVST) *was selected* by the U.S. Department of Energy (DOE) in collaboration with General Motors *to receive a $200 million grant* as part of the first set of projects funded by President Biden's Bipartisan Infrastructure Law. Over 200 companies applied for the $2.8 billion in DOE grant funding and 20 companies were awarded grants.
>
> ***
>
> As part of the selection process for the DOE grant, Microvast has been invited to negotiate the specific terms of the grant funding. *Once the terms have been*

---

[5] Unless otherwise noted, the emphases in these statements are taken from the Complaint. (Doc. No. 30).

*finalized*, the grant funding will remain subject to the conditions precedent and other terms and conditions to be agreed during these negotiations.

### 3.  November 10, 2022, Q3 2022 Earnings Call

On November 10, 2022, Defendants held a conference call to discuss Microvast's Q3 2022 earnings, which included a PowerPoint slide deck. Two specific slides in the slide deck are at issue here. First is the slide listing a series of "highlights" for the company, and the first highlight on that slide stated that Microvast had been

> [s]elected by DOE, in collaboration with General Motors, **to receive $200 million grant** under Bipartisan Infrastructure Law in recognition of innovative polyaramid separator technology.

Similarly, Microvast included another slide dedicated to its representation that it was "[s]elected by the U.S. Department of Energy for a $200 [m]illion [g]rant":



## Selected by the U.S. Department of Energy for a $200 Million Grant

| Polyaramid Separator Funding of DOE |
| --- |

- Microvast selected by the U.S. Department of Energy ("DOE") to receive a $200 million grant.
- Over 200 companies applied for $2.8 billion in grant funding; only 20 companies selected.
- The DOE grant, plus funding to be arranged by Microvast, will support construction of a mass production facility in the U.S. for our thermally stable polyaramid separator technology.
- Target markets for polyaramid separator are large and growing and include commercial, specialty and passenger EVs, as well as consumer electronics and ESS systems.
- Microvast holds unique, patented wet-process technology to produce a thin polyaramid base film for very high temperature resistance.
- The separator is a critical element for battery safety and our polyaramid technology has significant safety advantages over incumbent technology such as polyethylene and polypropylene.
- Microvast and General Motors will collaborate to create a specialized separator.

### 4.  February 15, 2023, Baird Vehicle Technology and Mobility Conference Presentation

On February 15, 2023, Microvast delivered a presentation at the Baird Vehicle Technology & Mobility Conference. The presentation contained the same slide it presented to its investors in the November 10, 2022, call, which is reproduced above.

In that presentation, Kelterborn also stated:

And now we're bringing [the separator] to the market, thanks to the DOE grant of 200 million, *which we just, just, just received*. As I mentioned, *selected by the US Department of Energy for a 200 million grant for our separator technology*, only 20 companies were selected. *We are very proud as an American company to receive that honor and being recognized as one of the very important partners for developing battery technology further into US*—and we are happy that General Motors will collaborate with us to create this special live separator.

### 5.  March 16, 2023, Q4 2022 Earnings Call

On March 16, 2024, Microvast held a call to discuss its Q4 2022 earnings. Delivering

prepared remarks, Wu highlighted:

*We were also selected for $200 million grant* by the U.S. Department of Energy to build our most advanced high-temperature separator plant in the United States to help enhance battery safety for the industry.

When asked about the grant by an analyst, Wu further commented:

Yeah, the DOE grant we are working on the—right now *it's very close to close the deal and it's in the contract negotiating stage*. We still need an engagement contract with DOE. We are in the first batch of the negotiation, and we'll see the results soon.

The call was accompanied by a slide deck, which stated that Microvast was "[*s*]*elected* by U.S.

Dept. of Energy for $200M grant for [its] unique polyaramid separator technology."

### ii.  Statements Regarding the Clarksville Facility

### 6.  March 16, 2023, Q4 2022 Earnings Call

In that same March 16, 2023, earning call, Wu answered an analyst's question about the

Clarksville Facility as follows:

The question is the Clarksville—Clarksville factory will be ready at the end of this year scheduled and we are on the fast speed and those sort of for the construction and then equipment is fabricating in China and—actually *I went there last week. I saw all the equipment laying on the floor for FAT [Factory Acceptance Testing] and—the factory testing*. After factory testing, it's qualified and we're going to ship I, ship to U.S. and install in U.S. The expectation is going to the end of this year to produce the battery.

The slide deck accompanying the call also stated that the "New 2GWh U.S. cell and module facility in Clarksville, TN will be online in Q4 [2023]."

### 7. May 9, 2023, Q1 2023 Earnings Call

On May 9, 2023, Microvast held a call to discuss its Q1 2023 earnings. During the call, an analyst asked whether Wu could "talk a little bit about equipment procurement and any sort of headwinds or progress that [Microvast is] making in terms of buying that equipment and getting it into the country." In response, Wu stated:

> *The U.S. facility actually is 100% of mirror with China, the equipment that same supplier, same system, just the different certification that U.S. require a UL certification.* And that's why we slightly, the behind a giant China equipment installation. *And with the maturity of China site and operation experience and installation experience, we overcome all the problems in China.* And we think the U.S. is going to be much smoother, and also we send the U.S. crew to China for operation and installation training as well, that's why I expected U.S. is going to be much, much smoother. *And we're still on the track on the plan to build this factory before the end of this year. That's our plan. It still remain[s].*

### 8. May 25, 2023, Investor Day Remarks and Press Release

On May 25, 2023, Microvast held its Investor Day. In prepared remarks, Smith stated as follows regarding the Clarksville Facility:

> Right now, it's just the *building with utilities, with the equipment on the way* . . .

> Now in Clarksville, we're making changes to the equipment. It's now put—that we had to do in Huzhou to get that running—*it's now being put on boats. Through June, July, August, September, all the equipment's coming into Clarksville* . . .

> But the confidence is very high because the U.S. team was with me while we [built out the Huzhou expansion]. Those that weren't there are now. We have a team there now, we got another team going in June. They get to see a production line already operating, already programmed, set up, and then they go back home and say, okay, *as soon as [the equipment] lands, we're ready to do that* . . . .

That same day, Microvast also issued a press release updating investors on its activities after announcing the termination of negotiations with the Department of Energy. Speaking about the

Clarksville Facility, Defendants stated "[t]he facility is ***about half-way through the company's more than $300 million investment in the plant.***"

### 9.  June 30, 2023, Press Release

On June 30, 2023, Microvast issued a press release titled "Microvast Will Not Be Moving Forward with the Kentucky Plant Construction; Will Focus on Core Operations." The press release announced Microvast's intentions to pause the Hopkinsville Facility to focus on the Clarksville Facility and that Microvast "***expects production to start in this year's fourth quarter, creating hundreds of new jobs in Tennessee.***"

### 10. August 7, 2023, Q2 2023 Earnings Call

On August 7, 2023, Microvast held its Q2 2023 earnings call. In prepared remarks, Webster stated, "we are pleased to report that our Clarksville Facility ***remains on track for a Q4 start of trial production.***"

### 11. August 8, 2023, Oppenheimer Technology, Internet & Communications Conference Presentation

On August 8, 2023, Microvast delivered a presentation at the Oppenheimer Technology, Internet & Communications Conference. There, Wu exchanged a question and answer as follows:

> Q: [C]an you talk a little bit about where you're at with the US manufacturing? Obviously, you guys are building a substantial factory in Tennessee. ***Can you talk about where that is from a process perspective and how you're tracking to your targeted time frame?***

> A: ***We are ready right now.*** We are running super, super fast. ***The entire team is just racing to get there***. And they put their 2 GWh in Clarksville Tennessee. ***And we expect the test production at the end of this year*** and as to slowly ramping up to the capacity—design capacity.

Webster also made the following statement:

> But I think through that—so Huzhou 3.1 is done, very small CapEx needs in Huzhou 3.1 for the next year. Phase 1A in Clarksville as [Defendant Wu] said, ***the construction phase is nearly done.*** The equipment we've been paying installments for, ***the equipment's arriving now***.

### 12. November 9, 2023, Q3 2023 Earnings Call

On November 9, 2023, Microvast held its Q3 2023 earnings call. On the call, Ward stated:

> *On the construction side, we are nearly at completion with a majority of the building now under joint occupancy and only minor work remains to be done in the fourth quarter*. We're also in good position with our production equipment, where we're using the same equipment that is now running with great success on our Huzhou 3.1 line. *We have approximately 30% of the equipment on site in Clarksville with majority of the remaining equipment having already been shipped.*

### 13. December 13, 2023, Fireside Chat with Cantor Fitzgerald

On December 13, 2023, Webster and Wu participated in a Fireside Chat with Cantor Fitzgerald, with Wu dialing in from the Clarksville Facility. Webster made the following statements that Plaintiffs allege were false or misleading:

> *If you just wind back to the start of the year, we've really achieved [our goals] for this year . . . And then we've really moved along great strides on Clarksville. Construction—pretty much done. We still do commissioning and installation from here on in, and when that's all done it's what we set out to do.*
>
> . . .
>
> *[W]e're in the race to get Clarksville into production.*

When the interviewer chimed in, "[s]o it sounds to me like the CapEx is largely complete," Defendants did not contradict the statement. Webster further stated:

> *If you look at both Huzhou and Clarksville, the sort of hard yards have been done* . . . From ordering equipment through to finishing commissioning/installing is like 9-12 months. And then that would be the same in Clarksville. *The building, the infrastructure is done*. Phase 1B just goes in at the side of Phase 1A and again, you're mainly ordering equipment, and when you're ordering equipment, you pay in milestones to suppliers, so you don't need to fund it all up front it'll be funded over 9-12 months. So what you're able to do is match some of your cash flows from IRA against your main payments which are on the equipment side. So that's how you can use IRA credits to effectively fund the capacity expansion, basically paying for your equipment.

Moreover, when the interviewer asked, "what milestones need to be achieved to get the right amount of capacity in place by Q4 2024," Wu rejected the premise of the question: "Q4? We should put in production before Q4 2024. We plan in production in Q2. Why move to Q4?"

Finally, Wu exchanged the following question-and-answer with the interviewer:

Q: And so exiting the year, what are the goals in terms of utilization of that [Clarksville] facility and what needs to happen in terms of milestones to get there? So really just executing. Sort of copy pasting what you're doing in Huzhou in Clarksville?

A: Yeah, you know, for the production line you know this is the same production line and the employee in order to send to China, on the real production line, train 20 more people and came back already. And also we will have a team from China side to help to start up. To safeguard the initial production. And I don't see the big problem for putting in production. Right now we are heavily, heavily training our employees, the training programs initiated, and everybody to the training right now.[6]

In the Complaint, each of the allegedly-actionable statements is followed by lengthy fact-based allegations that set out why Plaintiffs contend that a particular statement was either false or misleading. The Complaint also contains specific additional allegations regarding scienter. *See* (Doc. No. 30 at 59–66). Further, it alleges that, on May 23, 2023—the day after Bloomberg reported that DOE had terminated grant negotiations—Microvast's stock price fell from $2.20 to $1.40 per share. Moreover, it alleges that, on April 2, 2024—the day after the April 1 earnings call—Microvast's stock price fell from $0.90 per share to $0.59 per share.[7]

---

[6] Notably, while the Complaint initially alleges that the April 1, 2024, Q4 2023 earnings call is another "venue[] in which Defendants made false statements," (Doc. No. 30 at 6), it later states "Microvast admitted on the call that it stopped construction of the Clarksville Facility until it could secure financing," (*id.* at 57). Consequently, the Court does not consider the April 1 statements as a part of the actionable statements that Plaintiffs allege.

[7] Plaintiffs' allegations for both the May 23 and April 2 share-price drops suffer from what appears to be a problem that this Court sees frequently: lawyers doing math. Regarding the May 23 share-price drop, the Complaint alleges that "Microvast's stock fell from its previous close of $2.20 to close at $1.40, down $0.70 (45.2%), damaging investors." (*Id.* at 57). The difference between $2.20 and $1.40 is $0.80, not $0,70, and a $0.80 drop from $2.20 is a 36.36% drop, not 45.2%. Similarly, regarding the April 2 share-price drop, the Complaint alleges that the drop from $0.90 to $0.59 is a $0.41 drop when in fact it is a $0.31 drop. (*Id.* at 59). With respect to the April 2 drop, though, Plaintiffs did manage to get closer in their estimated percentage calculation.

Defendants move to dismiss Plaintiffs' Amended Class Action Complaint under Rule 12(b)(6).

## II.    Legal Standards

A complaint in a federal securities fraud claim must contain "a short and plain statement of the claim showing that the pleader is entitled to relief" but must also meet additional heightened pleading requirements under Rule 9(b). FED. R. CIV. P. 8(a)(2), 9(b); *see also Melder v. Morris*, 27 F.3d 1097, 1100 (5th Cir. 1994).

### A.    Rule 9(b)

Rule 9(b) is interpreted strictly and requires the plaintiff to "specify the statements contended to be fraudulent, identify the speaker, state when and where the statements were made, and explain why the statements were fraudulent." *Flaherty & Crumrine Preferred Income Fund, Inc. v. TXU Corp.*, 565 F.3d 200, 207 (5th Cir. 2009) (citations omitted); FED. R. CIV. P. 9(b). The Private Securities Litigation Reform Act ("PSLRA") further requires plaintiffs to specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and for "each act or omission alleged" to be false or misleading, "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *Ind. Elec. Workers' Pension Tr. Fund IBEW v. Shaw Grp., Inc.*, 537 F.3d 527, 533 (5th Cir. 2008) (citing 15 U.S.C. §§ 78u-4(b)(1)(B), (b)(2)).

### B.    Rule 12(b)(6)

Rule 12(b)(6) allows a defendant to move to dismiss a complaint based on failure to state a claim upon which relief can be granted. FED. R. CIV. P. 12(b)(6). To survive such a motion, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads

factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* A complaint "must provide the plaintiff's grounds for entitlement to relief—including factual allegations that . . . raise a right to relief above the speculative level." *Wilson v. Houston Cmty. Coll. Sys.*, 995 F.3d 490, 500 (5th Cir. 2020) (quotations omitted).

In reviewing a 12(b)(6) motion, a court must accept "all well-pleaded facts as true and view[] those facts in the light most favorable to the plaintiff." *True v. Robles*, 571 F.3d 412, 417 (5th Cir. 2009) (quotations omitted). That being said, a court is not bound to accept legal conclusions couched as factual allegations. *Papason v. Allain,* 478 U.S. 265, 286 (1986); *see Iqbal*, 556 U.S. at 678) ("[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."). "Generally, a court ruling on a 12(b)(6) motion may rely on the complaint, its proper attachments, 'documents incorporated into the complaint by reference, and matters of which a court may take judicial notice.'" *Wolcott v. Sebelius*, 635 F.3d 757, 763 (5th Cir. 2011) (quoting *Dorsey v. Portfolio Equities, Inc.*, 540 F.3d 333, 338 (5th Cir. 2008)). In a securities fraud claim, "[i]f the plaintiff fails to satisfy the pleading requirements for scienter, the district court shall, on defendant's motion to dismiss, dismiss the complaint." *In re Enron Corp. Secs., Derivative & ERISA Litig.*, 238 F. Supp. 3d 799, 826 (citations and internal quotations omitted).

## III.    Analysis

As noted, Plaintiffs assert two causes of action: (1) violation of § 10(b) of the Securities Exchange Act of 1934 ("Act") and Rule 10b-5 and (2) violation of § 20(a) of the Act. These are taken in turn.

### A. Section 10(b) of the Act and Rule 10b-5

Section 10(b) of the Act and Securities and Exchange Commission ("SEC") Rule 10b-5

promulgated thereunder provide an implied private right of action based on material misstatements

or omissions in connection with the sale or purchase of a security. 15 U.S.C. § 78j(b); 17 C.F.R.

§ 240.10b-5. Section 10(b) is the general anti-fraud provision of the Act and states:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange—
>
> . . .
>
> (b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, or any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j(b).

Rule 10b-5, as promulgated by the SEC, implements § 78j and makes it unlawful for any

person, directly or indirectly, by use of any means or instrumentality of interstate commerce, or of

the mails or of any facility of any national securities exchange:

> (a) To employ any device, scheme, or artifice to defraud,
> (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
> (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person
>
> in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5.

To state a claim under § 10(b) and Rule 10b-5, a plaintiff must allege "(1) a misstatement

or omission (2) of material fact (3) in connection with the purchase or sale of a security, which

was made (4) with scienter, and upon which (5) plaintiff justifiably relied, (6) proximately causing

injury to the plaintiff." *Masel v. Villareal*, 924 F.3d 734, 747 (5th Cir. 2019) (quoting

*Rosenzweig v. Azurix Corp.*, 332 F.3d 854, 865 (5th Cir. 2003)) (modification omitted). As explained above, under Rule 9(b) and PSLRA, a securities-fraud complaint must specify: (1) the statement, (2) identity of the speaker, (3) when and where the statement was made; and (4) explain why the statement was false and misleading. *See Nathenson v. Zonagen, Inc.*, 267 F.3d 400, 412 (5th Cir. 2001).

As noted, Plaintiffs' claims are based on two broad, but distinct, categories of statements: (1) statements regarding the DOE grant (the "DOE Statements"); and (2) statements about the readiness of the Clarksville Facility (the "Clarksville Statements"). Regarding both the DOE and Clarksville Statements, Defendants raise similar arguments: that (1) they were not misleading or false; (2) they were not material; (3) the Complaint does not raise a strong inference of scienter; and (4) they fall under the PSLRA safe harbor provision. The Court addresses the categories of statements separately.

### i.    The DOE Statements

*Whether The Statements Were Misleading*

Defendants challenge the first element of Plaintiffs' claim regarding the DOE Statements—whether they were misleading. Plaintiffs offer three arguments as to why the DOE Statements were misleading: (1) Microvast stated that it was selected as a *recipient* of the DOE grant, when it was selected merely to *negotiate* the grant, (Doc. No. 30 at 8); (2) Microvast failed to disclose the risk that the grant would fall through *because of* its extensive Chinese connections, (*id.* at 38); and (3) Microvast failed to disclose the risk that the grant would fall through because it *misled the DOE* about the extent of its Chinese connections, (*id.* at 39).

Regarding the first argument, Defendants' defense is simply that "the conditional nature of the grant selection was known to the public." (Doc. No. 37 at 18). They do not dispute that they were not selected to receive, but rather, to negotiate, the grant. (*Id.* at 19). Instead, they point to

two sources that purportedly disclaim the conditional nature of the grant—the DOE's website and Microvast's 2022 10-Q. (*Id.* at 19).

These sources, however, are wholly different and separate documents from the ones that contain the at-issue statements. This renders them arguably irrelevant to the Court's falsity analysis because the fact that the truth was published elsewhere does not transform an otherwise false statement into a true one. That Defendants disclosed something in a different, separate filing does not affect the veracity or falsity of a statement made somewhere else. As Defendants remind the Court, each statement must be taken individually. *See* (Doc. No. 37 at 13). Indeed, Defendants' argument is, in effect, one of materiality, because the materiality element asks whether there was a "substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of the information available." *Basic Inc. v. Levinson*, 485 U.S. 224, 231–32 (1988). Their argument is simply that information elsewhere changed the "total mix" of the information available. Falsity and materiality are two different, non-mutually exclusive elements, and whether a statement was material (which is examined separately below) has little impact on the falsity or misleading nature of a particular statement.

Taking the purported actionable statements in their alleged contexts, the Court finds them to be misleading as contended, at least at this stage of the litigation. In each of the DOE Statements, Defendants claimed that Microvast was "selected as a recipient of a $200 million grant," (Statement 1); "selected . . . to receive a $200 million grant," (Statement 2); "[s]elected by DOE . . . to receive $200 million grant," (Statement 3); "the DOE grant of 200 million, which we just, just, just received . . . selected by the U.S. [DOE] for a 200 million for our separator technology," (Statement 4); and "were also selected for $200 million grant," (Statement 5). Microvast, however, was not selected as a recipient—it was only invited to negotiate. Accepting those allegations as

true, as it must, the Court concludes that, by overstating the status of the $200 million funding to their investors, Defendants arguably misled them.

To be sure, some of the statements were accompanied by dampening language. For example, in the November 2, 2022, press release that contains Statement 2, Defendants further stated that

> as part of the selection process for the DOE grant, Microvast *has been invited to negotiate the specific terms* of the grant funding. *Once the terms have been finalized*, the grant funding will remain subject to the conditions precedent and other terms and conditions to be agreed during these negotiations.

(Doc. No. 30 at 39) (emphasis added). This additional language, however, was also arguably misleading because it downplayed the remaining steps left and overstated the likelihood of successful negotiations. It downplayed the remaining steps by stating that only the *specific* terms were left to be resolved, when, in fact, no terms had been finalized and the DOE had yet to do even due diligence on Microvast. *See* (*id.* at 8). Further, it overstated the likelihood of successful negotiations by stating that *once* the terms have been finalized, the grant will be subject to the agreed-upon terms. "Once" arguably suggests that Microvast's receipt of the grant is merely a function of time, not that the DOE could terminate the negotiations at any point. All these become especially true when inferences are drawn in Plaintiffs' favor, as they must at this stage for this element. *See In re BP p.l.c. Sec. Litig.*, 843 F. Supp. 2d 712, 745 (S.D. Tex. 2012) (Ellison, J.) (noting that the Court must draw all reasonable inferences in favor of Plaintiff except those for scienter).

Similarly, in the Q4 2022 earnings call during which Statement 5 was made, Wu added to his claim that Microvast was selected for the grant by stating that "it's very close to clos[ing] the deal and it's in the contract negotiating stage." (Doc. No. 30 at 44). Not only did the DOE have to conduct due diligence into the contents of Microvast's application, but it also "reserve[d] the right

to back out of negotiations without explanation." (*Id.* at 16–17). Thus, even with this additional language, Wu's statements plausibly misled the investors by overstating the grant's progress and concealing the hurdles that needed to be overcome.

Plaintiffs' first contention as to why the DOE Statements were misleading (that Microvast repeatedly misstated that it was an actual recipient of the grant), therefore, survives this Motion to Dismiss. The Court need not address Plaintiffs' second and third contentions (that Defendants failed to disclose the risk that the grant would ultimately fall through *because* of Microvast's Chinese connections and *because they misled* the DOE about those Chinese connections) because they are subsumed in the overall misrepresentation that Microvast received the grant when it did not. These latter allegations hinge on Defendants' failure to disclose the risk that the grant would fall through, but those are simply additional reasons that buttress the first contention. The Court thus need not separately address whether these two arguments also survive the Motion to Dismiss.

*Whether The Statements Were Material*

Having concluded that the DOE Statements were, as alleged, plausibly misleading or false, the Court next considers whether they were material. As to the materiality element, Plaintiffs must sufficiently plead that there was a "substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of the information available." *Basic Inc.*, 485 U.S. at 231–32. "Put another way, a statement or omitted fact is 'material' if there is a substantial likelihood that a reasonable investor would consider the information important in making a decision to invest." *ABC Arbitrage Plaintiffs Grp. v. Tchuruk*, 291 F.3d 336, 359 (5th Cir. 2002) (internal quotes and modification omitted). The "total mix" of information "normally includes information that is and has been in the readily available general public domain and facts known or reasonably available to the shareholders." *Kapps v. Torch Offshore, Inc.*, 379 F.3d 207, 216 (5th Cir. 2004). "There is no bright-line rule for

materiality; it requires a fact-intensive inquiry into 'the source, content, and context' of the allegedly misleading or omitted information." *In re Venator Materials PLC Sec. Litig.*, 547 F. Supp. 3d 624, 649 (S.D. Tex. 2021) (quoting *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 43 (2011)).

Defendants argue that the allegedly omitted or misrepresented information was, in fact, disclosed elsewhere, making dismissal appropriate even at the pleading stage. (Doc. No. 37 at 19). The disclosures Defendants point to are (1) the DOE's website, which stated, as of October 2022, that "[s]election for award negotiations is not a commitment by DOE to issue an award or provide funding," (Doc. No. 38-6 at 3); and (2) Microvast's Q3 2022 Form 10-Q, filed on November 10, 2022, which stated that Microvast was "selected . . . to negotiate and receive $200 million in grant funding," (Doc. No. 38-8 at 4).

It is arguably true that the information contained in the DOE's website and Microvast's Form 10-Q would have been considered important by a reasonable investor. The DOE's website apprises an investor that "[s]election for award negotiations is not a commitment by DOE to issue an award or provide funding." This would tell the reader that being selected for negotiations is not the same as actually getting the award. Similarly, the Q3 2022 Form 10-Q, which notifies the reader that Microvast was "selected . . . to negotiate and receive" the grant, might indicate to the reader that there was a remaining negotiation stage before Microvast will receive the grant.

That, however, is not the end of the materiality inquiry. In addition to persuading the Court that the information disclosed elsewhere, in isolation, would have been considered important by a reasonable investor, Defendants also have the burden of demonstrating that the "corrective information [was] conveyed to the public with a degree of intensity and credibility sufficient to counter-balance effectively any misleading information created by the alleged misstatements." *In*

*re MBIA, Inc., Sec. Litig.*, 700 F. Supp. 2d 566, 581 (S.D.N.Y. 2010) (quoting *Ganino v. Citizens Utilities Co.*, 228 F.3d 154, 167 (2d Cir. 2000)). They have not carried this burden at this stage.

For example, the DOE's website stated that "[s]election for award negotiations is not a commitment by DOE to issue an award or provide funding." (Doc. No. 38-6 at 3). This disclaimer that Defendants point to is implicitly conditional—*if* entities are selected for award negotiations, that is not a commitment by the DOE to issue an award or provide funding. That is, that disclaimer would be triggered and become relevant to a reasonable investor only if the rest of the website conveys that Microvast was selected only for award negotiations. The website, however, does not uniformly do so. It states that "DOE has *awarded* a total of $1.92 billion to 15 projects"; "DOE has closed the first round of . . . *investments*"; and "DOE's Office of Manufacturing and Energy Supply Chains will *administer* [not negotiate] the awards." (*Id.* at 2–3). It further links a fact sheet on "selectees." (*Id.* at 3). The website fails to convey that the disclaimer even applies, and thus, the disclaimer was not conveyed "with a degree of intensity and credibility sufficient to counter-balance" the rest of that website and Microvast's own statements.

Microvast's Form 10-Q fails at this stage for similar reasons. The disclaimer Defendants point to is that Microvast was "selected . . . to negotiate and receive" the grant. (Doc. No. 38-8 at 4). The difference between this disclaimer and any other DOE Statements at issue in this case is two words: "negotiate and," buried in a 51-word sentence. Moreover, the phrase "to negotiate and receive" fails to convey the substantial task of passing the DOE's due diligence and implicitly relegates the negotiation stage to mere formality.

In sum, at this motion-to-dismiss stage, while the information contained in the DOE's website and Microvast's Q3 2022 Form 10-Q might arguably be deemed important by a reasonable investor, it nevertheless was not conveyed with sufficient intensity to counterbalance the repeated and more prominent alleged misstatements made by Defendants before and after the website or

the 10-Q. Consequently, the Court declines to hold that the alleged misstatements were immaterial as a matter of law.

*Whether There Was Scienter*

Next, Defendants argue that the Complaint "lacks particularized facts supporting the necessary 'strong inference' of scienter." (Doc. No. 37 at 26). The PSLRA requires Plaintiffs to "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2)(A). In this Circuit, the requisite scienter is the "intent to deceive, manipulate, or defraud or severe recklessness." *Okla. Firefighters Pension & Ret. Sys. v. Six Flags Entertainment Corp.*, 58 F.4th 195, 214 (5th Cir. 2023). Severe recklessness is defined as follows:

> [T]hose highly unreasonable omissions or misrepresentations that involve not merely simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and that present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it.

*Shaw Grp.*, 537 F.3d at 533.

The Court "must consider plausible inferences that both oppose and support a strong inference of scienter; the inference must be 'cogent and compelling,' not 'merely "reasonable" or "permissible." ' " *Six Flags*, 58 F.4th at 214 (quoting *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007)). Circumstantial evidence may sometimes support a strong inference of scienter, but allegations of motive and opportunity, standing alone, will not suffice. *Shaw Grp.*, 537 F.3d at 533. The Court must "'assess all the allegations holistically,' not in isolation." *Owens v. Jastrow*, 789 F.3d 529, 536 (5th Cir. 2015). "Where there are competing inferences that establish or negate the scienter requirement, a tie favors the plaintiff on a motion to dismiss." *Six Flags*, 58 F.4th at 214 (quoting *Spitzberg v. Houston Am. Energy Corp.*, 758 F.3d 676, 686 (5th Cir. 2014)).

Moreover, the Fifth Circuit has "rejected the group pleading approach to scienter and instead looks to the state of mind of the individual corporate official or officials 'who make or issue the statement (or order or approve it or its making or issuance, or who furnish information or language for inclusion therein, or the like) rather than generally to the collective knowledge of all the corporation's officers and employees acquired in the course of their employment.'" *Shaw Group*, 537 F.3d at 533 (quoting *Southland Sec. Corp. v. INSpire Ins. Solutions, Inc.*, 365 F.3d 353, 366 (5th Cir. 2004)).

This doctrine has a particular effect on corporate scienter. "In order to adequately plead scienter as to a corporate defendant, Plaintiffs must link the statement to a corporate officer who can be seen as acting on behalf of the corporation in making the statement." *In re BP p.l.c.*, 843 F. Supp. 2d at 788 (citing *Southland*, 365 F.3d at 366). "Because 'an essentially subjective state of mind' is an element of a cause of action for fraud, 'the required state of mind must actually exist in the individual making (or being a cause of the making of) the misrepresentation,' and may not simply be imputed to the corporation on general principles of agency." *Id.* (quoting *Southland*, 365 F.3d at 366). Once the statement of a corporate officer is so linked to an officer or officers, however, they are treated as having been made by Microvast itself, as all of them appear from the face of the Complaint to have been made pursuant to their positions of authority within the company. *Southland*, 365 F.3d at 365.

When a statement is not attributed to a particular officer or officers, Plaintiffs face the hurdle of this Circuit's rule against group pleading. Nevertheless, courts in this Circuit have identified "the only way around this dead-end for unattributed corporate statements." *In re BP p.l.c.*, 843 F. Supp. 2d at 789 (citing *Makor Issues & Rights, Ltd. v. Tellabs, Inc.*, 513 F.3d 702, 710 (7th Cir. 2008) (Posner, J.) ("*Tellabs II*")); *In re Dell Inc., Sec. Litig.*, 591 F. Supp. 2d 877,

899 (W.D. Tex. 2008). In these cases, courts have used as guidance the example given by the

Seventh Circuit in *Tellabs II*. Judge Posner, writing for a panel of the Seventh Circuit, explained:

> Suppose General Motors announced that it had sold one million SUVs in 2006, and the actual number was zero. There would be a strong inference of corporate scienter, since so dramatic an announcement would have been approved by corporate officials sufficiently knowledgeable about the company to know that the accouchement was false.

*Tellabs II*, 513 F.3d at 710. In such a case, the court wrote, "it is possible to draw a strong inference

of corporate scienter without being able to name the individuals who concocted and disseminated

the fraud." *Id.* The "critical question, therefore, is how likely is it that the allegedly false statements

. . . were the result of merely careless mistakes at the management level based on false information

fed it from below, rather than of an intent to deceive or a reckless indifference to whether the

statements were misleading." *In re BP p.l.c.*, 843 F. Supp. 2d at 789 (citing *Tellabs II*, 513 F.3d at

709).

With these principles in mind, the Court turns to each DOE Statement. In Statement 1,

Plaintiffs allege that "*Microvast* tweeted on its official account" and "filed an 8-K with the SEC"

stating that it "was selected as a recipient of a $200 million grant." (Doc. No. 30 at 38) (emphasis

added). Similarly, as to Statement 2, Plaintiffs allege that "*Microvast* issued a press release" that

it was "selected . . . to receive a $200 million grant." (*Id.* at 39) (emphasis added). As to Statement

3, Plaintiffs also plead that, during an earnings call, "*Microvast* included" certain slides in its slide

deck that it was "selected . . . to receive a $200 million grant." (*Id.* at 41) (emphasis added). That

is, Plaintiffs do not attribute Statements 1, 2, or 3 to a specific officer or officers, and, as such,

those statements must fall into the narrow exception identified in *Tellabs II* to survive this motion.

The Court concludes that, at least at this stage, they do. Due to the importance of the grant,

it is unlikely that information regarding the DOE grants were merely "fed . . . from below" with

little oversight or check by the management. The grant amount was $200 million—needless to say,

a substantial sum. Moreover, to Microvast, the grant would have matched an entire year's worth of revenue and would have been equivalent to 22 times the yearly profit. *See* (Doc. No. 38-15 at 4, 9) (Q4 2022 earnings call transcript showing Microvast's revenue of $204.5 million and profit of $9 million).[8] Further, that $200 million was supposed to offset nearly 40% of the cost to build an entire separator facility in Hopkinsville, Kentucky, that would "dwarf Microvast's existing U.S. operations." (Doc. No. 30 at 21, 28). Indeed, just a month after the DOE terminated grant negotiations, Microvast announced that it would not proceed with the Hopkinsville facility. (*Id.* at 49–50). Given the crucial nature and substantial sum of the funding, far from the information being fed from below, it was much more likely that the executive management had a direct hand in the process and was apprised of any developments, including that negotiations and vetting were pending.

To be sure, the difference between receiving the grant and being selected to negotiate may not be as dramatic as the difference between selling one million SUVs and none in the *Tellabs II* exception. *See Tellabs II*, 513 F.3d at 710. It nonetheless overcomes the hurdle, even if it does so slightly. *See Six Flags*, 58 F.4th at 214 ("Where there are competing inferences that establish or negate the scienter requirement, a tie favors the plaintiff on a motion to dismiss."). Receiving a $200 million grant is quite a different thing from merely being a contender for it. The former allows Microvast to build out a facility that would "dwarf" its existing United States operations, while the latter is simply the next step beyond the application stage. Indeed, just as the difference between selling one million SUVs and none is millions of dollars, so too is the difference between receiving

---

[8] While courts are usually constrained to the contents of the pleadings at the motion-to-dismiss stage, the Fifth Circuit has allowed considerations of "documents that a defendant attaches to a motion to dismiss . . . if they are referred to in the plaintiff's complaint and are central to her claim." *Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498–99 (5th Cir. 2000). Here, what was said at the various earnings calls, including the one for Q4 2022, is repeatedly referenced in the Complaint and central to Plaintiffs' claims, and the transcripts for those calls are attached to Defendants' Motion to Dismiss. Thus, the Court may properly consider the earnings call transcript, and Defendants, of course, do not and cannot dispute the validity of their own earnings call representations.

$200 million and not receiving any money. Consequently, the Court holds that Plaintiffs have pleaded sufficient facts to, at least at this stage, demonstrate corporate scienter as to Statements 1, 2, and 3.

For Statements 4 and 5, Plaintiffs do identify the speakers. Regarding Statement 4, Plaintiffs allege that Kelterborn (the Chief Revenue Officer) delivered a presentation at the Baird Vehicle Technology & Mobility Conference, in which Kelterborn stated that "we just, just, just received" "the DOE grant of 200 million" and that Microvast was "selected by the US Department of Energy for a 200 million grant." (Doc. No. 30 at 42–43). Plaintiffs also allege that Kelterborn showed a slide containing information to the same effect. As for Statement 5, Plaintiffs allege that, during the Q4 2022 earnings call, Wu (the Chief Executive Officer) delivered prepared remarks, stating, "[w]e were also selected for $200 million grant by the U.S. Department of Energy." (*Id.* at 44).

The issue then becomes whether Plaintiffs pleaded particularized facts that demonstrate a strong inference that Kelterborn (in making Statement 4) or Wu (in making Statement 5) had the "intent to deceive, manipulate, or defraud or severe recklessness." *Six Flags*, 58 F.4th at 214. Assessed holistically, the pleaded facts raise strong inferences in the affirmative. The Fifth Circuit observed in *Dorsey v. Portfolio Equities, Inc.* that "there can be 'a number of special circumstances' which, taken together with an officer's position, may support a strong inference of scienter." 540 F.3d 333, 342 (5th Cir. 2008) (citing *Nathsenson*, 267 F.3d at 424); *see also Six Flags*, 58 F.4th at 219 (explaining the "core operations" theory of scienter). In *Nathenson*, the Fifth Circuit held that there was "a strong inference of scienter with respect to the CEO and the company" because, among other reasons, the company was essentially a one-product company, acquiring a patent for that patent was crucial, and the CEO publicly stated that the company's

patent covered the product even when the company had ample opportunity to discover whether or not that was true. *Nathenson*, 267 F.3d at 425.

Applying *Nathenson*, the court in *In re Venator Materials* held that, under similar facts as pleaded here, there was a strong inference of scienter with respect to the CEO and the CFO. *In re Venator*, 547 F. Supp. 3d at 664 (Eskridge, J.). The issue in that case was the defendant company's and officers' statements regarding a certain manufacturing facility's re-construction and production schedule following a fire. *Id.* at 635. The company, Venator, manufactured and sold, among others, titanium dioxide ($TiO_2$), which was responsible for 73% of the company's total sales in the relevant year. *Id.* at 664. The particular manufacturing facility that caught fire, located in Pori, Finland, produced the most profitable $TiO_2$ products for the company, accounted for 17% of the company's total manufacturing capacity, and was responsible for approximately one-third of the company's earnings each quarter. *Id.* The court held, "[t]his supports a strong inference of scienter with respect to Turner [CEO] and Ogden [CFO] because [the defendant company] was so heavily dependent on $TiO_2$, and the Pori facility was . . . arguably Venator's most profitable $TiO_2$ facility." *Id.*

The facts here similarly support a strong inference of scienter with respect to Kelterborn and Wu. In 2022, Microvast earned $204.5 million in revenue and $9 million in gross profit. (Doc. No. 38-15 at 4, 9). The grant, on the other hand, was $200 million—an amount that almost matches an entire year's revenue and is 22 times the profit. Moreover, that $200 million was supposed to fund approximately *half* of a brand-new facility in Hopkinsville, which would have "dwarf[ed] Microvast's existing U.S. operations." (Doc. No. 30 at 28). Further, Kelterborn and Wu each delivered a pre-prepared presentation or remarks, suggesting that they had time and opportunity to assess the accuracy of their statements. Therefore, "[i]t defies reason and common sense" to hold, especially at this stage, that the Chief Revenue Officer and Chief Executive Officer would not

have been aware of the status of a grant that matches an entire year's revenue, is multitudes greater than a year's worth of profit, and would have been instrumental in exponentially expanding Microvast's existing U.S. operations. *See In re Venator*, 547 F. Supp. 3d at 665.

Accordingly, the Complaint pleads sufficient facts as to scienter for Statements 1–5.

*Whether They Are Protected By PSLRA Safe Harbor*

Defendants argue that Plaintiffs' claims based on the DOE Statements should be dismissed because those statements are protected by the PSLRA safe harbor for forward-looking statements. (Doc. No. 37 at 23). As Defendants argue is applicable here, the PSLRA defines "forward-looking statements" as, among others, "a statement of the plans and objectives of management for future operations, including plans or objectives relating to the products or services of the issuer." 15 U.S.C. § 78u-5(i)(1)(B).

The safe harbor provides that a speaker is not liable with respect to any forward-looking statements, whether written or oral, if (1) the statement is identified as forward-looking and "accompanied by meaningful cautionary statements"; (2) the statement is immaterial; or (3) Plaintiffs failed to plead that the statement was made with actual knowledge that it was false or misleading. 15 U.S.C. § 78u-5(c)(1)(A)–(B). These are disjunctive; Defendants are not liable for those statements if any one of these requirements are met.

Many of the statements that Defendants contend are forward-looking statements are either not forward-looking at all or are not purely forward-looking. *See* (Doc. No. 37-2). Defendants identify the following statements as forward-looking in their view:

- "A wholly-owned subsidiary of Microvast Holdings, Inc. . . . was selected by the U.S. Department of Energy (DOE) in collaboration with General Motors to receive a $200 million grant . . . ."

- "Once the terms [of the DOE grant] have been finalized . . . ."

- "Selected by DOE, in collaboration with General Motors, to receive $200 million grant . . . ."

- "Microvast [was] selected by the U.S. Department of Energy ("DOE") to receive a $200 million grant."

- "[W]e are happy that General Motors will collaborate with us . . . ."

(*Id.*). While the second and last statements above may relate to the future, as to the rest, Defendants fail to explain how stating that Microvast "was selected"—in past tense—constitutes a forward-looking statement.

The second statement ("[o]nce the terms have been finalized") and the last ("we are happy that General Motors will collaborate with us") may, in insolation, constitute statements of the management's plans and objectives. To hold so, however, would be to cherry-pick those statements out of their respective contexts. The second statement came from Microvast's November 2, 2022, press release. *See* (Doc. No. 38-7). In it, the paragraph just before statement in question opens with "Microvast . . . is a *recipient of the first set of projects funded by the President's Bipartisan Infrastructure Law*." (*Id.* at 6) (emphasis added). Similarly, the last statement came from Kelterborn (the Chief Revenue Officer) during a presentation delivered at the Baird Vehicle Technology & Mobility Conference. *See* (Doc. No. 38-13). There, too, just before stating that General Motors will collaborate with Microvast, Kelterborn expressly stated that Microvast was "*selected* by the U.S. Department of Energy for a $200 million grant." (*Id.* at 7) (emphasis added). These statements, therefore, when read in context, were mixed present/future statements, ineligible for the safe harbor. *See Six Flags*, 58 F.4th at 210.

In sum, regarding the DOE Statements, the Court **DENIES** Defendants' Motion to Dismiss.

ii.    **The Clarksville Statements**

*Accounts by Former Employee Accounts*

For their claims over the Clarksville Statements, Plaintiffs rely heavily on information provided by three of Microvast's FEs. While they are anonymized in the Complaint, they are described as follows:

> FE 1 was a Microvast Maintenance Supervisor employed at its Clarksville, Tennessee facility between March 2023 through December 2023. FE 1 was hired ostensibly to lead one of four teams of six technicians who would be responsible for preventive maintenance and fixing equipment when it broke. But because the equipment never came in, Microvast had FE 1 and FE 1's team conduct basic construction tasks like hanging up drywall and repairing bathrooms. Until August 2023, FE 1 reported to FE 3. From mid-August through December 2023, FE 1 reported to Christopher Barbee, who reported to William Muir, Microvast's Vice President – North American Manufacturing and Director of the Clarksville Facility. Muir reported to Smith.

> FE 2 worked for Microvast as Buyer for the Clarksville Facility from May 2023 through August 2023, where FE 2 reported to Joe Muraca, who reported to David Lankewicz, Microvast's VP of Global Supply Chain. FE 2 was responsible for purchasing services for the Clarksville Facility. After August 2023, FE 2's responsibilities switched to supporting Microvast's Colorado Facility, serving as both a Buyer and a Systems, Application, and Products Analyst. As a Buyer for the Clarksville Facility, FE 2 was responsible for purchasing services and tools. FE 2 would also field calls and emails from vendors asking to have their overdue bills paid.

> FE 3 was the Clarksville Facility's Maintenance Manager. FE 3 was responsible for building out the Clarksville maintenance department that would install, commission, test, and put into operation the equipment at the Clarksville Facility. FE 3 reported to Muir, who reported to Smith. FE 3 worked out of the Clarksville Facility. In early May 2023, FE 3 visited Microvast's Huzhou Facility [in China]. While in China, FE 3 also visited the offices and factories of Lyric.

(Doc. No. 30 at 13–14).

In the Fifth Circuit, special rules apply when plaintiffs rely on unnamed sources. Under the heightened PSLRA pleading standard, courts must "weigh the strengths of plaintiffs' favored inference in comparison to other possible inferences." *Six Flags*, 58 F.4th at 207. This process, however, "is obstructed when the witness is anonymous, so courts must apply a discount to

confidential witness allegations." *Id.* "Courts may rely on assertions from confidential sources if the person is 'described in the complaint with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged.'" *Id.* at 208 (quoting *Owens*, 789 F.3d at 542 n.11). "[T]he important assertions must be factual and not mere conclusory statements." *Id.*

Here, Plaintiffs specifically allege the "job descriptions, individual responsibilities, and specific employment dates for the" FEs. *Cent. Laborers' Pension Fund v. Integrated Elec. Servs., Inc.*, 497 F.3d 546, 553 (5th Cir. 2007). These allegations demonstrate that the FEs were in a position to know first-hand facts regarding the Clarksville Facility and whether Defendants' statements were accurate. *See Six Flags*, 58 F.4th at 208 (quoting *Tellabs II*, 513 F.3d at 712) ("When confidential sources 'consist of persons who from the description of their jobs were in a position to know at first hand the facts,' and there is 'convincing detail' to the information they provide, there is reason to credit the informants' reliability."). Moreover, the FEs' assertions are largely factual with little by way of conclusory statements. Thus, the Court will consider the factual information attributed to FEs 1, 2, and 3, but nonetheless will disregard any conclusions or speculations.

*Whether The Statements Were False When Made*

Defendants argue that Plaintiffs have not pleaded sufficient facts that would plausibly show that the Clarksville Statements were false when made. (Doc. No. 37 at 19). The Court considers each statement individually.

**Statement 6.** On March 16, 2023, during Q4 2022 earnings call, Wu allegedly stated that he went to China "last week[, where he] saw all the equipment [destined for the Clarksville Facility] laying on the floor for FAT [Factory Acceptance Testing]." (Doc. No. 30 at 45). FE 3's account strongly indicates that was impossible. FE 3 visited China in May of 2023—two months

*after* the statement—and visited Lyric, which was responsible for providing 65–75% of the equipment for the Clarksville Facility. (*Id.* at 35–36). FE 3 saw that only *one* of the pieces of equipment was ready for factory acceptance testing, and it failed the test. (*Id.* at 36). The rest of the equipment was not even assembled, let alone ready for testing. (*Id.*). While the exact number of pieces of equipment to be made by Lyric is unalleged, the Complaint does allege that Lyric was supposed to make 24 cut-and-stack machines. (*Id.*). Even assuming that was the sum total of the equipment it was supposed to make, one out of 24 is hardly "all." Even assuming further that the remaining 25% to 35% of the equipment to be made by other manufacturers was complete and ready for FAT, 35% of the equipment plus one piece (out of 24) cannot reasonably be interpreted as "all."

**Statement 7.** On May 9, 2023, in response to an analysist's question about "headwinds" "in terms of buying that equipment and getting it into the country," Wu stated that "we're still on track on the plan to build this factory before the end of this year" because the Clarksville Facility is a 100% mirror of Microvast's Chinese facility with the same equipment and installation process. (*Id.* at 47).

Equipment procurement and delivery, however, were allegedly not "on track" in May. While Lyric was supposed to complete delivery in March or April 2023, it blew past those deadlines. (*Id.* at 31). In fact, Plaintiffs allege that, by May, none of the equipment had passed FAT, and only one piece of equipment had been assembled. (*Id.* at 31, 36). Even if the equipment had shipped in May without passing FAT, according to FE 3 (who was responsible for installing and putting into operation the equipment), the journey from the factory in China to Clarksville would have taken approximately eight weeks, (*id.* at 35), meaning the equipment would arrive in late June or early July. Once the equipment is delivered, it would have allegedly taken Microvast nine months to install the equipment based on a past installation time frame, (*id.* at 31), completing

installation in late Q1 of the next year, not "before the end of this year." To be sure, by "build[ing] this factory," Wu could have meant completing the *construction* of the building. Such a reading, however, would run counter to the motion-to-dismiss standard, where inferences (other than those for scienter) are drawn in favor of Plaintiffs. *See In re BP p.l.c.*, 843 F. Supp. 2d at 745. Further, Wu was responding to a question specifically about the equipment procurement and delivery process, not the building.

**Statement 8.** On May 25, 2023, Smith (then the Chief Operating Officer) delivered prepared remarks during Microvast's Investor Day. (Doc. No. 30 at 48). He stated that equipment is "now being put on boats" and that, "[t]hrough June, July, August, September, *all* the equipment[]" will be delivered to Clarksville. (*Id.*) (emphasis added). Under the pleaded facts, that was false. By mid-August 2023, "none of Lyric's equipment had been delivered and none had even been shipped." (*Id.* at 37). Thus, it was impossible for Lyric's equipment to have been "put on boats" and shipped three months before in May, and it certainly was not being delivered through June, July, August, and September because it takes eight weeks to arrive. If, then, Lyric's equipment—constituting 65–75% of all equipment—could not be delivered by September, it was incorrect say that through those months, *all* of the equipment would be delivered.

**Statements 9 and 10.** On June 30, 2023, Microvast issued a press release, stating that it "expects production to start in this year's fourth quarter, creating hundreds of new jobs in Tennessee." (*Id.* at 50). Similarly, on August 7, 2023, Webster (the Chief Financial Officer) delivered prepared remarks during Microvast's Q2 2023 earnings call, stating, "we are pleased to report that our Clarksville Facility remains on track for a Q4 start of trial production." (*Id.*).

The Q4 2023 production timeline was set in November 2022, when Lyric's equipment delivery deadline was March/April 2023. (*Id.* at 30). By May, as discussed above, none of Lyric's equipment had passed FAT in China, let alone been delivered to Tennessee. (*Id.* at 31). That delay,

combined with the eight-week delivery and nine-month installation timelines, supports Plaintiffs' conclusion that it would have been apparent that the statement was false when made.

**Statement 11**. On August 8, 2023, Wu and Webster delivered a presentation at the Oppenheimer Technology Internet & Communications Conference. (*Id.* at 50). Wu stated, "We are ready right now . . . And we expect the test production at the end of this year." (*Id.* at 51). For the same reasons as above, it may be reasonable to conclude this assertion that the production is expected to start at the end of the year was false or misleading when made.

At the same conference, Webster stated that "the construction phase is nearly done." (*Id.* at 52). The Complaint alleges that this was also false. An important part of the Clarksville Facility was the cleanrooms, but by August, only *some* of these cleanrooms were being built, and even those did not have ceilings, doors, or airlocks—integral to making a cleanroom free of airborne particulates. (*Id.*). According to FE 3, by mid-August, over 50% of the task of building cleanrooms remained. (*Id.*). Moreover, the remaining work was not likely to be completed soon, because Microvast's contractors began reducing headcount around July 2023, and they continued to do so throughout August, due to unpaid bills. (*Id.* at 33–34). Thus, not only were cleanrooms—areas that were essential to the purpose of the facility—incomplete by this point, construction was also slowing.

**Statement 12.** On November 9, 2023, Microvast held a Q3 2023 earnings call, during which Ward stated that "[o]n the construction side, we are nearly at completion with a majority of the building now under joint occupancy and only minor work remains to be done in the fourth quarter." (*Id.* at 53). According to FE 1, however, by December, the facility "still lacked a cleanroom, had no filters, had no tanks for storing chemicals, and had no venting for a 'high-temperature room' because the vents had been placed 'in the wrong position.'" (*Id.* at 34–35). If this was the state of the facility in December, it was plausibly false or misleading that, in

November, construction was "nearly at completion . . . [with] only minor work remains to be done."

**Statement 13.** On December 13, 2023, Webster and Wu participated in a Fireside Chat with Cantor Fitzgerald. (*Id.* at 53). There, Webster stated, "we've really moved along great strides on Clarksville. Construction—pretty much done . . . The building, the infrastructure is done." (*Id.* at 53–54). Moreover, when the interviewer suggested that production might be moved to Q4 2024, Wu resisted: "Q4? We should put in production before Q4 2024. We plan [for] production in Q2. Why move to Q4?" (*Id.* at 54). Wu further declared that he "do[es]n't see the big problem for putting in production." (*Id.* at 55).

Under Plaintiffs' alleged facts, this statement was misleading for several reasons. First, as mentioned above, by December, the facility cleanrooms, filters, chemical tanks, and venting for high-temperature rooms remained to be completed—far from the "building, the infrastructure" being done. Second, the construction was not progressing. According to the Complaint, contractors began pulling personnel from the Clarksville construction in July 2023, and FE 3 asserts that "contractors and subcontractors completely demobilized in December 2023/January 2024." (*Id.* at 33–34). Vendors also issued credit holds and liens, starting as early as August 2023. (*Id.* at 34). Notwithstanding these hurdles, Wu claimed that he "do[es]n't see the big problem for putting in production," an assertion that could plausibly mislead investors.

Therefore, accepting the pleaded facts as true, all of the Clarksville Statements outlined above were false or misleading when made.

*Whether The Statements Were Material*

Defendants raise four arguments as to why the Clarksville Statements were not material, that is, would not have misled a reasonable investor. First, "Defendants spoke about the Clarksville [F]acility in generalized terms and without any reference to specific deadlines for construction and

36

equipment delivery." (Doc. No. 37 at 20). Second, "Defendants updated investors as plans changed and disclosed the risks associated with bringing on production capacity in Clarksville." (*Id.* at 21). Third, "Plaintiffs improperly mischaracterize a number of the challenged statements" and take them out of the context. (*Id.*). Fourth and last, corporate puffery is immaterial. (*Id.* at 22).

In support of their first argument, Defendants rely on *In re Plains All Am. Pipeline, L.P. Sec. Litig.*, which held that "a reasonable investor would not understand the company's high-level general statements that it was operating in *substantial* compliance with regulatory requirements as implicitly assuring *absolute* compliance." 245 F. Supp. 3d 870, 909 (S.D. Tex. 2017) (emphasis added). Applying this, Defendants argue that statements like "the equipment was laying on the floor for FAT," "the equipment is being put on boats," "we are ready right now," "the construction phase is nearly done," "the equipment's arriving now," "we are nearly at completion," "construction—pretty much done," and "the building, the infrastructure is done" cannot be understood as anything other than high-level, general statements that would not mislead a reasonable investor. (Doc. No. 37 at 20–21).

This argument flips *In re Plains* on its head. In that case, the plaintiffs sought to read *out* "hedges and disclaimers" like "substantial" from the defendants' statements. *In re Plains*, 245 F. Supp. 3d at 909. Here, however, Defendants seek to read *into* their statements such disclaimers or qualifying language. Defendants wish this Court to read "the equipment is being put on boats" as "*some but not all* of the equipment is being put on boats"; "we are ready right now" as "we are *somewhat* ready right now"; "the equipment's arriving now" as "the equipment is arriving now *or will be in the next several months*"; and "the building, the infrastructure is done" as "the building, the infrastructure is *partially* done." The Court declines to do so.

True enough, some of the statements at issue did contain modifiers: "we are *nearly* at completion" and "construction—*pretty much* done." Even with those modifiers, the Court cannot

hold as a matter of law that those statements were immaterial. As explained above, when Ward and Webster made those respective statements, they were far from true in light of the facts alleged in the Complaint; the facility still had no cleanrooms, no filters, no chemical storage, or vents—crucial parts of a battery manufacturing facility. (Doc. No. 30 at 34–35). By failing to adequately convey the substantial remaining work to be done on their facility, Defendants' conduct stands in stark contrast with that of the defendant in *In re Plains*. There, the plaintiffs argued that the defendant was not in "substantial compliance" due to what the court described as "recordkeeping violations on minor portions of the company's operation" that "are commonplace and unremarkable." *In re Plains*, 245 F. Supp. 3d at 910. Here, on the other hand, the remaining work to be done was not minor. Thus, *In re Plains* is distinguishable, and a reasonable jury under the alleged facts could find that the statements—with or without the qualifiers—were materially misleading or false as alleged.

Second, Defendants argue that they disclosed risks "associated with bringing on production capacity in Clarksville." (Doc No. 37 at 21). They point to their Form 10-K for 2021, filed on March 29, 2022. In it, as relevant here, Microvast disclosed that "delays by our suppliers and equipment vendors" may negatively impact its manufacturing output to meet demand. (Doc. No. 38-1 at 23). These statements obviously warn of some possible future pitfalls, and it is reasonable to conclude that investors would deem them important in their investing decisions.

These statements, however, were not "conveyed to the public with a degree of intensity and credibility sufficient to counter-balance effectively any misleading information created by the alleged misstatements." *In re MBIA*, 700 F. Supp. 2d at 581. That is because these earlier disclosures of potential risk are overshadowed by later statements that affirmatively and repeatedly represented that those risks did not materialize. For example, stating that "equipment is arriving now" signals to investors that the potential delays by equipment vendors did not occur or were

mitigated. Thus, this earlier disclosure of potential risk does not render immaterial Defendants' later-issued, affirmative statements that the risks did not materialize or were mitigated.

Third, Defendants contend that Plaintiffs mischaracterize their statements by "draw[ing] a false equivalency between capital expenditures and construction progress." (Doc. No. 37 at 22). True, Plaintiffs sometimes allege that Microvast's statement that it was "half-way through the company's more than $300 million investment in the plant" must be false because the Clarksville Facility was "nowhere near halfway through completion." (Doc. No. 30 at 49). While that comparison may indeed be one of apples to oranges, the most problematic parts of Defendants' statements do not involve those concerning their capital expenditures but instead are about the actual progress of the facility and equipment. *See supra* (explaining the allegations concerning the alleged false or misleading nature of the Clarksville Statements).

Fourth, Defendants argue that many of the statements at issue were mere corporate puffery. "Vague, optimistic statements are not actionable." *In re BP p.l.c.*, 843 F. Supp. 2d at 748. "Allegations that amount to little more than corporate 'cheerleading' are puffery . . . not actionable under federal securities law because no reasonable investor would consider such statements material and because investors and analysts are too sophisticated to rely on vague expressions of optimism rather than specific facts." *Id.* (citing *Krim v. BancTexas Grp., Inc.*, 989 F.2d 1435, 1446 (5th Cir. 1993)).

The statements Defendants identify as corporate puffery are as follows:

- "The entire team is just racing to get there." (Doc. No. 30 at 51) (Statement 11).

- "If you just wind back to the start of the year, we've really achieved [our goals] for this year . . . And then we've really moved along great strides on Clarksville." (*Id.* at 53) (Statement 13).

- "[W]e're in the race to get Clarksville into production." (*Id.*) (Statement 13).

- "If you look at both Huzhou and Clarksville, the sort of hard yards have been done." (*Id.* at 54) (Statement 13).

*See* (Doc. No. 37 at 22). The first, third, and fourth statements are corporate puffery. Stating that Microvast is "racing to get there," "in the race," and that "hard yards have been done" is so vague and generalized that no reasonable investor would rely on them. *See Rosenzweig v. Azurix Corp.*, 332 F.3d 854, 870 (5th Cir. 2003) (holding that "making steady progress" is "precisely the sort of generalized positive characterization that is not actionable under the securities laws").

The second statement is a closer call, but due to its context, the Court declines to hold as a matter of law that it is corporate puffery. Whether "[w]e've really achieved [our goals] for this year" is merely a generalized positive characterization depends heavily on the context. If the goals that the statement refers to were specific revenues or actual production predictions, for example, stating that the company has met its goals would not be mere puffery, but a material statement. Similarly, "we've really moved along great strides" could be interpreted in countless ways depending on the context. The following is what Webster stated during that Fireside Chat that contains the statements at issue:

> And if you just wind back to the start of this year, if you look at what we set out to do, you know we've really achieved it for this year. We said that you know as a business operational thing to achieve, we have to bring on that capacity expansion in China, which would add that revenue potential. You know, we did that. As we did it, we then you know, you saw the acceleration in the European revenues because the European customer base was waiting for that 53.5 and then, you know we've really moved along great strides on Clarksville, you know, construction pretty much done, we do commissioning and installation from here on in and when that's all done is what we set out to do, you know.

(Doc. No. 38-27 at 8). When read in context, the statement could be interpreted by a reasonable investor that the "goals" to be achieved included making sufficient progress on the Clarksville Facility and that Microvast achieved it, because Webster stated that the facility only had a few remaining steps—namely, "commissioning and installation." That representation was sufficiently

factual and concrete enough to prevent this Court from holding, at least at this stage, that it was mere corporate puffery as a matter of law.

Accordingly, the Court concludes that the above-discussed parts of Statements 11 and 13 are immaterial as corporate puffery. The remaining statements and other parts of Statements 11 and 13 remain at issue.

*Whether There Was Scienter*

Next, Defendants argue that Plaintiffs have not alleged particularized facts supporting a strong inference of scienter with regard to the Clarksville Statements. (Doc. No. 37 at 30). Since "the required state of mind must actually exist in the individual making (or being a cause of the making of) the misrepresentation," *In re BP p.l.c.*, 843 F. Supp. 2d at 788, the Court considers the allegations against and Defendants' scienter arguments as to each individual speaker.[9]

**Defendant Wu.** Wu stated on March 16, 2023, that he saw "all the equipment laying on the floor for FAT." (Doc. No. 30 at 45) (Statement 6). Defendants argue that Wu never claimed the equipment was "ready" for FAT or that he saw *Lyric's* equipment (indeed, there are other equipment vendors whose equipment was ready). (Doc. No. 37 at 31). This ignores the plain words and meaning of his statement: he saw "*all* the equipment laying on the floor *for* FAT." No qualifications were attached. Further, if equipment is on the floor *for* a test, one would quite reasonably assume that the equipment was on the floor for the purpose of being tested. Any other reading would be a stretch. If what Wu saw was only a subset of the equipment laying on the floor for assembly and not for testing, that would contradict the plain meaning of his statement and give rise to a strong inference of scienter.

---

[9] Defendants make a more generalized challenge to Plaintiffs' scienter allegations, rather than challenging scienter underlying each individual statement. *See* (Doc. No. 37 at 30–36). The Court addresses only the arguments Defendants set forth in their motion.

Defendants further challenge the sufficiency of Plaintiffs' scienter allegations that are based on former employees' accounts. (Doc. No. 37 at 31). According to FE 1, "Defendant Wu visited the Clarksville Facility on several occasions," during which he would "'walk around' and meet with facility managers." (Doc. No. 30 at 62). Indeed, during December 2023 Fireside Chat, Wu "was calling in from the Clarksville Facility and had been there for three days." (*Id.* at 65). Moreover, according to FE 3, "Microvast executives, including C-suite officers, held weekly calls with Lyric." (*Id.* at 62). Defendants argue that the lack of necessary detail—such as when he visited the facility, how many times he visited, and the state of the facility during those visits—means scienter cannot be inferred. (Doc. No. 37 at 31).

In support, Defendants cite to *Shaw Group*, in which the plaintiffs alleged that Shaw (the defendant company) failed to disclose earlier that its contracting counterparty (NRG) faced financial difficulty and could not make the milestone payments on a construction project. 537 F.3d at 541. The court declined to infer scienter because the complaint—relying on a single confidential source—"does not indicate how or when the officers [of the company] became aware of what the confidential source allegedly knew" about NRG's financial difficulties "long before NRG missed a payment." *Id.* at 542. Further, while the confidential source did assert that he organized a meeting with the defendant officers regarding the project, the complaint did "not state that these defendants attended or how they allegedly learned what was discussed at that meeting." *Id.*

The allegations here, however, are far more robust than those in *Shaw Group*. First, Plaintiffs rely on more than one single confidential source. Second, the Complaint here, unlike in *Shaw Group*, does indicate how or when the officers became aware of what the sources knew. It does so by alleging that Wu visited the Clarksville Facility on "several" occasions and that he met with managers of the facility. (Doc. No. 30 at 62). It also alleges that C-suite officers held weekly calls with Lyric. (*Id.*). These visits and calls indicate how Wu would have been aware of the lack

42

of progress. *See In re Venator*, 547 F. Supp. 3d at 663 (holding that "substantial indication that [officers] had regular access to information regarding the [defendant's] facility capacity and construction progress" constituted sufficient allegation of scienter). Moreover, the fact that Wu— the founder and Chief Executive Officer—visited the facility more than once and that C-suite officers took time out of their days to attend calls with Lyric demonstrate the importance of the facility to Microvast and its most senior executives. The frequency of the visits, the import of the facility, and the weekly calls with Lyric by Microvast's executives thus give rise to a strong inference that Wu was, at least, severely reckless in making statements regarding the facility progress.

**Defendant Smith.** Plaintiffs allege that, just because Smith worked out of the Guangzhou facility for three months, only two hours away from Lyric, there "would be no reason for Smith not to visit Lyric in person." (Doc. No. 30 at 62). Defendants argue that this is speculative. (Doc. No. 37 at 32). The Court agrees; however, that is not the extent of Plaintiffs' allegations that speak to Smith's scienter. The Complaint also alleges that Smith "had an office in the Clarksville Facility [and] was present at his office, on average, about once per week." (Doc. No. 30 at 62). It further alleges that, according to Wu, Smith was responsible for the Clarksville Facility. (*Id.*) (quoting Wu as stating that Smith is responsible for "putting together an amazing factory here in Clarksville"). Finally, as explained above, it alleges that "Microvast executives, including C-suite officers, held weekly calls with Lyric." (*Id.*).

These allegations sufficiently allege scienter. As the court in *In re Venator* held, allegations that a corporate officer was privy to regular reports about the status of a project sufficiently alleges scienter at the motion-to-dismiss stage, even if the "precise dates and the contents of specific reports" are not pleaded. 547 F. Supp. 3d at 664. The weekly calls, combined with a routine presence at the Clarksville Facility, would make Smith "privy to regular reports," especially

because he was responsible for the project. Further bolstering this conclusion is the fact that the allegedly-false statement given by Smith was a prepared statement, given after Smith's direct report, Muir (then Director of Clarksville Facility), concluded that Lyric could not possibly meet the existing equipment-delivery deadline. (Doc. No. 30 at 48, 63). Smith had opportunity to verify the prepared statement he later delivered, armed with frequent reports from Lyric and well-informed direct-report supervisees. Assuming Plaintiffs' allegations to be true, he either did verify and still misstated the progress or he failed to verify the statements—as a reasonable person responsible for the project would have—which would have been severely reckless. Thus, as alleged in the Complaint, Smith had scienter.

**Defendant Webster.** As to Webster, Microvast's Chief Financial Officer, Plaintiffs contend that his later statements that seek to exculpate himself and Microvast from his prior statements support an inference of scienter. (Doc. No. 30 at 64). On April 1, 2024, Microvast held a Q4 2023 earnings call where Defendants revealed that they were stopping construction on the Clarksville Facility pending further financing. (*Id.* at 58). On that call, Webster stated, "So as we indicated last time, we've got about halfway through Clarksville on CapEx [capital expenditure]. So to get it done, it's about $150 million." (*Id.*).

Plaintiffs argue that, contrary to Webster's representation, Defendants had told their investors that they were halfway through the capital expenditure not "last time" (*i.e.*, Q3 2023 earnings call on November 9, 2023), but about six months before that—in May 2023. (*Id.* at 63). Moreover, they allege that, since May 2023, Microvast spent $38.3 million in Q3 2023 and $33.2 million in Q4 2023 on the Clarksville Facility. (*Id.* at 64 n.12). According to Plaintiffs, Webster's attempt to downplay when Microvast was last at the halfway point of its capital expenditures indicates scienter because that suggests that Webster knew when the original statement was made in May 2023 that it was misleading.

While that theory of scienter may not be sufficient on its own, when combined with other facts of the "core operations" doctrine of scienter and at this stage of litigation, it gives rise to a strong inference of scienter. The Fifth Circuit has identified four considerations that, when taken together with an officer's position, "might tip the scales in favor of an inference of scienter." *Six Flags*, 58 F.4th at 219 (citing *Local 731 I.B. of T. Excavators & Pavers Pension Tr. Fund v. Diodes, Inc.*, 810 F.3d 951, 958–59 (5th Cir. 2016)). This is also known as the "core operations" doctrine, and its factors are: (1) the company's size; (2) whether the transaction at issue was "critical to the company's continued vitality"; (3) whether the misrepresented information "would have been readily apparent to the speaker"; and (4) whether "the defendant's statements were internally inconsistent with one another." *Id.* (citing *Diodes*, 810 F.3d at 959).

First, Microvast is a medium-to-large company, with 1,255 full-time employees in 2021, weighing this factor against Plaintiffs. *See Six Flags*, 58 F.4th at 219. The Court notes, however, that it only had 20 employees in the United States, and the two plants at issue and the DOE grant all took place in the United States.

Second, the Clarksville Facility was indeed critical to the company's continued vitality. Several factors indicate as much. One of those factors is that there was a "backlog" of orders to the tune of $700 million to be fulfilled by the Clarksville Facility. (Doc. No. 30 at 29). That is more than *double* the revenue Microvast earned in 2023. *See* (Doc. No. 38-28 at 4) (stating Microvast's 2023 revenue as $306.6 million). Moreover, the construction of the facility nearly brought the company to the brink of bankruptcy. In its Form 10-K for the fiscal year 2023, Microvast warned that "there is substantial doubt regarding our ability to continue as a going concern," due to the capital expenditures surrounding the Clarksville Facility. (Doc. No. 30 at 65). Clearly, the success of the facility—with so much invested capital and promised revenue—was critical to the company's continued vitality. *Cf. Six Flags*, 58 F.4th at 219 (holding that a

transaction worth only 3% of a company's revenue but was a "key growth driver" satisfied this element).

Third, the status of the Clarksville Facility and its progress would have been readily apparent to Webster. Plaintiffs plead that "Microvast executives, including C-suite officers, held weekly calls with Lyric." (Doc. No. 30 at 62). Webster, as the CFO, is a member of the C-suite. Plaintiffs also plead that, in 2023, Microvast faced $31.9 million in mechanics' liens on the facility, with $57 million in accounts payable. (*Id.* at 35). It seems cogent and compelling to conclude that the Chief *Financial* Officer would have known about large overdue bills and liens that not only total nearly a third of Microvast's 2023 revenue but were also inhibiting the completion of a facility that would have brought $700 million in revenue. *See Plotkin v. IP Axess Inc.*, 407 F.3d 690, 700 (holding that "[i]t is reasonable to assume, given the importance of these deals to the company, that [defendant company] would have familiarized itself with the financial condition of [contractual counterparties] and would have discovered details about their poor financial condition").

Finally, Webster's statements were internally inconsistent. Courts may cross-reference statements made at different points in time to determine their consistency. *See id.* As explained above, Webster stated in April 2024 that Microvast was halfway through its capital expenditure for the Clarksville Facility. (Doc. No. 30 at 58). That, however, was inconsistent with his statement almost a year prior in May 2023 that Microvast was halfway through its capital expenditure, given that in the intervening time, Q3 and Q4 of 2023, it expended another $71.5 million on the project— about a quarter of the planned expenditure. (*Id.* at 63–64).

Therefore, Plaintiffs have pleaded sufficient facts to weigh the "core operations" factors in their favor. Consequently, the Court concludes that Plaintiffs have sufficiently pleaded Webster's scienter.

*Whether The Statements Are Protected By PSLRA Safe Harbor*

Defendants next argue that the allegedly-actionable statements are protected by the PSLRA safe harbor. As explained above, the PSLRA defines a "forward-looking statement" as "a statement of the plans and objectives of management for future operations, including plans or objectives relating to the products or services of the issuer." *Id.* § 78u-5(i)(1)(B). For a forward-looking statement to qualify for the safe harbor, at least one of the following must be met: (1) the statement is identified as forward-looking and "accompanied by meaningful cautionary statements"; (2) the statement is immaterial; or (3) Plaintiffs failed to plead that the statement was made with actual knowledge that it was false or misleading. 15 U.S.C. § 78u-5(c)(1)(A)–(B). Again, these are disjunctive.

A "meaningful" cautionary statement identifies "important factors that could cause actual results to differ materially from those in the forward-looking statement." § 78u-5(c)(1)(A). Companies must disclose "substantive company-specific warnings based on a realistic description of the risks applicable to the particular circumstances, not merely a boilerplate litany of generally applicable risk factors." *Six Flags*, 58 F.4th at 211.

Slightly different rules apply to cautionary statements for oral statements. To meet the first element (whether the statement is identified as forward-looking or accompanied by meaningful cautionary statements), (1) the oral statement must be accompanied by a cautionary statement that the "particular" oral statement is forward-looking and that actual results could differ materially; (2) be accompanied by an oral statement that additional information that could cause actual results to differ materially is contained in a readily-available written document; (3) identify the document

or portion thereof containing the additional information; and (4) the identified document itself must contain appropriate cautionary language. *Id.* at 211 n.13 (quoting *Southland*, 365 F.3d at 372); § 78u-5(c)(2).

Defendants argue that the following statements qualify as forward-looking statements under § 78u-5(i)(1)(B) due to their use of "anticipatory" language, such as "will," "expect," and "on track":

- "And we're still on track . . . to build this factory before the end of this year. That's our plan." (Statement 7).

- "Through June, July, August, September, all the equipment's coming into Clarksville . . . [A]s soon as the equipment lands, we're ready to do that." (Statement 8).

- "The Company expects production to start in this year's fourth quarter, creating hundreds of new jobs in Tennessee." (Statement 9).

- "Clarksville Facility remains on track for a Q4 start of trial production." (Statement 10).

- "The entire team is just racing to get there." (Statement 11)

- "And we expect the test production at the end of this year." (Statement 11).

- "We still do commissioning and installation from here on in, and when that's all done it's what we set out to do." (Statement 13).

- "[W]e're in the race to get Clarksville into production." (Statement 13).

- "We plan production in Q2 [2024]." (Statement 13).

- "And also we will have a team from China side to help start up. To safeguard the initial production. And I don't see the big problem for putting in production." (Statement 13).

(Doc. No. 37 at 3–24); (Doc. No. 37-2).

Plaintiffs, on the other hand, argue that these statements were "mixed present/future statements" that are actionable because they convey a misleading picture of current construction status. (Doc. No. 39 at 24–25). In support, they point to *Six Flags*, 58 F.4th 195. There, Six Flags stated, "right now, barring some other decision that's made, all our parks are progressing nicely towards their anticipated opening dates." *Id.* at 210. The Fifth Circuit held that the statement was

a "mixed present/future statement ineligible for safe harbor" because "Six Flags was asserting the parks were undergoing sufficient construction to meet the deadlines. Although the deadline is a future projection, the crux of Plaintiff's fraud claim is that Defendants misled investors about the Company's *present* construction progress." *Id.* at 210–11 (emphasis in original). Conversely, the court held that statements such as "three new parks . . . are expected to begin opening in 2021" and "those start to come online in Zhejiang in early 2020" were "statements of the plans and objectives of management for future operations" because they were "concrete plan[s] with no commentary about present construction progress." *Id.* at 211 (modifications omitted).

In *In re Venator*, the court also examined statements regarding construction progress. There, corporate executives "represented that they were 'on pace' and 'on schedule' to fully rebuild the specialty portion of [the Pori facility]," even though the antecedent demolition phase was not complete. *In re Venator*, 547 F. Supp. 3d at 656. The executives also "represented that Venator 'continues to make progress on the construction phase of the rebuild,' and '[they] expect some of this specialty capacity to be producing finished product during the second half of this year"—again, despite the fact that demolition was not complete. *Id.* at 657. The court there held that these statements were not "*solely* forward looking within the comprehension of the safe-harbor provision. These are instead largely mixed present/future statements," and thus escape the safe harbor. *Id.* at 657–58 (emphasis added).

The law, as expressed in these cases, compels a similar conclusion here: the vast majority of the statements were mixed present/future statements, not entitled to the protections of the safe harbor. For example, in Statements 7 and 10, the speaking Defendants stated that the Clarksville Facility was "still on track" or "remains on track." *See* (Doc. No. 30 at 47, 50). Like in *Six Flags*, Defendants were "asserting the [facility was] undergoing sufficient construction to meet the deadlines. Although the deadline is a future projection, the crux of Plaintiff[s'] fraud claim is that

Defendants misled investors about the Company's *present* construction progress." *Six Flags*, 58 F.4th at 210–11 (emphasis in original).

The same can be said for Smith's statement that equipment is "now being put on boats[, and t]hrough June, July, August, September, all the equipment's coming into Clarksville." (Doc. No. 30 at 48) (Statement 8). While the deadline of equipment arrival was a future projection, he was asserting that the equipment manufacturing and testing were completed and that the equipment was being shipped at that moment. Likewise, Wu's statement, "I don't see the big problem for putting in production," (*Id.* at 55) (Statement 13), implies a statement of present fact—that no current problems existed that would hinder a future projection.

Lastly, when Webster stated, "Construction—pretty much done[; w]e still do commissioning and installation from here on in, and when that's all done it's what we set out to do [for this year]," (*Id.* at 53) (Statement 13), that was a mixed present/future statement. That is so for two reasons. "Construction—pretty much done" is a statement of present fact. Moreover, while "we still do commissioning and installation from here on in" might be a forward-looking statement indicating the management's objectives, when combined with "when that's all done it's what we set out to do," it indicates that those two steps—commissioning and installation—are the only remaining steps left. Such an assertion is a statement of present fact.

This leaves two categories of statements that Defendants contend are forward-looking statements. First is a few executives' statement that Microvast is "in the race" or is "racing to get there." (*Id.* at 51, 53) (Statements 11 and 13). The Court already held above that these were mere corporate puffery, unactionable as a matter of law. The Court thus need not address whether these are protected by the forward-looking-statement safe harbor.

Second, in three of the statements, Microvast or Individual Defendants stated that "[t]he Company expects production to start in this year's fourth quarter," "we expect the test production

at the end of this year," and "[w]e plan in production in Q2." (*Id.* 50, 51, 54) (Statements 9, 11,

and 13). These statements, unlike the rest of the statements above, are "concrete plan[s] with no

commentary about present construction progress," *Six Flags*, 58 F.4th at 211, and thus, constitute

forward-looking statements.

Having concluded that Statement 9 ("The Company expects production to start in this

year's fourth quarter"), a part of Statement 11 ("[W]e expect production at the end of the year"),

and a part of Statement 13 ("We plan production in Q2") are forward-looking statements under

§ 78u-5(i)(1)(B), the Court next considers whether the other elements of the safe harbor are met.

Statement 9, while identified as a forward-looking statement, was not accompanied by

specific and sufficient cautionary statements. Statement 9 was made in a press release announcing

the end of the Hopkinsville Facility project. (Doc. No. 38-20). The Court recognizes that, at the

very end of the press release, Microvast included the following disclaimer:

> **Cautionary Statement Regarding Forward-Looking Statements**
>
> This communication contains "forward-looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995. Such statements include, but are not limited to, statements about future financial and operating results, our plans, objectives, expectations and intentions with respect to future operations, products and services; and other statements identified by words such as "will likely result," "are expected to," "will continue," "is anticipated," "estimated," "believe," "intend," "plan," "projection," "outlook" or words of similar meaning. These forward-looking statements include, but are not limited to, statements regarding Microvast's industry and market sizes, future opportunities for Microvast and the combined company, and Microvast's estimated future results. Such forward-looking statements are based upon the current beliefs and expectations of our management and are inherently subject to significant business, economic, and competitive uncertainties and contingencies, many of which are difficult to predict and generally beyond our control. Actual results and the timing of events may differ materially from the results anticipated in these forward-looking statements.

(*Id.*). That disclaimer identifies statements with the words "are expected to" or words of similar

meaning as forward-looking statements, and the statement at issue states "[t]he Company *expects*

production to start in this year's fourth quarter." Thus, the statement was clearly identified as a forward-looking statement.

Nevertheless, the cautionary language was not sufficiently meaningful nor did it "identify[] important factors that could cause actual results to differ materially from those in the forward-looking statement[]." § 78u-5(c)(1)(A). As the Fifth Circuit explained in *Six Flags*, "boilerplate cautions, unattached to individual forward-looking statements" were insufficient to constitute meaningful cautionary language. *Six Flags*, 58 F.4th at 211. An example of such a generic disclaimer the court pointed to was "statements involve numerous risks, uncertainties and assumptions, and actual results could differ materially from anticipated results." *Id.* (quoting *Plotkin*, 407 F.3d at 694). Further, the court held that the disclaimer's failure to address the actual, specific risk at issue (in that case, that the parks might be significantly delayed or fail to ever open) meant the disclaimer was not sufficiently meaningful. *Id.* at 212.

Here, this Court faces a nearly-identical disclaimer. It is equally as generic as the one given as an example in *Six Flags*, and it also fails to address the specific risk at issue—that the Clarksville Facility might be significantly delayed or fail to ever open. Thus, here, as in *Six Flags*, the cautionary language accompanying Statement 9 was not meaningful enough.

As to Statements 11 and 13 (which were oral statements), the speaking Defendants did not: (1) identify them as forward-looking statements; (2) state that actual results might differ from those projected; or (3) direct the listener to another document containing additional information that might qualify the forward-looking statements. *See* § 78u-5(c)(2). Indeed, the transcripts for both the August 2023 Oppenheimer Technology, Internet & Communications Conference (in which Statement 11 was made) and the December 2023 Fireside Chat (in which Statement 13 was made) reveal no such identification, qualification, or disclaimers.

Consequently, Statements 9, 11, and 13 all fail the safe harbor's first element. Given, however, the safe harbor's elements are disjunctive, the Court considers the next elements.

Next is materiality. Defendants' challenge to materiality is limited to only those statements containing "vague references to 'racing' and 'being in the race' towards production" as being "immaterial corporate puffery." (Doc. No. 37 at 25). The Court agreed, as explained above. That, however, leaves the forward-looking statements the Court identified here—Statements 9, 11, and 13—unchallenged as to their materiality. Thus, the Court need not address them.

The final hurdle for Defendants is whether Plaintiffs pleaded that the statements were made with actual knowledge that they were false or misleading. 15 U.S.C. § 78u-5(c)(1)(B). The scienter requirement for forward-looking statements is higher than for current statements. *Six Flags*, 58 F.4th at 214. The former requires *actual* knowledge while the latter requires only severe recklessness. *Id.* Like for current statements, for forward-looking statements, Plaintiffs must plead sufficient facts to give rise to a strong inference of scienter.

The allegations regarding Statement 13 suffice to overcome even that higher bar. Plaintiffs allege that "by July/August, contractors had started walking off the job because Microvast was not paying their invoices." (Doc. No. 30 at 31). As a result, Plaintiffs allege, "little was done between August and November/December when Microvast's contractors departed *en masse* because" Microvast was not paying their bills. (*Id.*). Indeed, "the contractors and subcontractors *completely* demobilized in December 2023/January 2024." (*Id.* at 34) (emphasis added). According to FE 1, "even as of December 2023 . . . the Clarksville [F]acility was still 'just a shell'" because "it was not ready to install equipment . . . lacked a cleanroom, had no filters, had no tanks for storing chemicals, and had no venting for a 'high-temperature room' because the vents had been placed 'in the wrong position.'" (*Id.* at 34–35).

The pleaded facts strongly suggest Wu knew as much. When Statement 13 was made during the Fireside Chat, Wu was calling in *from* the Clarksville Facility. (*Id.* at 62); (Doc. No. 38-27 at 15) ("I'm in the Clarksville [Facility] right now."). In fact, he had allegedly been there for three days by the time he made that statement during the interview. (Doc. No. 30 at 65). Even worse, Wu made it clear his three-day visit has not been a mere formality; he admitted that he "came over here just two days ago to check around." (Doc. No. 38-27 at 15). He observed, "you know everything [is] normal. I'm happy." (*Id.*). This means that, when Wu made the statement, he was present on the facility premises, observed the lack of critical infrastructure, and, having "checked" the progress for days, was very likely aware that construction would not advance much further. Thus, there is a strong inference of actual knowledge on Wu's part for Statement 13.

The actual-knowledge scienter is not as clear for Statement 11. Wu was also the speaker of Statement 11. Under the lower scienter standard for current statements, the Court addressed above Defendants' challenge to the sufficiency of accounts of FEs in establishing Wu's scienter. Under the heightened standard for forward-looking statements, too, the Court holds that those FEs' accounts are sufficient to give rise to a strong inference of actual knowledge. According to FEs, Wu visited the Clarksville Facility on several occasions, during which he would "walk around" and meet with facility managers. (Doc. No. 30 at 62). Moreover, according to the Complaint, C-suite officers held weekly calls with Lyric, (*id.*), which not only would itself serve as a source of information but also indicate the import of the facility. While these factors do not conclusively prove that Wu had actual knowledge under the heightened standard, at least at this stage, the Court concludes that Plaintiffs have met this pleading burden, even if they do so barely.

As to Statement 9, however, the Complaint fails to plead adequate facts that give rise to a strong inference of actual knowledge. To start, it fails to identify the speaker. It simply states that *Microvast*—not any individual speaker—issued a press release containing the statement. (Doc.

No. 30 at 49–50). As detailed above, *supra* Part III.A.i., this Circuit's rule against group pleading disfavors such statements that are unattributed to particular officer or officers. *See In re BP p.l.c.*, 843 F. Supp. 2d at 788. The "only way around this dead-end for unattributed corporate statements" is when a statement is "so dramatic" as to lead to a strong inference of scienter. *See id.* at 789 (citing *Tellabs II*, 513 F.3d at 710). For example, the *Tellabs II* court wrote, if General Motors announced that it sold one million SUVs in 2006, but the actual number was zero, that would lead to a strong inference of corporate scienter. *Tellabs II*, 513 F.3d at 710.

Here, however, the representation was not so dramatic. The statement, released on June 30, 2023, *i.e.*, Q2, predicted that production would begin in Q4. That long-term prediction does not come close to the black-and-white, million-or-none statement in the *Tellabs* example.

Other pleaded facts also do not give rise to a strong inference of actual knowledge. Much of Plaintiffs' allegations as to the facility's progress before June 30 merely alleges that it was falling behind schedule. *See* (Doc. No. 30 at 31). That delayed schedule could perhaps be made up, and thus, standing alone, cannot lead to a strong inference of actual knowledge that production would not begin in Q4. Only in July/August did it become apparent that the construction would not progress at all, as contractors began walking off the project, (*id.*), and the statement pre-dates this walk-off. Thus, the Court cannot conclude, based on the pleaded facts, that Microvast or the unnamed speaker had actual knowledge in Q2 2023 that production would not begin in Q4. Plaintiff's claims based on Statement 9, therefore, are precluded by the PSLRA safe harbor.

In sum, regarding the Clarksville Statements, the Court **DENIES IN PART** Defendants' Motion to Dismiss but **GRANTS IN PART** as to section 10(b) claims based on Statement 9 and the parts of Statements 11 and 13 held above to be corporate puffery, which are **DISMISSED**.

B.    **Sections 20(a) of the Act**

Section 20(a) of the Act imposes control-person liability. *See* 15 U.S.C. § 78t(a). It creates liability for anyone "who, directly or indirectly, controls any person liable [for violations of the Act] shall also be liable jointly and severally with and to the same extent as such controlled person." *Id.* The "person" here includes both a natural person and a company like Microvast. *See id.* § 78c(a)(9).

Plaintiffs must establish a primary violation before Defendants can be found liable under § 20(a), and courts may only hold control persons liable jointly and severally with the primary violators for damages the primary violation caused. *Southland Secs. Corp. v. INSpire Ins. Sols., Inc.*, 365 F.3d 353, 383 (5th Cir. 2004).

Defendants' sole ground for seeking dismissal of the § 20(a) claims is that "Plaintiffs have failed to adequately plead a violation of Section 10(b)." (Doc. No. 37 at 36). As explained above, however, vast majority of Plaintiffs' § 10(b) and Rule 10b-5 claims survive this Motion to Dismiss. Thus, the Court **DENIES IN PART** Defendants' Motion to Dismiss Plaintiffs' § 20(a) claims and **GRANTS IN PART** as to Plaintiffs' § 20(a) claims based on Statement 9 and corporate puffery in parts of Statements 11 and 13.

**IV.    Conclusion**

For the foregoing reasons, the Court **GRANTS IN PART** and **DENIES IN PART** Defendants' Motion to Dismiss. (Doc. No. 37).

All of Plaintiffs' claims based on the DOE Statements remain. Plaintiffs' claims based on the Clarksville Statements remain except those based on the following statements:

- Statement 9: Microvast "expects production to start in this year's fourth quarter, creating hundreds of new jobs in Tennessee."

- Statement 11, in part: "The entire team is just racing to get there."

- Statement 13, in part: "[W]e're in the race to get Clarksville into production."

- Statement 13, in part: "If you look at both Huzhou and Clarksville, the sort of hard yards have been done."

Signed on this the 22nd day of August, 2025.

ANDREW S. HANEN
UNITED STATES DISTRICT JUDGE